# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

|  |  |
|---|---|
| KYLE PRITCHARD, Individually and On Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>     v.<br><br>APYX MEDICAL CORPORATION f/k/a/ BOVIE MEDICAL CORPORATION, and CHARLES D. GOODWIN,<br><br>                Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Kyle Pritchard ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Apyx Medical Corporation f/k/a/ Bovie Medical Corporation ("Apyx" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Apyx; and (c) review of other publicly available information concerning Apyx.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that acquired Apyx securities between August 1, 2018 and April 1, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Apyx is a medical technology company that purportedly develops J-Plasma, a plasma-based surgical product for cutting, coagulation and ablation of soft tissue. The Company markets and sells J-Plasma under the brand name Renuvion Cosmetic Technology. The Company claims that it has developed J-Plasma/Renuvion for use in dermal resurfacing procedures.

3.      On February 21, 2019, White Diamond Research released a report alleging, among other things, that a clinical study on the use of J-Plasma for dermal resurfacing may have missed its endpoints.

4.      On this news, the Company's share price fell $2.10, or nearly 25%, to close at $6.40 per share on February 21, 2019, on unusually heavy trading volume.

5.      On April 1, 2019, the Company revealed that it had withdrawn its application for regulatory clearance of J-Plasma for use in dermal resurfacing procedures, citing concerns raised by the U.S. Food and Drug Administration ("FDA").

6.      On this news, the Company's share price fell $2.49, or nearly 36%, to close at $4.46 per share on April 2, 2019, on unusually heavy trading volume.

7.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the clinical study on the use of J-Plasma for dermal resurfacing had not met its primary efficacy endpoint; (2) that, as a result, the clinical study did not support the Company's application for regulatory clearance; (3) that, as a result, the Company was unlikely to receive regulatory approval of J-Plasma for dermal resurfacing; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are located in this district.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13.    Plaintiff Kyle Pritchard, as set forth in the accompanying certification, incorporated by reference herein, purchased Apyx securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.    Defendant Apyx is incorporated under the laws of Delaware and its principal executive offices are located in Clearwater, Florida. Apyx's common stock trades on the NASDAQ exchange under the symbol "APYX." Apyx was formerly known as Bovie Medical Corporation, and its stock traded on the New York Stock Exchange ("NYSE") under the symbol "BVX" until January 1, 2019.

15.    Defendant Charles D. Goodwin ("Goodwin") was the Chief Executive Officer ("CEO") of the Company at all relevant times. Defendant Goodwin is also referred to hereinafter as the "Individual Defendant." Defendant Goodwin because of his position with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his position and access to material non-public information available to her, the Individual Defendant knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendant is liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

16.    Apyx is a medical technology company that purportedly develops J-Plasma, a plasma-based surgical product for cutting, coagulation and ablation of soft tissue. The Company markets and sells J-Plasma under the brand name Renuvion Cosmetic Technology. The

Company claims that it has developed J-Plasma/Renuvion for use in dermal resurfacing procedures.

17.     The clinical study for J-Plasma's use for dermal resurfacing enrolled its final patient in May 2018. The study was conducted at three investigational centers with 55 subjects.

### Materially False and Misleading
### Statements Issued During the Class Period

18.     The Class Period begins on August 1, 2018.  On that day, the Company announced its second quarter 2018 financial results and provided certain operational highlights. The press release stated, in relevant part:

> Mr. Goodwin continued: "We complemented our second quarter financial performance by achieving a number of important operational milestones related to our longer-term growth strategy to create a foundation of support for our Renuvion technology that will encourage its broader adoption in the cosmetic surgery market going forward. Specifically, we completed enrollment in our U.S. IDE clinical study evaluating the use of Renuvion Technology for dermal resurfacing procedures. This study represents an exciting first step in our efforts to establish strong clinical support demonstrating the positive outcomes that can be achieved by using Renuvion technology. ***Furthermore, the results from the dermal resurfacing U.S. IDE clinical study will support our 510(k) submission to the FDA for a new indication to market and sell Renuvion for dermal resurfacing procedures.***"

(Emphasis added.)

19.     On November 1, 2018, the Company announced its third quarter 2018 financial results, but did not provide any clinical results from the study relating to J-Plasma use for dermal resurfacing.

20.     On December 21, 2018, the Company announced that it had submitted an application for regulatory clearance for the use of J-Plasma for dermal resurfacing procedures. The Company stated, in relevant part:

> **Bovie Medical Corporation (NYSE:BVX)** (the "Company"), a maker of medical devices and supplies and the developer of J-Plasma®, a patented surgical product marketed and sold under the Renuvion® Cosmetic Technology brand in the cosmetic surgery market, today announced a Premarket Notification 510(K) submission to the U.S. Food and Drug Administration (FDA) for a new indication for J-Plasma/Renuvion for use in dermal resurfacing procedures.

