# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| KYLE PRITCHARD, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>   v.<br><br>APYX MEDICAL CORPORATION f/k/a/ BOVIE MEDICAL CORPORATION, and CHARLES D. GOODWIN,<br><br>       Defendants. | Case No.  8:19-cv-00919-SCB-AEP<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>**JURY TRIAL DEMANDED**</u> |

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ............................................................................1

II.     JURISDICTION AND VENUE .....................................................................3

III.    PARTIES .......................................................................................................4

        A.      Plaintiffs.............................................................................................4

        B.      Defendants .........................................................................................4

IV.     STATEMENT OF FACTS ..............................................................................5

        A.      Company Background ........................................................................5

        B.      Bovie's J-Plasma Product ..................................................................6

        C.      Bovie Pivots Away From Its Core Business and Tries To Increase Its Potential
                Marketplace For J-Plasma/Renuvion By Making A Play For The Lucrative Dermal
                Resurfacing Market Under Goodwin's Direction.....................................9

        D.      Defendants Misled The Public By Failing To Disclose That The IDE Study Failed
                And That One Of Its Investigative Centers Had Failed To Follow Protocol.........15

                1.      The Company Announces Its 510(k) Submission But Fails To Disclose That
                        Its IDE Study Had Not Met Its Efficacy Endpoint Or That An Investigative
                        Center Had Deviated From Protocol And Its Results Were Far Superior Than
                        The Other Two Centers That Had Followed Protocol ...............................15

                2.      An Analyst Calls Into Question The Results Of The IDE Study And
                        Defendants Still Fail To Disclose The Truth About The Study's
                        Results.....................................................................................................16

V.      MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE
        WITH SCIENTER DURING THE CLASS PERIOD......................................19

VI.     LOSS CAUSATION AND DEFENDANTS' STATEMENTS ISSUED AT THE END OF
        THE CLASS PERIOD .................................................................................23

VII.    ADDITIONAL SCIENTER ALLEGATIONS.................................................26

        A.      The Growth Of The J-Plasma/Renuvion Business Was The Focus Of The Company
                And Dermal Resurfacing Was An Extremely Large Growth Market....................26

B.      Goodwin Claimed That He And The Company Received And Were Focused On The Specific Data That Was Not Disclosed To The Public ........................................27

VIII.   CLASS ACTION ALLEGATIONS ................................................................................28

IX.     UNDISCLOSED ADVERSE FACTS..............................................................................30

X.      APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE...............................................................................31

XI.     NO SAFE HARBOR ......................................................................................................32

XII.    COUNTS.........................................................................................................................33

XIII.   PRAYER FOR RELIEF .................................................................................................36

XIV.    JURY TRIAL DEMANDED...........................................................................................37

1.     Lead Plaintiff Gregory P. Mouton and plaintiff Kyle Pritchard (together, "Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.   Plaintiffs' information and belief are based on, among other things, their counsel's investigation, which includes without limitation: (a) a review and analysis of regulatory filings made by Defendant Apyx Medical Corporation f/k/a/ Bovie Medical Corporation ("Apyx" or the "Company")[1] with the U.S. Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued by and disseminated by the Company; (c) a review of other publicly available information concerning the Company; and (d) a review of other sources of information deemed reliable.

## I.     NATURE OF THE ACTION

2.     This is a securities class action on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Apyx securities between December 21, 2018 and April 1, 2019, inclusive (the "Class Period"), seeking to recover damages caused by Defendants'[2] violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

3.     Apyx is a medical technology company that historically had three operating segments: (i) the Core segment, which manufactured medical products under the Bovie brand name; (ii) the Original Equipment Manufacturer segment, which produced electrosurgical equipment for large medical device manufacturers; and (iii) the Advanced Energy segment, which manufactured and sold products employing J-Plasma, a patented helium-based plasma surgical product.  J-Plasma has been approved by the U.S. Food and Drug Administration ("FDA") for the use of skin tightening, but some medical professionals have used it off-label for dermal resurfacing.

---

[1] Unless otherwise stated, "Apyx" or the "Company" is also used to refer to Apyx's predecessor entities: Bovie Medical Corporation ("Bovie") and NewCo.

[2] "Defendants" refers to Apyx and Charles D. Goodwin ("Goodwin").

4.      In late 2017, the Company pivoted its business to focus on commercializing J-Plasma for the cosmetic surgery market.  To do so, Apyx appointed Goodwin as Chief Executive Officer, who intended to "drive broad-based adoption of [its] J-Plasma technology in the Cosmetic Surgery market," and appointed Dr. Topaz J. Kirley to the newly-created position as Director of Regulatory Affairs, who would "focus on obtaining new clinical indications for [its] J-Plasma technology in the cosmetic surgery market."  Moreover, the Company sold its Core business segment, along with the lucrative Bovie brand name, to "focus the organization on [its] strategic objective of commercializing [its] J-Plasma/Renuvion technology in the cosmetic surgery market."

5.      To reach the cosmetic surgery market, the Company intended to market J-Plasma for dermal resurfacing, which represented an annual market opportunity of approximately $85 million from an estimated 200,000 procedures.  Before seeking regulatory clearance, Apyx completed a clinical study, identified as Clinicaltrials.gov Identifier NCT 03286283, to demonstrate the safety and efficacy of J-Plasma for reduction in the appearance of wrinkles and rhytides.  The primary efficacy endpoint of the study evaluated the score improvement on the Fitzpatrick Wrinkle and Elastosis Scale ("FWS"), a clinically validated tool for wrinkle severity assessment.  The primary safety endpoint evaluated the rate and duration of adverse events.  The study was a failure because it failed to satisfy the primary efficacy endpoint.

6.      Even though Goodwin and his team were provided with the results, the Company failed to release them to the public.  Instead, Defendants misled the public about the success of the study by omitting the material facts that the study did not satisfy its efficacy endpoint, and that one of the three investigational centers in the study failed to comply with protocol and had substantially superior results than the other centers in the study.

7.      The Class Period begins on December 21, 2018 when the Company announced that it had submitted a 510(k) application for regulatory clearance with the FDA for the use of J-Plasma for dermal resurfacing based on the results of the clinical study.

8.     On February 21, 2019, a research analyst published a report suspecting that the Company did not release the results from the clinical study because it failed to meet its primary endpoints.

9.     On this news, the Company's share price fell $2.10, or nearly 25%, to close at $6.40 per share on February 21, 2019, on unusually heavy trading volume.

10.    On March 13, 2019, Goodwin attempted to dispel investors' concerns by casting aspersions on the analyst report's claim that the study likely failed to meet its endpoint and stating that "the study was launched with the primary goal of demonstrating safety and efficacy to support our FDA 510(k) submission and that following the receipt of this regulatory clearance, we would pursue options for showcasing the results."  Yet, the study results still were not released and Goodwin failed to disclose that the analyst report was right in that the study failed to meet its primary efficacy endpoint.

11.    On April 1, 2019, the Company announced that it had withdrawn its application for regulatory clearance.  In the press release, the Company finally disclosed that the study had failed to meet its primary efficacy endpoint.  Moreover, it revealed that one of three investigational centers used in the study deviated from protocol by prescribing a steroid to its patients, which could have been the reason this center had far superior results than the other two centers.

12.    On this news, the Company's stock price fell $2.49, or nearly 36%, to close at $4.46 per share on April 2, 2019, on unusually heavy trading volume.

13.    Defendants acted with scienter and must be held accountable for their wrongful acts and omissions which, as the true facts came to light, were the cause of a significant decline in the market value of the Company's securities.  Plaintiffs and other Class members have suffered significant losses and damages at the hands of Defendants and are entitled to redress.

## II.    JURISDICTION AND VENUE

14.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Additionally, the Company's principal executive offices are located in this Judicial District.