"We are pleased to announce this 510(K) submission requesting clearance for a new clinical indication to market and sell our Renuvion Cosmetic Technology for dermal resurfacing procedures, which represents another important step towards our strategic objective to expand Renuvion's clinical indications for use in the cosmetic surgery market," said Charlie Goodwin, Chief Executive Officer. "***Our submission is supported by data from our multi-center, single arm, evaluator-blind prospective study evaluating the safety and efficacy of our Renuvion technology for the reduction of facial wrinkles and rhytides***, which was conducted at three investigational centers and consisted of 55 patients. ***We were very pleased with the clinical results of this study and we are optimistic in receiving regulatory clearance for this differentiated technology in 2019***."

21.    On January 7, 2019, the Company announced its preliminary financial results for fourth quarter 2018 and highlighted the submission of the 510(k) application as a milestone. The Company stated, in relevant part:

"Our fourth quarter revenue results exceeded the high-end of our guidance range and reflects the continued success we are having in commercializing our J-Plasma technology under the Renuvion brand in the cosmetic surgery market," said Charlie Goodwin, President and Chief Executive Officer. "Our strategic focus has resulted in Advanced Energy sales growth of more than 72% in 2018 and we are experiencing a growing awareness of our differentiated technology in the U.S. cosmetic surgery market as more and more clinicians appreciate Renuvion's unique ability to manage heat which allows for improved tissue effect and treatment time.

Mr. Goodwin continued: "The outlook for 2019 is very positive for Apyx Medical; we are investing in our selling infrastructure to maximize the opportunity to gain share in the U.S. cosmetic surgery market with our disruptive technology, and we achieved another milestone near the end of the fourth quarter with the announcement of a 510(k) submission requesting clearance for a new clinical indication to market and sell our Renuvion Cosmetic Technology for dermal resurfacing procedures. We have a strong balance sheet and a focused plan to encourage broad-based adoption of Renuvion, which we believe ultimately achieves strong, sustained and profitable growth for the benefit of our stockholders."

22.    The above statements identified in ¶¶18-21 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the clinical study on the use of J-Plasma for dermal resurfacing had not met its primary efficacy endpoint; (2) that, as a result, the clinical study did not support the Company's application for regulatory clearance; (3) that, as a result, the Company was unlikely to receive regulatory

approval of J-Plasma for dermal resurfacing; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

## The Truth Begins to Emerge

23.     On February 21, 2019, White Diamond Research released a report alleging, among other things, that "Apyx did not reveal the results of its clinical study on J-Plasma use for dermal resurfacing – a red flag that it may have missed its endpoints."

24.     On this news, the Company's share price fell $2.10, or nearly 25%, to close at $6.40 per share on February 21, 2019, on unusually heavy trading volume.

25.     On April 1, 2019, after the market closed, the Company revealed that it had withdrawn its application for regulatory clearance of J-Plasma for use in dermal resurfacing procedures, citing concerns raised by the FDA. It also revealed that the clinical study for J-Plasma had missed its primary efficacy endpoint. The Company stated, in relevant part:

> As previously disclosed, on December 19, 2018, the Company filed a premarket notification 510(k) for regulatory clearance for a new clinical indication to market and sell Renuvion Cosmetic Technology for dermal resurfacing procedures. The application was supported by data from a multi-center, single arm, evaluator-blind prospective investigational device exemption (IDE) study evaluating the safety and efficacy of J-Plasma/Renuvion technology for the reduction of facial wrinkles and rhytides, which was conducted at three investigational centers and consisted of 55 patients. The primary efficacy endpoint was the comparison of the proportion of subjects (i.e., the percentage of treatment responders) with a ≥ 1-score improvement on the Fitzpatrick Wrinkle and Elastosis Scale (FWS) at the 3-month follow-up visit, as compared to baseline, as determined by at least 2 out of 3 blinded Independent Photographic Reviewers (IPRs). The primary safety endpoint was the adverse event rate and duration for a period of 3 months following the procedure.

> ***The IDE study yielded no serious adverse events, however, the study did not meet the primary efficacy endpoint***, as only 62% of subjects were deemed to have experienced a ≥ 1-score improvement on the FWS at the 3-month follow-up visit, whereas the study protocol and statistical analysis plan included 75% success criteria.

> In the course of its review of the Company's submission, ***the Agency raised a number of questions and concerns related to superior clinical results from one investigational center as compared to the other two investigational centers in the study. The Agency also questioned the potential impact of protocol***

*deviations at this investigational center including the prophylactic use of methylprednisolone in all but five subjects treated.*

"*The IDE study results show good progress towards being able to <u>eventually demonstrate</u> the efficacy of our Renuvion Cosmetic Technology* as more than 90% of subjects in the study experienced an improvement in appearance as assessed by investigators, and the independent photographic reviewers were able to correctly identify post treatment photographs in more than 97% of subjects," said Shawn Roman, Vice President of R&D for Apyx Medical. "Unfortunately, we experienced a larger than expected range of clinical outcomes in the study due primarily to the inconsistent application of treatment time on tissue among investigators at the three centers."