17.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   **PARTIES**

### A.     **Plaintiffs**

18.     Lead Plaintiff Gregory P. Mouton, as set forth in the certification previously filed with the Court, purchased Apyx securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19.     Plaintiff Kyle Pritchard, as set forth in the certification previously filed with the Court, purchased Apyx securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B.     **Defendants**

20.     Defendant Apyx is incorporated under the laws of Delaware and its principal executive offices are located in Clearwater, Florida.  Apyx's common stock trades on the Nasdaq exchange under the symbol "APYX."  Apyx was formerly known as Bovie Medical Corporation,

and its stock traded on the New York Stock Exchange ("NYSE") under the symbol "BVX" until January 1, 2019.

21.    Defendant Goodwin was the Chief Executive Officer ("CEO") and a director of the Company at all relevant times.  According to the Company, Goodwin was the Chief Executive Officer of MIS Implants Technologies, Inc., a privately held company specializing in dental implants, prior to joining Apyx in December 2017.  Prior to this position, Goodwin spent more than 11 years with Olympus/Gyrus ACMI.  Goodwin holds a B.A. Finance and Economics from Eastern Washington University.

22.    Defendant Goodwin is also referred to hereinafter as the "Individual Defendant." Goodwin, because of his position with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his position and access to material non-public information available to him, the Individual Defendant knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendant is liable for the false statements pleaded herein.

## IV.    <u>STATEMENT OF FACTS</u>

### A.    **Company Background**

23.    Bovie Medical Corporation was incorporated in 1982 and was headquartered in Purchase, New York until 2017.

24.    According to Bovie's 2017 annual report dated March 13, 2018, Bovie was an energy-based medical device company specializing in developing, manufacturing and marketing a range of electrosurgical products and technologies, as well as related medical products used in doctors' offices, surgery centers and hospitals worldwide, under the Bovie brands (Bovie®, IDS™

and DERM™) and on a private label basis to distributors throughout the world.  Bovie further described itself as a producer of equipment for large, well-known medical device manufacturers through original equipment manufacturing ("OEM") agreements, as well as for start-up companies with the need for energy-based designs.  Bovie also represented that it was the developer of J-Plasma: "a patented helium-based plasma surgical product which [Bovie] believe[s] has the potential to be a transformational product for surgeons."

25.    Bovie managed its business through three operating segments: Core, OEM, and Advanced Energy.  For Bovie's 2017 fiscal year, the Core segment contributed 73.7%, the OEM segment contributed 6.7% and the Advanced Energy segment contributed 19.6% of Bovie's total consolidated revenue.

26.    According to Bovie, its Core segment manufactured and marketed various medical products, both under private label and the Bovie brands (Bovie, IDS and DERM), to distributors worldwide, which distribute to more than 6,000 hospitals and to doctors and other healthcare facilities.  Core products consisted of electrosurgery generators and accessories, battery-operated cauteries, lighting, nerve locators, eye-bubbles, penlights, and a variety of other products.

27.    Bovie's OEM segment designed, developed and manufactured electrosurgical equipment for large, well-known medical device manufacturers through OEM agreements, as well as for start-up companies with the need for our energy-based designs.  These OEM and private label arrangements and its use of the Bovie brands enable it to gain greater market share for the distribution of its product.

**B.     Bovie's J-Plasma Product**

28.    Bovie's Advanced Energy segment consists primarily of J-Plasma, which is a patented helium-based plasma surgical product that is marketed and sold under the Renuvion® Cosmetic Technology brand in the cosmetic surgery market.[3]  Bovie's J-Plasma product

---

[3] On March 29, 2018, Bovie announced that J-Plasma technology will now be marketed and sold in the cosmetic surgery market under the brand name, Renuvion.

initially received FDA clearance through a 510(k) submission[4] in 2012 and regulatory clearance to sell the product in the European Union in December 2014. Bovie describes the J-Plasma[5] as follows:

> The J-Plasma system consists of an electrosurgical generator unit (ESU), a handpiece and a supply of helium gas. Radiofrequency (RF) energy is delivered to the handpiece by the ESU and used to energize an electrode. When helium gas passes over the energized electrode, helium plasma is generated which allows for conduction of the RF energy from the electrode to the patient in the form of a precise helium plasma beam. The energy delivered to the patient via the helium plasma beam is very precise and cooler in temperature in comparison to other surgical energy modalities such as standard RF monopolar energy.

29.     The FDA had approved J-Plasma (now Renuvion) for an initial intended use: "The Bovie J-Plasma Handpiece is used for the delivery of helium gas plasma for cutting, coagulation, and ablation of soft tissue during open and laparoscopic surgical procedures.  The Bovie J-Plasma Handpiece is compatible only with Bovie J-Plasma generators."

30.     In layman's terms, J-Plasma was approved as a device for skin tightening that is used in a procedure that tightens loose skin without the need for invasive surgery, extended downtime, or large surgical scars.  It works by a specialist creating a small entry point through which the device is put under the skin.  Once the device is in place, the specialist releases helium gas and radiofrequency to create a precise stream of energy (*i.e.*, plasma).

31.     According to Bovie, there are approximately 400,000 liposuction procedures performed in the U.S. per year in which J-Plasma could be used as a subdermal coagulator.[6] Moreover, according to Bovie, there are 165,000 to 200,000 procedures in the U.S. for fully ablative resurfacing (or dermal resurfacing), which represents a substantial marketplace for Bovie.

---

[4] A 510(k) is a premarket submission made to the FDA to demonstrate that the device to be marketed is at least as safe and effective, i.e., substantially equivalent, to a legally marketed device (21 C.F.R. § 807.92(a)(3)) that is not subject to premarket approval.

[5] Prior to the Class Period, Bovie had launched numerous new J-Plasma products in an effort to target new surgical procedures, users, and markets.

[6] As the former CEO of Bovie explained in November 2017, "our product is not used as a substitution, if you will, for liposuction. It's actually used in liposuction cases where another product is used for the lipo portion and our product is being used as a subdermal coagulator, and that is on label."

32.     While J-Plasma was only approved as a subdermal coagulator, some medical professionals were using the product off-label[7] for dermal resurfacing.  To improve its marketing of J-Plasma, in September 2017, Bovie submitted a proposed IDE study[8] to the FDA in the hope of achieving an indication for the use of J-Plasma for dermal resurfacing.  As Bovie explained the study design:

Brief Summary:

This study evaluates the safety and effectiveness of J-Plasma in the reduction of facial wrinkles and rhytides. It is a multi-center, single arm, evaluator-blind prospective study of 55 study subjects who are seeking a procedure to reduce the appearance of wrinkles and rhytides and will be conducted at up to 5 investigational centers in the United States. Each study subject will receive one procedure with J-Plasma at enrollment. Follow-up will occur immediately following the procedure, at 10 days, 1, 3, and 6 months after enrollment.

\*\*\*

Detailed Description:

The study objective is to demonstrate the safety and efficacy of the J-Plasma system for use in dermal skin resurfacing.

This is a multi-center, single arm, evaluator-blind prospective study of 55 study subjects who are seeking a procedure to reduce the appearance of wrinkles and rhytides at up to 5 investigational centers in the United States.

Study subjects that meet study eligibility criteria and have provided informed consent will be enrolled in the study. During the procedure, the investigators will use J-Plasma on applicable facial zones to reduce wrinkles and rhytides.

Study subjects will be followed immediately following the procedure, at 10 days, 1, 3, and 6 months post-procedure for study assessments.

Study enrollment is expected to occur over 3-6 months. Imaging and study assessments will continue through 6 months post-procedure. Total study duration is expected to be approximately 9-12 months.

---

[7] An "off-label" treatment means that, while approved by the FDA for a particular indication, the treatment is being used for another indication.  Once a medication/device is FDA-approved for one indication, physicians may use it off-label if they believe it is an appropriate use.

[8] An investigational device exemption ("IDE") allows the investigational device to be used in a clinical study in order to collect safety and effectiveness data that is required to be submitted to the FDA as part of a premarket approval application or premarket notification submission.