"We have been involved in productive and positive interactions with the Agency and they have been very engaged throughout the process," said Charlie Goodwin, President and Chief Executive Officer of Apyx Medical. "They were understandably focused on the performance versus our stated primary endpoint, the variability in treatment outcomes across the three centers and the protocol deviations identified at one investigational center. . . ."

(Emphases added.)

26.    On this news, the Company's share price fell $2.49, or nearly 36%, to close at $4.46 per share on April 2, 2019, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

27.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Apyx securities between August 1, 2018 and April 1, 2019, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

28.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Apyx's common stock actively traded on the NASDAQ and on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Apyx common stock were traded publicly during the Class Period on the NASDAQ and on the NYSE.

Record owners and other members of the Class may be identified from records maintained by Apyx or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

29.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

30.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

31.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Apyx; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

32.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

33.    The market for Apyx's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures

to disclose, Apyx's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Apyx's securities relying upon the integrity of the market price of the Company's securities and market information relating to Apyx, and have been damaged thereby.

34.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Apyx's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Apyx's business, operations, and prospects as alleged herein.

35.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Apyx's financial well-being and prospects.   These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.   Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## **LOSS CAUSATION**

36.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

37.     During the Class Period, Plaintiff and the Class purchased Apyx's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information

alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

38.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendant, by virtue of his receipt of information reflecting the true facts regarding Apyx, his control over, and/or receipt and/or modification of Apyx's allegedly materially misleading misstatements and/or his associations with the Company which made them privy to confidential proprietary information concerning Apyx, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

39.    The market for Apyx's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Apyx's securities traded at artificially inflated prices during the Class Period.  On January 25, 2019, the Company's share price closed at a Class Period high of $8.75 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Apyx's securities and market information relating to Apyx, and have been damaged thereby.

40.    During the Class Period, the artificial inflation of Apyx's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Apyx's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Apyx and its

business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

41.     At all relevant times, the market for Apyx's securities was an efficient market for the following reasons, among others:

(a)     Apyx shares met the requirements for listing, and was listed and actively traded on the NASDAQ and on the NYSE, highly efficient and automated markets;

(b)     As a regulated issuer, Apyx filed periodic public reports with the SEC and/or the NASDAQ and/or the NYSE;

(c)     Apyx regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Apyx was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

42.     As a result of the foregoing, the market for Apyx's securities promptly digested current information regarding Apyx from all publicly available sources and reflected such information in Apyx's share price. Under these circumstances, all purchasers of Apyx's securities during the Class Period suffered similar injury through their purchase of Apyx's securities at artificially inflated prices and a presumption of reliance applies.

43.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose

material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

44.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Apyx who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

45.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

46.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and

other members of the Class to purchase Apyx's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

47.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Apyx's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

48.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Apyx's financial well-being and prospects, as specified herein.

49.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Apyx's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Apyx and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

50.     The Individual Defendant's primary liability and controlling person liability arises from the following facts: (i) the Individual Defendant was a high-level executive and/or director at the Company during the Class Period and member of the Company's management team or had control thereof; (ii) the Individual Defendant by virtue of his responsibilities and activities as a

senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) the Individual Defendant enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) the Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

51.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Apyx's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

52.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Apyx's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Apyx's securities during the Class Period at artificially high prices and were damaged

thereby.

53.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Apyx was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Apyx securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

54.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

55.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

<u>**SECOND CLAIM**</u>
**Violation of Section 20(a) of The Exchange Act**
<u>**Against the Individual Defendant**</u>

56.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

57.    The Individual Defendant acted as a controlling person of Apyx within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendant was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements

to be corrected.

58.    In particular, Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

59.    As set forth above, Apyx and Individual Defendant each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of his position as controlling person, Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: April17, 2019                     Respectfully submitted,

                                         */s/ Leo W. Desmond*
                                         Leo W. Desmond, Esquire
                                         Florida Bar Number 0041920
                                         **DESMOND LAW FIRM, P.C.**
                                         5070 Highway A1A, Suite D
                                         Vero Beach, Florida 32963
                                         Telephone: 772.231.9600
                                         Facsimile: 772.231.0300
                                         lwd@desmondlawfirm.com

                                         **GLANCY PRONGAY & MURRAY LLP**
                                         Lionel Z. Glancy
                                         Robert V. Prongay
                                         Lesley F. Portnoy
                                         Charles H. Linehan
                                         Pavithra Rajesh
                                         1925 Century Park East, Suite 2100
                                         Los Angeles, CA 90067
                                         Telephone:  (310) 201-9150
                                         Facsimile:  (310) 201-9160

                                         *Attorneys for Plaintiff Kyle Pritchard*