Primary study endpoints will be assessed at 3 months following the procedure.[9]

**C.     Bovie Pivots Away From Its Core Business and Tries To Increase Its Potential Marketplace For J-Plasma/Renuvion By Making A Play For The Lucrative Dermal Resurfacing Market Under Goodwin's Direction**

33.     On December 18, 2017, Bovie announced that Charles D. Goodwin had been named Chief Executive Officer.  In the press release announcing his appointment, he made it clear that his focus for the Company was the commercialization of J-Plasma:

> "I am excited to lead Bovie Medical as the Company commercializes its transformational J-Plasma technology and continues to grow sales," said Charlie Goodwin, Chief Executive Officer of Bovie Medical. "J-Plasma represents an exciting step forward from the surgical energy technologies that have been traditionally applied in these markets, with its potential in several surgical specialties to improve surgical precision and enhance procedure safety by minimizing collateral tissue damage. I am looking forward to working together with our employees and the Board to continue to drive the commercial adoption of this unique, cutting edge energy technology, for the benefit of our customers and shareholders."

34.     Just months later, on March 6, 2018, Bovie announced the hiring of Dr. Topaz J. Kirlew as Director of Regulatory Affairs.  In the press release announcing her hiring, Goodwin explained: "We are excited to add her to our team, and expect to benefit from her strategic guidance and expertise as we focus on obtaining new clinical indications for our J-Plasma technology in the cosmetic surgery market."[10]

35.     On March 12, 2018, Bovie held its 2017 fiscal fourth quarter earnings call.  This was Bovie's first earnings call with Goodwin as CEO.  Goodwin explained that going forward Bovie would be focused on marketing J-Plasma, stating:

---

[9] The primary efficacy endpoint was the comparison of the proportion of subjects (i.e., the percentage of treatment responders) with a $\geq$ 1-score improvement on the Fitzpatrick Wrinkle and Elastosis Scale ("FWS") at the 3-month follow-up visit, as compared to baseline, as determined by at least 2 out of 3 blinded Independent Photographic Reviewers ("IPRs"). The primary safety endpoint was the adverse event rate and duration for a period of 3 months following the procedure.

[10] Additionally, Bovie announced the addition of Scott Sanders and Dr. Diane Duncan to Bovie on March 27 and May 1, respectively.  Mr. Sanders, who according to Bovie has 37 years of clinical and sales and marketing experience in the healthcare industry, was appointed as Director of Clinical Education and Market Development.  Dr. Duncan, a Board-certified plastic surgeon with over 30 years of experience in private practice, was appointed to Bovie's Medical Advisory Board.

Since joining the Bovie Medical team, I have focused in part on building relationships with our employees and physician customers to evaluate all of the primary aspects of our strategy and determine how best to position the Company for growth going forward.

The primary takeaway from these discussions has been understanding and appreciating the extent to which our physician customers are very passionate about the benefits of J-Plasma technology. I've been aware of J-Plasma since my early days at Olympus and my decision to join Bovie Medical was driven largely by my personal conviction that this Company possesses a truly unique technology with the potential to transform energy-based surgery. J-Plasma is differentiated from the landscape of energy-based surgical devices by its ability to more effectively control heat and maximize precision, while limiting the potential for damage to tissue surrounding the treatment area.

My excitement about these primary benefits was confirmed when I begin to have in-depth conversations with our customers in the Cosmetic Surgery market. Just as a side-note what we define as the Cosmetic Surgery market consist primarily of plastic surgeons, cosmetic surgeons and dermatologists who perform a variety of elective procedures, which are paid for out of pocket.

The physician customers that I have interacted with in this market, have been able to achieve very positive outcomes when using J-Plasma as a subdermal coagulator following liposuction. The passion of our physician customers as a result of their experience with J-Plasma has also evidenced itself in frequent peer-to-peer selling between our physician customers and their colleagues, which serves as a very nice tailwind to our commercialization efforts.

These experiences in addition to the strong commercial traction that we achieved in 2017 have reinforced my conviction that the Cosmetic Surgery market represents the most attractive opportunity for our J-Plasma technology.

36.     During this earnings call, Goodwin further explained that Bovie would pivot to be in the "best position [] to drive broad-based adoption of [its] J-Plasma technology in the Cosmetic Surgery market in the coming years."  To achieve this goal, Goodwin laid out a four-point plan:

As I think about our longer-term strategy in the Cosmetic Surgery market, I believe more work needs to be done beyond the early adopter phase that we are currently in and position our organization to drive sustainable both long-term growth. ***Bovie Medical historically speaking, has enjoyed a long and impressive history as a developer and manufacturer of a diverse array of electrosurgery devices. More recently in its history, the Company has created an impressive and differentiated energy-based technology, J-Plasma, but identifying the appropriate target market to commercialize this technology has been a multi-year process***.

***2017 marked the clear point in the Company's history, and that we successfully identified the ideal target market for J-Plasma, the Cosmetic Surgery market.*** We experienced strong validation of this decision in the form of improving trends in awareness, adoption, utilization and revenue as we move through the year. We are encouraged by the recent performance in commercializing our J-Plasma technology in the Cosmetic Surgery market but we recognized that we are very early in the penetration of this large and growing market opportunity.

*At this point in our growth cycle, I believe it is incredibly important to remain highly focused on executing our near-term strategic growth plans, while also taking the requisite steps to ensure our ability to succeed over a multi-year period. To that end, we will be developing our organizational expertise in the Cosmetic Surgery market as part of an effort to establish an infrastructure that will best position Bovie Medical to drive broad-based adoption of our J-Plasma technology in the Cosmetic Surgery market in the coming years.*

With this goal in mind in 2018, we are focused on laying the groundwork to drive adoption in this Cosmetic Surgery market by; expanding our clinical support of J-Plasma; enhancing physician and practice support for our customers; formulizing our regulatory strategy; and improving our manufacturing capabilities and in efficiencies. Let me discuss each one of these items in more detail.

First, we will establish clinical support, demonstrating the safety and efficacy of our J-Plasma technology when applied to our target procedures in the Cosmetic Surgery market. *To this end, in late January, we announced the enrollment of our first patient in our IDE clinical study for J-Plasma for using dermal skin resurfacing. I'm very pleased to report that our three clinical sites for the study are now enrolling patients and we expect to complete enrollment in the first half of 2018.*

Second, we will demonstrate our commitment to the Cosmetic Surgery market by launching a new channel-specific brand for our J-Plasma technology that will resonate with our physicians and their customers. Within the Cosmetic Surgery market, our technology will be known under the brand name, Renuvion. Our current and potential customers will be able to leverage the increasing awareness of this brand and integrate it into their practice-based marketing efforts and advertising efforts.

Third, we will formalize our regulatory strategy to obtain specific clinical indications for our target procedures. To assist and formulating our regulatory strategy, we recently appointed a new Director of Regulatory Affairs, Dr. Topaz Kirlew. Under the direction of Dr. Kirlew, we will expand our strategy beyond its initial focus on specific indication for dermal resurfacing procedures and pursue indications for additional procedures to support our longer-term goal of penetrating the Cosmetic Surgery market.

And lastly, we will improve our manufacturing capacity and efficiencies to accommodate the strong demand that we anticipate as we penetrate this market and see broad-based adoption of J-Plasma technology. By focusing on these primary elements of our J-Plasma strategy in 2018, I am very confident that we can deliver on the stated near-term growth objectives, while establishing the foundation to support broad-based adoption and deliver strong sustainable profitable growth over the longer-term.

(Emphases added).

37.     On March 29, 2018, Bovie announced the rebranding of its J-Plasma product, stating:

Bovie Medical's J-Plasma technology will now be marketed and sold in the cosmetic surgery market under the brand name, Renuvion. The Renuvion brand will be marketed as a cosmetic technology and will feature its own distinct logo, website and promotional materials. The Company has also adopted two taglines related to the Renuvion brand: Reshaping What's Possible™ and What will you renu?™

11

38.     On May 14, 2018, Bovie announced that it had completed the enrollment for its IDE study of its J-Plasma/Renuvion technology for use in dermal resurfacing.  As Goodwin further elaborated on Bovie's 2018 fiscal first quarter earnings call that same day:

> Obviously, it was key for us to get the IDE Study finished. And we were very fortunate today to get to announce that we got our last of our 55 patients. And obviously with bringing Dr. Kirlew in here and also with Dr. Diane Duncan and Scott Sanders, that we will be working on other things within the cosmetic surgery space, but we have not given or announced any guidance for that. ***It remains a key strategic focus area for us. And it has [the] focus of everybody in the building.***

(Emphasis added).

39.     Additionally, on that same call, Goodwin further explained in response to a question regarding his "best guess as to when a 510(k) clearance should come," that:

> Well, I can't necessarily speak to you about a 510(k) clearance because I'm not the FDA. But what I can help you with is that our focus now shifts to being preparing for that submission, and really what the timeline for that is.  Our last patient was enrolled in the study today. There is a 90-day follow-up for that and then we will need at least a couple months to analyze the data and prepare that submission. And so we are estimating to have that to be able to submit to the FDA in November of this year, in November of 2018.

40.     During this same call, Goodwin reiterated that Bovie's long-term growth strategy was tied to commercial expansion of J-Plasma/Renuvion.  As he explained:

> I'll now turn to review of our longer term growth strategy that we are pursuing. As a reminder, despite the traction we have seen in the US, since we began our focus of our Advanced Energy commercial efforts on the cosmetic surgery market, we continue to believe that we will remain in the early stages of the adoption curve for our Renuvion technology. We expect our growth this year will continue to stem from our ability to raise awareness of the benefits for our Renuvion technology among the market's earlier adopters, those physicians who fully appreciate the potential of this technology and are willing to pursue Renuvion in advance of substantial clinical validation.
>
> With this in mind in addition to leveraging our internal resources to drive growth in 2018, we are also focused on creating a foundation of support for our Renuvion technology to move beyond this early adopter phrase and encourage its broader adoption in the cosmetic surgery market over a multi-year period. ***Specifically, our organization is focused on the following four initiatives in 2018, as it relates to this longer term strategy. Number one, securing new clinical evidence that demonstrates the safety and efficacy of our Renuvion technology when applied to our target procedures in the cosmetic surgery market. Number two, formulizing our regulatory strategy to pursue specific clinical indications enabling us to fully market and sell Renuvion for our target procedures.*** Number three, enhancing our physician and practice support for our cosmetic surgery customers. And lastly, improving our manufacturing capabilities inefficiencies. We believe that by pursuing

these four initiatives, we will position Bovie Medical for sustainable long-term growth in the cosmetic surgery market.

***Importantly, we have already begun to make some exciting initial progress in 2018 with respect to these initiatives which I will now discuss in detail. Beginning with our first initiative, expanding clinical support for our Renuvion Cosmetic Technology, we are focused on pursing our IDE clinical study evaluating use of Renuvion and dermal resurfacing procedures, which represents a new target procedure for Bovie Medical and cosmetic surgery. Recall, this is a multi-center, single arm, evaluator-blind prospective study designed to evaluate the safety and efficacy of Renuvion for the reduction of facial wrinkles and rhytides.***

On January 23, we announced that our first study subject had been enrolled by Dr. J David Holcomb, of the Institute for Integrated Aesthetics in Sarasota, Florida. Over the remaining months of the first quarter we made steady progress in enrolling subjects to the study's three clinical sites with the expectation of enrolling all 55 patients required for the study in the first half of 2018. We are please announce in a separate press release this afternoon that we enrolled the last patient in our dermal resurfacing study. The study represents an exciting first step in our efforts to establish strong clinical support demonstrating the positive outcome that can be achieved by using Renuvion technology.

(Emphasis added).

41.     On July 9, 2018, Bovie announced that it had entered into an agreement to sell its Core business segment and the Bovie brand, including the Company's name, for gross proceeds of $97 million in cash.  The purpose of this transaction, as explained by Goodwin, was to allow the Company "to further focus the organization on [its] strategic objective of commercializing [its] J-Plasma/Renuvion technology in the cosmetic surgery market."  Moreover, as Goodwin explained in a conference call with analysts that day, "[t]his transaction gives [the Company] the financial flexibility to invest more aggressively in the fastest-growing, largest market opportunity for our J-Plasma/Renuvion technology."

42.     On August 30, 2018, Bovie announced the completion of its Core business sale. Thereafter, on September 5, 2018, the Company (which was referring to itself as NewCo at this time due to the sale of its name) held a conference call to discuss the sale and its 2018 fiscal second quarter financial results.  Therein, Goodwin again explained that the Company's focus was on the IDE study, that he and others were developing a regulatory strategy, and that the Company was creating an infrastructure around the approval of the IDE study:

Beginning with our first initiative, expanding clinical support for our Renuvion cosmetic customers, we are focused on pursuing our IDE clinical study evaluating

the use of Renuvion and dermal resurfacing procedures, which represents a new target procedure for NewCo in the cosmetic surgery market.

Recall, this is a multi-center, single-arm, evaluator-blind prospective study designed to evaluate the safety and efficacy of Renuvion for the reduction of facial wrinkles and rhytides. We completed enrollment of the 55th patient in mid-May and we are working through the period of patient follow-up and data evaluation. The clinical data from our dermal resurfacing IDE study will be the basis of clinical evidence used to support our FDA 510(k) submission.

Moving forward to our second strategic initiative, formulizing our regulatory strategy to pursue specific channel indications enabling us to fully market and sell Renuvion for our target procedures. As discussed on our first quarter earnings call, we made an important addition to our leadership team in March with the addition of Dr. Topaz Kirlew as Regulatory Director, a newly created position for the company. Under her direction, we are focused on developing an effective regulatory strategy to secure specific channel indications for our target procedures in the cosmetic surgery market.

Our efforts to pursue a specific clinical indication for dermal resurfacing is the first step in this regulatory strategy, but I am very encouraged by the progress Dr. Kirlew and team have already made in developing a multiyear regulatory strategy. We are not in a position to share additional details on the longer-term plan at this time, but certainly plan to do so at the appropriate time in the future.

***

Importantly, all of our efforts with this launch represent a foundation of brand awareness and clinical practice support that we expect will allow us to introduce new procedures to the cosmetic surgery market more effectively in the coming years. For example, following the expected 510(k) clearance for Renuvion in the dermal resurfacing procedures next year, we are incredibly well positioned with a platform of channel-specific branding, website, patient marketing materials, clinical practice programs and support, all of which improves our ability to scale a new product more effectively.

43.   On November 1, 2018, the Company announced its 2018 fiscal third quarter financial results and held a conference call with analysts to discuss these results.  On that call, Goodwin explained that the Company was focused on analyzing the results of the IDE study.  As he explained:

***…we have been primarily focused on securing new clinical evidence for our Renuvion Cosmetic Technology by pursuing an IDE clinical study evaluating the use of Renuvion for dermal resurfacing procedures. Dermal resurfacing represents a new target procedure for Renuvion in the cosmetic surgery market.*** An estimated 200,000 dermal resurfacing procedures are performed in the US market each year, representing an annual incremental market opportunity of approximately $85 million from the sales of handpieces alone.

We announced the enrollment of our first patient in January of this year and completed the enrollment of our 55th and final patient in mid-May. ***Following the completion of this enrollment, our team has been focused on the patient follow up and data evaluation portion of the study. This IDE clinical study for dermal***

14

*resurfacing is also an important component of our second strategic initiative formalizing our regulatory strategy to pursue specific clinical indications.*

The first step in our regulatory strategy is to pursue a specific clinical indications for the use of Renuvion in dermal resurfacing procedures, and we intend to use this data obtained from the IDE clinical study to support our 510(k) submission. We expect to submit for 510(k) clearance before year-end.

(Emphasis added).

44.     Additionally, Goodwin admitted that he and his team would be provided with the results of the study prior to their submission to the FDA.  As he admitted:

Unidentified Participant

Great, thanks. So, can you speak a bit more about the expanded J-Plasma indication for dermal skin resurfacing? So what sort of steps remaining before you submit the 510(k) application? I think the ID enrolled 55 patients with 3 or 6 month follow-up, I can't remember, but can you talk about kind of what's left, how many patients, you're still trying to follow and data analysis associated with that.

Charles [D.] Goodwin, CEO

Yes. *So we in the data analysis portion of this and this is the part that is kind of out of our hands, our CRO [Contract Research Organization] does this work and so they are evaluating the data and when they are done, they will submit to us the report. We'll use that data or our submission for our 510(k), but this is the portion that is a little bit outside of our control.*

(Emphasis added).

**D.  Defendants Misled The Public By Failing To Disclose That The IDE Study Failed And That One Of Its Investigative Centers Had Failed To Follow Protocol**

1.  The Company Announces Its 510(k) Submission But Fails To Disclose That Its IDE Study Had Not Met Its Efficacy Endpoint Or That An Investigative Center Had Deviated From Protocol And Its Results Were Far Superior Than The Other Two Centers That Had Followed Protocol

45.     On December 21, 2018, the Company announced that it had submitted a 510(k) application for regulatory clearance with the FDA for the use of J-Plasma for dermal resurfacing procedures based on the results of the IDE study.  Along with this announcement, Goodwin touted the success of the study and stated that he was optimistic about receiving regulatory clearance: "We were very pleased with the clinical results of this study and we are optimistic in receiving regulatory clearance for this differentiated technology in 2019."

46.     Nowhere in this announcement did the Company or Goodwin disclose that the IDE study had *failed to meet its primary efficacy endpoint by well more than 10%*.  Moreover, nowhere did the Company or Goodwin disclose that one of the three investigative centers had fundamentally failed to follow the protocol, including providing a steroid to most of its patients, and that this deviating center had far superior results than the other centers that actually followed the protocol.

> 2.     An Analyst Calls Into Question The Results Of The IDE Study And Defendants Still Fail To Disclose The Truth About The Study's Results

47.     On February 21, 2019, White Diamond Research published an analyst report that, in part, called into question whether the IDE study had reached its endpoints.  In relevant part, the report stated:

> Apyx did not reveal the results of its clinical study on J-Plasma use for dermal resurfacing - a red flag that it may have missed its endpoints.
>
> ***
>
> We believe investors do not have the full picture regarding the safety and application of J-Plasma, given that management didn't reveal the outcomes of their completed IDE clinical study which was recently submitted to the FDA for the approval of use for dermal resurfacing. We believe there's a good chance it failed to reach its primary endpoint and could result in an FDA rejection.

48.     On this news, the Company's share price fell $2.10, or nearly 25%, to close at $6.40 per share on February 21, 2019, on unusually heavy trading volume.

49.     On March 13, 2019, the Company held its 2018 fiscal fourth quarter earnings call. On the call, Goodwin criticized the February 21 White Diamond Research report, claiming that "it was full of factual inaccuracies."  However, in spite of giving a long defense of its accusations against him personally, Goodwin failed to respond to the report's allegations that the IDE study had failed its endpoints.  Instead, he gave the impression that the study had met its endpoints by claiming that "the study was launched with the primary goal of demonstrating safety and efficacy to support our FDA 510(k) submission and that following the receipt of this regulatory clearance, we would pursue options for showcasing the results."

50.     Again, nowhere during this earnings call, which occurred after the issuance of the report that called into question the IDE study's results and the subsequent decimation of the

Company's stock price, did Goodwin (or the Company or any of its representatives) disclose that the IDE study had **failed to meet its primary efficacy endpoint** or that one of the three investigative centers had fundamentally failed to follow the protocol, including providing a steroid to most of its patients, and that this deviating center had far superior results than the other centers that actually followed the protocol.

### 3.   Defendants Are Forced To Disclose The Truth

51.   On April 1, 2019, in an announcement that it had withdrawn its 510(k) application, the Company finally revealed that the clinical study for J-Plasma had missed its primary efficacy endpoint and that one of the three investigative centers had not followed protocol and had far superior results than the other centers.  The Company stated, in relevant part:

> As previously disclosed, on December 19, 2018, the Company filed a premarket notification 510(k) for regulatory clearance for a new clinical indication to market and sell Renuvion Cosmetic Technology for dermal resurfacing procedures. The application was supported by data from a multi-center, single arm, evaluator-blind prospective investigational device exemption (IDE) study evaluating the safety and efficacy of J-Plasma/Renuvion technology for the reduction of facial wrinkles and rhytides, which was conducted at three investigational centers and consisted of 55 patients. The primary efficacy endpoint was the comparison of the proportion of subjects (i.e., the percentage of treatment responders) with a $\geq$ 1-score improvement on the Fitzpatrick Wrinkle and Elastosis Scale (FWS) at the 3-month follow-up visit, as compared to baseline, as determined by at least 2 out of 3 blinded Independent Photographic Reviewers (IPRs). The primary safety endpoint was the adverse event rate and duration for a period of 3 months following the procedure.

> **The IDE study yielded no serious adverse events, however, the study did not meet the primary efficacy endpoint**, as only 62% of subjects were deemed to have experienced a $\geq$ 1-score improvement on the FWS at the 3-month follow-up visit, whereas the study protocol and statistical analysis plan included 75% success criteria.

> In the course of its review of the Company's submission, **the Agency raised a number of questions and concerns related to superior clinical results from one investigational center as compared to the other two investigational centers in the study. The Agency also questioned the potential impact of protocol deviations at this investigational center including the prophylactic use of methylprednisolone in all but five subjects treated.**

> "**The IDE study results show good progress towards being able to <u>eventually demonstrate</u> the efficacy of our Renuvion Cosmetic Technology** as more than 90% of subjects in the study experienced an improvement in appearance as assessed by investigators, and the independent photographic reviewers were able to correctly identify post treatment photographs in more than 97% of subjects," said Shawn Roman, Vice President of R&D for Apyx Medical. "Unfortunately, we experienced a larger than expected range of clinical outcomes in the study due primarily to the

inconsistent application of treatment time on tissue among investigators at the three centers."

"We have been involved in productive and positive interactions with the Agency and they have been very engaged throughout the process," said Charlie Goodwin, President and Chief Executive Officer of Apyx Medical. "They were understandably focused on the performance versus our stated primary endpoint, the variability in treatment outcomes across the three centers and the protocol deviations identified at one investigational center. . . ."

(Emphases added.)

52.     Because Defendants had failed to previously disclose that the IDE study had failed to meet its primary efficacy endpoint (even after the results were called into question), and that one of the centers in the study had far superior results than the others after failing to follow the study protocol, investors were blindsided by Defendants' announcement that the application had been withdrawn.  The Company's share price tanked by more than one-third ($2.49 per share) to close at $4.46 per share on April 2, 2019, on unusually heavy trading volume.

53.     On May 8, 2019, Goodwin further elaborated on the Company's communications with the FDA.  In particular, he explained that Apyx had withdrawn its 510(k) application because it was clear that the FDA was not going to approve it due to the fact that the FDA had substantial issues with the study results, including: (i) that the study did not meet its primary efficacy endpoint; and (ii) that one of the investigative centers had failed to follow the study's protocol by prescribing a steroid to almost all of the patients, which could have been the reason that this center had far superior results than the other two centers in the study.  As Goodwin explained:

As discussed on recent earnings calls, our team has been focused on pursuing 510(k) regulatory clearance for Renuvion, specifically a new clinical indication for the use in dermal resurfacing procedures. On December 18 of last year, we filed our application for a premarket notification 510(k) regulatory clearance with the FDA.

Our application was supported by data from a multi-center, single arm evaluator blind perspective IDE study, which evaluated the safety and efficacy of Renuvion for the reduction of facial wrinkles and rhytides. ***During their review of our application, the FDA raised several questions and concerns regarding three aspects of our IDE clinical study.***

***First, the FDA questions the study's results regarding Renuvion's performance in dermal resurfacing procedures versus its stated primary endpoint. While the IDE study yielded no serious adverse events, it did not meet the primary efficacy endpoint as only 63.64% of the patients were deemed to have experienced an improvement of one point or greater on the Fitzpatrick Wrinkle Scale at the three***

*month follow up visit. The study protocol and statistical analysis plan included a success criteria of 75% of patients.*

*Second, the FDA questioned the variability in treatment outcomes across the three investigational centers in the study, as one of the three investigational centers in the study achieved superior outcomes compared to the other two. And third, the FDA questioned the impact of protocol deviations at this investigational center. Specifically, the FDA questioned how the protocol deviations may have contributed to the superior results obtained at this investigational center.*

Following the procedures, all but five subjects treated at this clinical center were prescribed with Medrol, a cortical steroid that can be used to treat inflammation of the skin and increase patient comfort post procedure. *Following discussions with the FDA in late March, we voluntarily withdrew our application on March 29 as we were unlikely to be able to favorably resolve the issue raised within the FDA's Congressionally mandated MDUFA 90-day review* period that would have otherwise ended on April 1.

While Apyx does not share the FDA's view with respect to the three areas in question regarding our clinical study, we understand their focus on these areas. *We also appreciate the FDA's engagement with our clinical and regulatory team, which has included many productive and positive interactions through the process.* Although we are greatly disappointed by this setback, we remain convinced of both safety and efficacy of our Renuvion technology when used in dermal resurfacing procedures, and we are committed to pursuing 510(k) clearance for dermal resurfacing.

(Emphases added).

## V.   MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE WITH SCIENTER DURING THE CLASS PERIOD

54.    During the less than four-month class period, Defendants were aware that the IDE study had failed to meet its primary efficacy endpoint.  Moreover, Defendants were aware that one of the three investigative centers in the study had far superior results than the other two after failing to follow the protocol.  In spite of this, Defendants misleadingly touted the success of study, claiming that the Company was "pleased with the clinical results of this study and [is] optimistic in receiving regulatory clearance for this differentiated technology in 2019."

55.    The Class Period starts on December 21, 2018.  On that date, the Company issued a press release entitled, "Bovie Medical Corporation Files 510(K) Submission With The FDA For A New Indication To Market And Sell J-Plasma/Renuvion For Use In Dermal Resurfacing Procedures."  Therein, Defendants, in relevant part, stated:

**Bovie Medical Corporation (NYSE:BVX)** (the "Company"), a maker of medical devices and supplies and the developer of J-Plasma®, a patented surgical product

19

marketed and sold under the Renuvion® Cosmetic Technology brand in the cosmetic surgery market, today announced a Premarket Notification 510(K) submission to the U.S. Food and Drug Administration (FDA) for a new indication for J-Plasma/Renuvion for use in dermal resurfacing procedures.

"We are pleased to announce this 510(K) submission requesting clearance for a new clinical indication to market and sell our Renuvion Cosmetic Technology for dermal resurfacing procedures, which represents another important step towards our strategic objective to expand Renuvion's clinical indications for use in the cosmetic surgery market," said Charlie Goodwin, Chief Executive Officer. "*Our submission is supported by data from our multi-center, single arm, evaluator-blind prospective study evaluating the safety and efficacy of our Renuvion technology for the reduction of facial wrinkles and rhytides*, which was conducted at three investigational centers and consisted of 55 patients. *We were very pleased with the clinical results of this study and we are optimistic in receiving regulatory clearance for this differentiated technology in 2019*."

(Emphasis added).

56.     The statements in ¶ 55 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the adverse facts that the IDE study had failed to meet its primary efficacy endpoint, that one of the three investigative centers had fundamentally failed to follow the protocol by providing a steroid to most of its patients, and that this deviating center had far superior results than the other centers that actually followed the protocol.

57.     The materially false and misleading statements in ¶ 55 were made with scienter. Defendants were deliberately reckless as to the falsity of these statements because Goodwin and Apyx's executives had received, reviewed and analyzed the IDE study results, which were the basis for the 510(k) submission, that demonstrated that the IDE study had failed to meet its primary efficacy endpoint, that one of the three investigative centers had fundamentally failed to follow the protocol by providing a steroid to most of its patients, and that this deviating center had far superior results than the other centers that actually followed the protocol.

58.     On January 7, 2019, the Company issued a press release entitled, "Apyx Medical Corporation Reports Preliminary Full Year And Fourth Quarter 2018 Revenue Results." Therein, Defendant Goodwin, in relevant part, stated:

"*The outlook for 2019 is very positive for Apyx Medical*; we are investing in our selling infrastructure to maximize the opportunity to gain share in the U.S. cosmetic surgery market with our disruptive technology, and *we achieved another milestone*

> ***near the end of the fourth quarter with the announcement of a 510(k) submission requesting clearance for a new clinical indication to market and sell our Renuvion Cosmetic Technology for dermal resurfacing procedures.*** We have a strong balance sheet and a focused plan to encourage broad-based adoption of Renuvion, which we believe ultimately achieves strong, sustained and profitable growth for the benefit of our stockholders."

(Emphasis added).

59.     The statements in ¶ 58 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the adverse facts that  the IDE study had failed to meet its primary efficacy endpoint, that one of the three investigative centers had fundamentally failed to follow the protocol by providing a steroid to most of its patients, and that this deviating center had far superior results than the other centers that actually followed the protocol.

60.     The materially false and misleading statements in ¶ 58 were made with scienter. Defendants were deliberately reckless as to the falsity of these statements because Goodwin and Apyx's executives had received, reviewed and analyzed the IDE study results, which were the basis for the 510(k) submission, that demonstrated that the IDE study had failed to meet its primary efficacy endpoint, that one of the three investigative centers had fundamentally failed to follow the protocol by providing a steroid to most of its patients, and that this deviating center had far superior results than the other centers that actually followed the protocol.

61.     On March 13, 2019, the Company issued a press release entitled, "Apyx Medical Corporation Reports Fourth Quarter And Fiscal Year 2018 Financial Results And Introduces Fiscal Year 2019 Outlook."  Therein, the Company, in relevant part, stated:

Fourth Quarter 2018 Highlights:

***

On December 21st, the Company announced a Premarket Notification 510(K) submission to the U.S. Food and Drug Administration (FDA) for a new indication for J-Plasma/Renuvion for use in dermal resurfacing procedures.

62.     The statements in ¶ 61 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed

to disclose the adverse facts that the IDE study had failed to meet its primary efficacy endpoint, that one of the three investigative centers had fundamentally failed to follow the protocol by providing a steroid to most of its patients, and that this deviating center had far superior results than the other centers that actually followed the protocol.

63.     The materially false and misleading statements in ¶ 61 were made with scienter. Defendants were deliberately reckless as to the falsity of these statements because Goodwin and Apyx's executives had received, reviewed and analyzed the IDE study results, which were the basis for the 510(k) submission, that demonstrated that the IDE study had failed to meet its primary efficacy endpoint, that one of the three investigative centers had fundamentally failed to follow the protocol by providing a steroid to most of its patients, and that this deviating center had far superior results than the other centers that actually followed the protocol.

64.     Additionally, during a conference call with analysts held also on March 13, 2019, Goodwin stated, in relevant part:

> The falsehood about my prior work history were frustrating but candidly the unsubstantiated claims against the safety and efficacy of our J-Plasma technology and blatant mischaracterization of our IDE study on dermal resurfacing are among the most troublesome. As discussed earlier in my prepared remarks, we believe our technology is truly differentiated and we have invested in expanding the clinical support for Renuvion which we look forward to sharing with the investment community, and our clinician customers in 2019 and beyond. As it relates to the result of the IDE study specifically, we have consistently said that the study was launched with the primary goal of demonstrating safety and efficacy to support our FDA 510(k) submission and that following the receipt of this regulatory clearance, we would pursue options for showcasing the results.

65.     The statements in ¶ 64 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because the February 21, 2019 White Diamond Research report was correct that the IDE study had failed to meet its primary efficacy endpoint.  Moreover, the statements in ¶ 64 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the adverse facts that the IDE study had failed to meet its primary efficacy endpoint, that one of the three investigative centers had fundamentally failed to follow the

protocol by providing a steroid to most of its patients, and that this deviating center had far superior results than the other centers that actually followed the protocol.

66.     The materially false and misleading statements in ¶ 64 were made with scienter. Defendants were deliberately reckless as to the falsity of these statements because Goodwin and Apyx's executives had received, reviewed and analyzed the IDE study results, which were the basis for the 510(k) submission, that demonstrated that the IDE study had failed to meet its primary efficacy endpoint, that one of the three investigative centers had fundamentally failed to follow the protocol by providing a steroid to most of its patients, and that this deviating center had far superior results than the other centers that actually followed the protocol.

## VI.    LOSS CAUSATION AND DEFENDANTS' STATEMENTS ISSUED AT THE END OF THE CLASS PERIOD

67.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

68.     During the Class Period, as a result of the open, well-developed, and efficient market for Apyx's securities, the prices of Apyx's securities fell when the misrepresentations alleged herein, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed to investors and the artificial inflation was removed over time from the price of Apyx's securities.  Defendants' wrongful conduct, alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.  Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Apyx's securities prices throughout the Class Period until Defendants began to disclose the truth regarding the Company's financial condition to the market.

69.     The truth regarding Apyx was partially revealed, and/or the concealed risks materialized, on or about: February 21, 2019 and April 1, 2019.  As a direct result of these partial disclosures, the price of Apyx's stock declined precipitously on heavy trading volume.

70.     On February 21, 2019, White Diamond Research published an analyst report entitled, "Apyx Medical's Stock Price Is About To Have A Liposuction - $3 Price Target (65% Downside)." Therein, in relevant part, the report stated:

> Apyx did not reveal the results of its clinical study on J-Plasma use for dermal resurfacing - a red flag that it may have missed its endpoints.
>
> ***
>
> We believe investors do not have the full picture regarding the safety and application of J-Plasma, given that management didn't reveal the outcomes of their completed IDE clinical study which was recently submitted to the FDA for the approval of use for dermal resurfacing. We believe there's a good chance it failed to reach its primary endpoint and could result in an FDA rejection.

71.     On this news, the Company's share price fell $2.10, or nearly 25%, to close at $6.40 per share on February 21, 2019, on unusually heavy trading volume.

72.     The February 21, 2019 disclosures revealed that Apyx may have missed its primary efficacy endpoint that could result in an FDA rejection of its 510(k) application.

73.     On April 1, 2019, after the market closed, the Company revealed that it had withdrawn its application for regulatory clearance of J-Plasma for use in dermal resurfacing procedures, citing concerns raised by the FDA.  It also revealed that the clinical study for J-Plasma had missed its primary efficacy endpoint.  The Company stated, in relevant part:

> As previously disclosed, on December 19, 2018, the Company filed a premarket notification 510(k) for regulatory clearance for a new clinical indication to market and sell Renuvion Cosmetic Technology for dermal resurfacing procedures. The application was supported by data from a multi-center, single arm, evaluator-blind prospective investigational device exemption (IDE) study evaluating the safety and efficacy of J-Plasma/Renuvion technology for the reduction of facial wrinkles and rhytides, which was conducted at three investigational centers and consisted of 55 patients. The primary efficacy endpoint was the comparison of the proportion of subjects (i.e., the percentage of treatment responders) with a ≥ 1-score improvement on the Fitzpatrick Wrinkle and Elastosis Scale (FWS) at the 3-month follow-up visit, as compared to baseline, as determined by at least 2 out of 3 blinded Independent Photographic Reviewers (IPRs). The primary safety endpoint was the adverse event rate and duration for a period of 3 months following the procedure.
>
> **The IDE study yielded no serious adverse events, however, the study did not meet the primary efficacy endpoint**, as only 62% of subjects were deemed to have experienced a ≥ 1-score improvement on the FWS at the 3-month follow-up visit, whereas the study protocol and statistical analysis plan included 75% success criteria.
>
> In the course of its review of the Company's submission, **the Agency raised a number of questions and concerns related to superior clinical results from one**

24

*investigational center as compared to the other two investigational centers in the study. The Agency also questioned the potential impact of protocol deviations at this investigational center including the prophylactic use of methylprednisolone in all but five subjects treated.*

"***The IDE study results show good progress towards being able to <u>eventually demonstrate</u> the efficacy of our Renuvion Cosmetic Technology*** as more than 90% of subjects in the study experienced an improvement in appearance as assessed by investigators, and the independent photographic reviewers were able to correctly identify post treatment photographs in more than 97% of subjects," said Shawn Roman, Vice President of R&D for Apyx Medical. "Unfortunately, we experienced a larger than expected range of clinical outcomes in the study due primarily to the inconsistent application of treatment time on tissue among investigators at the three centers."

"We have been involved in productive and positive interactions with the Agency and they have been very engaged throughout the process," said Charlie Goodwin, President and Chief Executive Officer of Apyx Medical. "They were understandably focused on the performance versus our stated primary endpoint, the variability in treatment outcomes across the three centers and the protocol deviations identified at one investigational center. . . ."

(Emphases added.)

74.     On this news, the Company's share price fell $2.49, or nearly 36%, to close at $4.46 per share on April 2, 2019, on unusually heavy trading volume.

75.     The April 1, 2019 disclosures revealed that Apyx was withdrawing its 510(k) submission due to the fact that the FDA had concerns regarding the IDE study results, including that the IDE study had failed to meet its primary efficacy endpoint, that one of the investigative centers had fundamentally failed to follow the protocol by providing a steroid to most of its patients, and that this deviating center had far superior results than the other centers that actually followed the protocol.

76.     During the Class Period, Plaintiffs and the Class purchased Apyx securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

77.    The Individual Defendant acted with scienter by virtue of: (a) his receipt of information reflecting that the IDE study had failed to meet its primary efficacy endpoint; and/or (b) his receipt of information reflecting that one of the three investigative centers in the IDE study had failed to follow the study's protocol and that this center had far superior results than the other two centers in the study; and/or (c) his intentional or reckless issuance of materially false or misleading statements regarding the IDE study; and/or (d) his ultimate responsibility to ensure the accuracy of such statements and his reckless failure to do so.  The Individual Defendant knew or was deliberately reckless in disregarding the materially false or misleading nature of the information he caused to be disseminated to the investing public.

78.    The Individual Defendant also knew or was deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated.  The Individual Defendant acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Plaintiffs and the Class.

### A.    The Growth Of The J-Plasma/Renuvion Business Was The Focus Of The Company And Dermal Resurfacing Was An Extremely Large Growth Market

79.    Prior to Goodwin's appointment as CEO of the Company, Bovie primarily derived its revenue from its Core products business, which consisted of the manufacture and sale of electrosurgery generators and accessories, battery-operated cauteries, lighting, nerve locators, eye-bubbles, penlights, and a variety of other products.  Upon becoming CEO, as discussed in Section IV.C., *supra*, Goodwin shifted the focus for the Company towards the commercialization of J-Plasma.  In fact, he sold the Core business and the Bovie name to fund this commercialization effort; as he explained on July 9, 2018, the purpose of this transaction was to allow Bovie "to further focus the organization on [its] strategic objective of commercializing [its] J-Plasma/Renuvion technology in the cosmetic surgery market."

80.     As the Company and Goodwin repeatedly touted, there are approximately 400,000 liposuction procedures performed in the U.S. per year in which J-Plasma/Renuvion could be used as a subdermal coagulator, and there are 165,000 to 200,000 procedures in the U.S. for the dermal resurfacing.  Thus, the ability to market J-Plasma/Renuvion for dermal resurfacing would open up a massive market for Apyx.  In fact, Goodwin even explained that the Company was focused on analyzing the results of the IDE study:  "…we have been primarily focused on securing new clinical evidence for our Renuvion Cosmetic Technology by pursuing an IDE clinical study evaluating the use of Renuvion for dermal resurfacing procedures…[as] Dermal resurfacing represents a new target procedure for Renuvion in the cosmetic surgery market."

81.     The Individual Defendant was certainly aware of the details of the IDE study that would open up a massive market of potential sales to the Company, as the Company's financial future relied on its success and the Company's executives discussed this information in press releases and on conference calls with analysts and investors; or if the Company's CEO was unaware, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs and other Class members.  However, the most reasonable inference is that Goodwin was aware that the IDE study had not met is primary efficacy endpoint and that one of the investigative centers, which had far superior results than the other centers in the study, had not followed the study protocol, as the Company later admitted.

**B.      Goodwin Claimed That He And The Company Received And Were Focused On The Specific Data That Was Not Disclosed To The Public**

82.     Goodwin admitted that he and his team would receive the results of the study prior the 510(k) submission.  As he stated on November 1, 2018, "So we [are] in the data analysis portion of this and this is the part that is kind of out of our hands, our CRO [Contract Research Organization] does this work and so they are evaluating the data and when they are done, they will submit to us the report.  We'll use that data or our submission for our 510(k), but this is the portion that is a little bit outside of our control."   Certainly, Goodwin and the Company received this information or else they would have not submitted the 501(k) to the FDA.  As such, it is not possible

27

that Goodwin and the Company's executives did not know that the study had failed to reach its primary efficacy endpoint.

83.     Moreover, Goodwin also explained that his "team has been focused on the patient follow up and data evaluation portion of the study … [as] [t]his IDE clinical study for dermal resurfacing is also an important component of our second strategic initiative formalizing our regulatory strategy to pursue specific clinical indications."  In fact, Goodwin claimed that "We have been involved in productive and positive interactions with the [FDA] and they have been very engaged throughout the process."  That Goodwin and his team would not know that the study failed its primary efficacy endpoint and that one of three investigative centers, which had failed to follow the study protocol, had far superior results than the other centers in the study when they were "focused on the patient follow up and data evaluation portion of the study" and they were in communication with the FDA regarding the study's results simply defies belief.  The only logical inference is that Goodwin and the Company were aware of these facts.

84.     If the Company's CEO was unaware, however, that the study failed its primary efficacy endpoint and that one of three investigative centers, which had failed to follow the study protocol, had far superior results than the other centers in the study, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs and other Class members.

## VIII.   CLASS ACTION ALLEGATIONS

85.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Apyx securities during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class").  Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

86.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Apyx securities were actively traded on the NYSE and Nasdaq.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Millions of Apyx shares were traded publicly during the Class Period on the NYSE and the Nasdaq.

87.    Plaintiffs' claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws that is complained of herein.  Further, Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' conduct alleged herein;

b.    whether statements made by Defendants to the investing public during the Class Period omitted or misrepresented material facts about the business, operations and prospects of Apyx; and

c.    to what extent Class members have sustained damages and the proper measure of damages.

88.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.   <u>UNDISCLOSED ADVERSE FACTS</u>

89.    The market for Apyx's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Apyx's securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Apyx's securities relying upon the integrity of the market price of the Company's securities and market information relating to Apyx, and have been damaged thereby.

90.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Apyx's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Apyx's business, operations and prospects as alleged herein.

91.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Apyx's business, operations and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, operations and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

X.   **APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE**

92.   The market for Apyx's securities was open, well-developed, and efficient at all relevant times.  As a result of Defendants' materially false or misleading statements and material omissions, the Company's securities traded at artificially inflated prices during the Class Period.  On January 25, 2019, the Company's stock closed at a Class Period high of $8.75 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying on the integrity of the market price of such securities and on publicly available market information relating to Apyx; Plaintiffs and Class members have been damaged thereby.

93.   During the Class Period, the artificial inflation of the value of Apyx securities was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiffs and other Class members.  As alleged herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, operations and prospects, causing the price of the Company's securities to be artificially inflated at all relevant times.  When the truth was disclosed, it drove down the value of the Company's securities, causing Plaintiffs and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

94.   At all relevant times, the market for Apyx's securities was efficient for the following reasons, among others:

a.   Apyx's stock met the requirements for listing, and it was listed and actively traded on the NYSE and Nasdaq, highly efficient and automated markets.

b.   As a regulated issuer, Apyx filed periodic public reports with the SEC and/or the NYSE/Nasdaq.

c.   Apyx regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services.

> d.      Apyx was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, which reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

95.      Based on the foregoing, during the Class Period, the market for Apyx securities promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of Apyx securities.  Under these circumstances, the market for Apyx securities was efficient during the Class Period and, therefore, investors' purchases of Apyx securities at artificially inflated market prices give rise to a class-wide presumption of reliance under the fraud-on-the-market doctrine.

96.      In the alternative, the *Affiliated Ute* presumption of reliance applies to the extent that Defendants' statements during the Class Period involved omissions of material facts.

## XI.    NO SAFE HARBOR

97.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein.  To the extent that statements alleged to be false or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

## XII.  COUNTS

### FIRST COUNT
#### Violation of Section 10(b) of The Exchange Act and
#### Rule 10b-5 Promulgated Thereunder Against All Defendants

98.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.  This claim is asserted against all Defendants.

99.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Apyx securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

100.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Apyx securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

101.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Apyx's business, operations and prospects, as specified herein.

102.     These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Apyx's value, performance and continued substantial growth, which included the making of, or the participation in the making of,

untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Apyx and its business, operations and prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

103.   The Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendant was a high level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) the Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) the Individual Defendant was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's business, operations and prospects at all relevant times; and (iv) the Individual Defendant was aware of the Company's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

104.   The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Apyx business, operations and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

105.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Apyx securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs' and the other members of the Class acquired Apyx securities during the Class Period at artificially high prices and were damaged thereby.

106.     At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Apyx, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Apyx securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

107.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

108.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND COUNT**
**Violation of Section 20(a) of the Exchange Act**
<u>**Against the Individual Defendant**</u>

109.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

110.     The Individual Defendant acted as a control person of Apyx within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position, and his ownership and contractual rights, participation in and/or awareness of the Company's operations

35

and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendant was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

111.    In particular, the Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

112.    As set forth above, Apyx and the Individual Defendant each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of his position as a control person, the Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act.

113.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.   PRAYER FOR RELIEF

114.    WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

**XIV.**   **JURY TRIAL DEMANDED**

115.    Plaintiffs hereby demand a trial by jury.

Dated: September 3, 2019                         **GLANCY PRONGAY & MURRAY LLP**

By:   _s/ Casey E. Sadler_
Robert V. Prongay
Casey E. Sadler (*pro hac vice*)
Lesley F. Portnoy
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
        csadler@glancylaw.com
        lportnoy@glancylaw.com

*Attorneys for Plaintiffs and Lead
Counsel for the Class*

**DESMOND LAW FIRM, P.C.**
Leo W. Desmond, Esquire
Florida Bar Number 0041920
5070 Highway A1A, Suite D
Vero Beach, Florida 32963
Telephone: (772) 231-9600
Facsimile: (772) 231-0300
Email: lwd@desmondlawfirm.com

*Liaison Counsel for the Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On September 3, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Middle District of Florida, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 3, 2019.


*s/ Casey E. Sadler*
Casey E. Sadler