# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| KYLE PRITCHARD, Individually and on Behalf of All Others Similarly Situated, | Case No.  8:19-cv-00919-SCB-AEP |
| Plaintiff, | |
| v. | **RESPONSE TO DISPOSITIVE MOTION** |
| APYX MEDICAL CORPORATION f/k/a/ BOVIE MEDICAL CORPORATION, and CHARLES D. GOODWIN, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ..........................................................................................1

II.     STATEMENT OF RELEVANT FACTS ............................................................................2

        A.      Apyx Bets Its Future On J-Plasma/Renuvion By Making A Play For The
                Lucrative Dermal Resurfacing Market Under Goodwin's Direction ....................2

        B.      Defendants Conceal That The IDE Study Did Not Meet Its Primary
                Endpoint And One Investigative Center Failed To Follow Protocol.......................3

        C.      Defendants Are Forced To Disclose The Truth After It Becomes Clear
                The Application Will Not Be Approved ..................................................................4

III.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION...............4

IV.     THE MISREPRESENTATIONS AND OMISSIONS ARE ACTIONABLE........................5

        A.      Defendants Made Materially Misleading Statements And Omissions ......................6

        B.      Defendants' Misrepresentations Are Not Non-Actionable Opinions ........................8

        C.      Defendants Had A Duty To Disclose The Omitted Information .............................11

        D.      Defendants' Misrepresentations Are Not Protected By The Safe Harbors..............12

        E.      Defendants' Misleading Statements And Omissions Are Not Puffery....................14

V.      THE AC ALLEGES A STRONG INFERENCE OF SCIENTER ......................................14

VI.     PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION.........................................17

VII.    THE COURT SHOULD REJECT DEFENDANTS' IMPROPER ATTEMPT TO
        CONVERT THE MOTION INTO A SUMMARY JUDGMENT MOTION .....................18

VIII.   PLAINTIFFS ADEQUATELY ALLEGE CONTROL PERSON LIABILITY...................20

IX.     CONCLUSION.................................................................................................................20

## TABLE OF AUTHORITIES

CASES

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................................ 5

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) .................................................................................... 5, 8, 11

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................................ 5

*Carvelli v. Ocwen Fin. Corp.,*
  934 F.3d 1307 (11th Cir. 2019) ........................................................................ 14

*City of Providence v. Aeropostale, Inc.,*
  2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) .................................................. 12

*City Pension Fund for Firefighters & Police Officers in the City of Miami Beach v. Aracruz Cellulose S.A.,*
  41 F. Supp. 3d 1369 (S.D. Fla. 2011) ................................................................ 12

*Dura Pharms., Inc. v. Broudo,*
  544 U.S. 336 (2005) .......................................................................................... 17

*Epstein v. World Acceptance Corp.,*
  2015 WL 2365701 (D.S.C. May 18, 2015) ................................................... 8, 12

*FindWhat Inv'r Grp. v. FindWhat.com,*
  658 F.3d 1282 (11th Cir. 2011) ................................................................. *passim*

*Foman v. Davis,*
  371 U.S. 178 (1962) .......................................................................................... 20

*Gillis v. QRX Pharma Ltd.,*
  197 F. Supp. 3d 557 (S.D.N.Y. 2016) ................................................... 11, 14, 16

*Halbert v. Credit Suisse AG,*
  2019 WL 3975362 (N.D. Ala. Aug. 22, 2019) ............................................ 18, 19

*Hardy v. Ambika, LLC,*
  2010 WL 4636636 (S.D. Ala. Nov. 3, 2010) .................................................... 20

*Health Ins. Innovations Sec. Litig.*,
2019 WL 3940842 (M.D. Fla. June 28, 2019) ...................................................................... 18

*In re BankAtlantic Bancorp, Inc.*,
2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) ...................................................................... 12

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) ......................................................... 7, 10, 14

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019) ............................................................................. 17

*In re Flowers Foods, Inc. Sec. Litig.*,
2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) ............................................................. 17, 18

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.D.C. 2015) ................................................................................................ 14

*In re Intuitive Surgical, Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) .................................................................................. 5

*In re Iso Ray, Inc. Sec. Litig.*,
189 F. Supp. 3d 1057 (E.D. Wash. 2016) .......................................................................... 11

*In re Netbank, Inc. Sec. Litig.*,
2009 WL 2432359 (N.D. Ga. Jan. 29, 2009) ..................................................................... 13

*In re Salix Pharm., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .................................................................... 12

*In re Sci. Atlanta, Inc. Sec. Litig.*,
754 F. Supp. 2d 1339 (N.D. Ga. 2010) ............................................................................. 15

*In re St. Jude Med., Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011) ............................................................................... 16

*In re Unicapital Corp. Sec. Litig.*,
149 F. Supp. 2d 1353 (S.D. Fla. 2001) ............................................................................. 13

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) .............................................................................................. 13

*Johnson v. Pozen, Inc.*,
2009 WL 426235 (M.D.N.C. Feb. 19, 2009) ..................................................................... 16

iii

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ................................................................................ 19

*Manns v. City of Atlanta*,
   2006 WL 2466836 (N.D. Ga. Aug. 23, 2006) ...................................................... 4

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ............................................................................. 4, 6, 7, 16

*Maz Partners LP v. First Choice Healthcare Sols., Inc. & Christian Romandetti, Sr.*,
   2019 WL 5394011 (M.D. Fla. Oct. 16, 2019) ...................................................... 8

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ......................................................................... 17

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ............................................................................... 6

*Mogensen v. Body Cent. Corp.*,
   15 F. Supp. 3d 1191 (M.D. Fla. 2014) ............................................................... 14

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ............................................................................. 16

*Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*,
   135 S. Ct. 1318 (2015) .................................................................................... 9, 10

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
   297 F.3d 1182 (11th Cir. 2002) ........................................................................... 8

*Schultz v. Applica Inc.*,
   488 F. Supp. 2d 1219 (S.D. Fla. 2007) .................................................... 12, 13, 16

*SEC v. Bankatlantic Bancorp, Inc.*,
   2015 WL 11142889 (S.D. Fla. Aug. 27, 2015) .................................................... 9

*SEC v. Merchant Capital, LLC*,
   483 F.3d 747 (11th Cir. 2007) ........................................................................... 13

*SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*,
   600 F.3d 1334 (11th Cir. 2010) ......................................................................... 18

*Sherleigh Assocs. LLC v. Windmere-Durable Holdings, Inc.*,
    178 F. Supp. 2d 1255 (S.D. Fla. 2000) .................................................................. 13

*Snook v. Trust Co. of Georgia Bank, NA.*,
    859 F.2d 865 (11th Cir. 1988) ............................................................................ 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................... 4, 5, 15, 17

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)................................................................................. 9, 10

*TransEnterix Inv'r Grp. v. TransEnterix, Inc.*,
    272 F. Supp. 3d 740 (E.D.N.C. 2017)................................................................. 11, 16

## STATUTES

15 U.S.C. § 78u-4(b)(1) ......................................................................................... 5

15 U.S.C. § 78u-4(b)(2) ......................................................................................... 14

## RULES

Fed. R. Civ. P. 12(b) ........................................................................................... 18

Fed. R. Civ. P. 12(b)(6)........................................................................................ 4

Fed. R. Civ. P 12(g) .............................................................................................. 4

Fed. R. Evid. 201 .................................................................................................. 19

## REGULATIONS

17 C.F.R. § 240.10b–5(b) .................................................................................. 6, 11

v

Plaintiffs respectfully submit their opposition to Defendants' Motion to Dismiss (Dkt. No. 30) (the "Motion") the Amended Class Action Complaint (Dkt. No. 29) (the "AC").[1]

## I.    PRELIMINARY STATEMENT

Plaintiffs' complaint alleges a straightforward claim of securities fraud. Apyx Medical Corporation ("Apyx" or the "Company")[2] had bet its future on the commercialization of its J-Plasma device, a helium-based plasma surgical product. Prior to the Class Period, the FDA had only approved J-Plasma (now Renuvion) for skin tightening. To increase the market for the product, Apyx sought approval for the use of J-Plasma for facial dermal resurfacing, which represented an annual market opportunity of $85 million. Before seeking regulatory clearance, Apyx completed an IDE study to demonstrate the safety and efficacy of J-Plasma for reduction in the appearance of wrinkles. The primary efficacy endpoint of the study—the agreed upon measure for determining if the product worked for its tested purpose—evaluated the improvement in wrinkle severity. Under the study protocol, 75% of patients needed appropriate improvement for the efficacy endpoint to be met.

On December 21, 2018, Defendants announced that, after analyzing the study data, they had submitted a 510(k) application for regulatory clearance with the FDA for dermal resurfacing procedures, claiming they "were very pleased" with the results. At no point during this, or any other Class Period announcement, did Defendants disclose that the study failed to meet its primary efficacy endpoint or that one of the three investigative centers in the study—the one with by far the best results—had failed to follow study protocol by providing steroids to patients. When Apyx was forced to withdraw its application due to these facts, its shareholders lost one-third of their investments in a single day.

As their primary defense, Defendants argue that even though they were aware the

---

[1] Citations to the AC are in the form "¶__ or §__." Terms not otherwise defined have the same meanings as in the AC. Unless otherwise noted, citations and quotations are omitted and emphasis is added throughout.

[2] "Apyx" or the "Company" also refers to Apyx's predecessor entities.

1

study failed to meet its primary efficacy endpoint and that one investigative center broke protocol, they still believed that the application could be approved. In fact, Defendants even improperly attach and rely on a self-created, non-public document in support of this argument. This argument is irrelevant, however, since if the complete and accurate picture had been provided to the public, it would have impacted a reasonable investor's investment decision. Defendants' other arguments fair no better and are similarly specious.

In sum, the AC sufficiently alleges that Defendants' omissions of present and historical facts are misleading and actionable. Therefore, the Motion must be denied.

## II.    STATEMENT OF RELEVANT FACTS

### A.    Apyx Bets Its Future On J-Plasma/Renuvion By Making A Play For The Lucrative Dermal Resurfacing Market Under Goodwin's Direction

J-Plasma is a patented helium-based plasma surgical product that is marketed and sold in the cosmetic surgery market.[3] ¶28. J-Plasma initially received FDA clearance as a skin-tightening device without the need for invasive surgery. ¶30. Some medical professionals were using the product off-label[4] for dermal resurfacing. ¶31.

To improve J-Plasma's commercialization, in September 2017, the Company submitted a proposed IDE study to the FDA to achieve an indication for dermal resurfacing. ¶32. The primary efficacy endpoint of the study was the comparison of the proportion of subjects with a $\geq$ 1-score improvement on the Fitzpatrick Wrinkle and Elastosis Scale at the 3-month follow-up visit. To satisfy its primary efficacy endpoint, the study needed at least 75% of patients to exhibit the requisite improvement under the criteria. ¶51.

After his appointment as CEO, Goodwin shifted the Company's entire focus to the commercialization of J-Plasma ¶¶33, 35-36, 40. As the AC outlines, Apyx and Goodwin were focused in mid-2018 on the study, including developing a regulatory strategy, creating

---

[3] J-Plasma technology is now marketed and sold under the name Renuvion. ¶37.

[4] An "off-label" treatment means that, while approved by the FDA for a particular indication, the treatment is being used for another indication. ¶32 n.7

an infrastructure around the approval of the study and analyzing the study's results. ¶¶42-44.

**B.    Defendants Conceal That The IDE Study Did Not Meet Its Primary Endpoint And One Investigative Center Failed To Follow Protocol**

On December 21, 2018, Apyx announced that it had submitted the 510(k) application (the "Application") for the use of J-Plasma for dermal resurfacing procedures based on the results of the IDE study. At that time, Goodwin touted the success of the study and stated that he was optimistic about receiving regulatory clearance: "***We were very pleased with the clinical results of this study*** and we are optimistic in receiving regulatory clearance for this differentiated technology in 2019." ¶45. He did not disclose that the study failed to meet its primary endpoint or that one of the three investigative centers failed to follow protocol. On February 21, 2019, White Diamond Research published an analyst report (the "WDR Report") calling into question whether the study reached its endpoints. The report stated:

> Apyx did not reveal the results of its clinical study on J-Plasma use for dermal resurfacing - a red flag that it may have missed its endpoints.
>
> ***
>
> We believe investors do not have the full picture regarding the safety and application of J-Plasma, given that management didn't reveal the outcomes of their completed IDE clinical study which was recently submitted to the FDA for the approval of use for dermal resurfacing. We believe there's a good chance it failed to reach its primary endpoint and could result in an FDA rejection.

¶47. On this news, the Company's share price fell by $2.10, or nearly 25%. ¶51.

Even though the WDR Report called into question the IDE study results, including its possible "fail[ure] to reach its primary endpoint," Goodwin continued to mislead the public. On March 13, 2019, despite giving a long defense of its accusations against him personally, Goodwin failed to respond to the report's allegations. Instead, he gave the impression the endpoints were met. He claimed that the report "blatantly mischaracteriz[ed]" the IDE study and made "unsubstantiated claims against the … efficacy of our J-Plasma technology" and that "the study was launched with the primary goal of demonstrating safety and efficacy to support our FDA 510(k) submission and that following the receipt of this regulatory

3

clearance, we would pursue options for showcasing the results," giving no indication of any reason that "this regulatory clearance" would not be forthcoming. ¶49.

### C.   Defendants Are Forced To Disclose The Truth After It Becomes Clear The Application Will Not Be Approved

On April 1, 2019, the Company announced that it had withdrawn the Application. Defendants also finally revealed that the IDE study had missed its primary efficacy endpoint (only 62% of subjects showed appropriate improvement) and that one of the three investigative centers had not followed protocol. ¶51. Since Defendants did not previously disclose this information (even after the results were called into question), investors were blindsided by the withdrawal. Apyx's share price tanked by nearly 36%. ¶52.

On May 8, 2019, Goodwin further explained that Apyx had withdrawn the Application as it was not going to be approved since the FDA had noted substantial issues with the study results, including that: (i) the study did not meet its primary efficacy endpoint; and (ii) one of the investigative centers had failed to follow the study's protocol by prescribing a steroid to almost all of the patients, which could have been the reason that this center had far superior results compared to the other two centers in the study. ¶53.

## III.   APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION

To state a claim under § 10(b) of the Securities Exchange Act of 1934, a plaintiff must allege: (1) a material misrepresentation or omission (*i.e.*, "falsity"); (2) scienter; (3) the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).[5] When ruling on a "Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must . . . accept all factual allegations in the complaint as true[,]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), "and the reasonable inferences therefrom are construed in the light most favorable to the

---

[5] Defendants challenge only falsity, scienter and loss causation (in part), conceding the remaining factors. *See* Fed. R. Civ. P 12(g); *Manns v. City of Atlanta*, 2006 WL 2466836, at *3 (N.D. Ga. Aug. 23, 2006).

plaintiff." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011).

To avoid dismissal, a complaint need only "contain sufficient factual matter . . . to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs need only plead facts "that allow[] the court to draw the reasonable inference that the defendant is liable." *Id.* at 678. Also, the Court "must consider the complaint in its entirety." *Tellabs*, 551 U.S. at 310. A court should deny a motion to dismiss when the complaint plausibly articulates the circumstances constituting fraud. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## IV.    THE MISREPRESENTATIONS AND OMISSIONS ARE ACTIONABLE

Defendants are liable under §10(b) for affirmative misstatements and material omissions. *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988). A plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The AC identifies four statements that misleadingly omitted material facts and explains they were false and misleading because:

> they failed to disclose the adverse facts that the IDE study had failed to meet its primary efficacy endpoint, that one of the three investigative centers had fundamentally failed to follow the protocol by providing a steroid to most of its patients, and that this deviating center had far superior results than the other centers that actually followed the protocol.

¶¶55-56, 58-59, 61-62, 64-65. Moreover, the AC alleges that Goodwin's March 13 response to the WDR Report was also misleading as he not only failed to disclose the endpoint failure, but also challenged the truth of the WDR Report. ¶65.[6]

---

[6] In spite of this, Defendants contend that the AC uses puzzle pleading. Mot. at 10 n.5. But "Plaintiff[s] here ha[ve] precisely detailed each problematic statement, alleged that each statement is false and misleading, and alleged the reasons as to why each statement was false or misleading." *In re Intuitive Surgical*, Sec. Litig. 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014) (rejecting a similar "puzzle pleading" argument). Demonstrating the absurdity of this argument, one of the "block quotes" that Defendants identify is a single sentence. *See* ¶61. Plaintiffs have made clear what they allege to be misleading.

Defendants concede they were aware that the primary efficacy endpoint was not met and that one of the investigative centers had far superior results than the others. *See, e.g.*, Mot. at 22. Defendants' defense is that their statements were not misleading since the undisclosed facts did not "preclude" clearance of the Application and that they "were fully optimistic that 510(k) clearance would be granted." *See, e.g.*, Mot. at 14, 22. That argument is non-responsive. Plaintiffs do not contend that these facts "preclude[d]" clearance or that their opinions were not sincerely held. Rather, Plaintiffs allege these facts were material— and thus needed to be disclosed—as they would significantly alter the total mix of information available to investors, and are not just minor facts "cutting the other way."

### A.    Defendants Made Materially Misleading Statements And Omissions

Rule 10b-5 "prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *FindWhat*, 658 F.3d at 1305; *see Matrixx*, 563 U.S. at 44 (same).[7] In considering whether an omission renders a statement misleading, "the appropriate inquiry is into the meaning of the statement to the reasonable investor and its relationship to the truth." *FindWhat*, 658 F.3d at 1305. "A statement is misleading if in the light of the facts existing at the time of the [statement] ... [a] reasonable investor, in the exercise of due care, would have been misled by it." *Id*. Thus, misrepresentations are evaluated "in the light of the circumstances under which they were made." 17 C.F.R. § 240.10b–5(b).

Because Defendants had bet Apyx's future on the commercialization of J-Plasma, investors were keenly focused on the results of the study and any risks relating to potential approval. §IV.C. Moreover, Goodwin touted the study's success and stated that he was

---

[7] Even literally accurate statements "'can become, through their context and manner of presentation, devices which mislead investors. Thus, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.'" *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).

optimistic about receiving regulatory clearance: "***We were very pleased with the clinical results of this study*** and we are optimistic in receiving regulatory clearance for this differentiated technology in 2019." ¶45. On January 7, Goodwin further stated "[t]he outlook for 2019 is very positive for Apyx," regarding the study. ¶58.  Given investors' focus on the study results and the statements that Defendants were "very pleased" with the results and were "optimistic" about approval and that the "outlook for 2019 is very positive," the omission of the study's major failures was misleading. *Matrixx*, 563 U.S. at 38 (affirming that omissions are actionable "when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) (failure to disclose "multiple adverse conditions" that had been identified made statements about making "good progress" and being "very pleased with the milestone" misleading).

Additionally, on February 21, 2019, the WDR Report directly questioned whether the study had met its endpoint and noted that a failure to meet its endpoint could result in rejection. *See* ¶47. On this news, the Company's stock fell by nearly 25%, indicating that whether the study met its primary endpoint was highly material to investors. Knowing that the Company's stock had just been decimated by the WDR Report, Defendants addressed it on March 13. Despite attempting to repudiate the report in a press release and earnings call, Defendants did not disclose that the study had in fact failed to meet its endpoint or that there were disparate results between investigative centers, as the most successful center failed to follow the protocol. ¶49. Instead, Goodwin gave the impression that the study met its endpoints, claiming that "the study was launched with the primary goal of demonstrating safety and efficacy to support our FDA 510(k) submission and that following the receipt of this regulatory clearance, we would pursue options for showcasing the results." *Id.*

The Company's future depended on the study's results. An analyst report doubted

7

whether the study met its primary endpoints. In this context, it was materially misleading to address the prospects for approval and the analyst report while failing to disclose that the primary efficacy endpoint had not been met and that the best results were from a site that did not follow protocol. §§IV.C. & IV.D.2.; *see Epstein v. World Acceptance Corp.*, 2015 WL 2365701, at \*5 (D.S.C. May 18, 2015) ("If a reasonable investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision, then the statement satisfies the initial element of a 10(b) claim.").

If the complete picture—that the study had failed to meet its primary endpoint and that the most successful site broke protocol—had been provided, it would have impacted a reasonable investor's investment decision. These facts materially affect the likelihood of approval of the Application. *Basic Inc.*, 485 U.S. at 231–32 (Statements are material if there is "a substantial likelihood that the disclosure of the[se] omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."). Regardless, motions to dismiss are rarely appropriate on materiality since it is "the trier of fact [who] usually decides the issue of materiality." *See Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002). "Only if the lack of importance of the omission is so plain that reasonable minds cannot differ thereabout is it proper for the court to pronounce the omissions immaterial as a matter of law." *Maz Partners LP v. First Choice Healthcare Sols., Inc. & Christian Romandetti, Sr.*, 2019 WL 5394011, at \*9 (M.D. Fla. Oct. 16, 2019). Here, it is difficult to see any factfinder viewing the omitted facts as immaterial; thus, the AC satisfies the pleading standard.

## B.    Defendants' Misrepresentations Are Not Non-Actionable Opinions

Defendants claim that certain of their misleading statements were just opinions. Mot. at 13. However, even if the Court treats these segments of the statements as opinions, they are still actionable due to the omission of material facts.

In *Omnicare*, the Supreme Court held that "opinion statements are not wholly

8

immune from liability" and may be considered material misstatements under several circumstances. *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 135 S. Ct. 1318, 1321 (2015). A statement of opinion violates securities laws if: (1) "the opinion qualifies as an untrue statement of fact (the opinion is not sincerely held by the speaker or the opinion is embedded with material false statements)"; or (2) "the opinion has an omission of material facts which renders the opinion misleading (the speaker omitted material facts about the speaker's inquiry into or knowledge underlying the opinion and the omission rendered the opinion misleading to reasonable investors)." *SEC v. Bankatlantic Bancorp, Inc.*, 2015 WL 11142889, at *1 (S.D. Fla. Aug. 27, 2015). Further, under *Omnicare* subjective disbelief is *not required*, as opinions "sincerely held and otherwise true as a matter of fact, may nonetheless be actionable *if the speaker omits information whose omission makes the statement misleading to a reasonable investor*." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016). Thus, a defendant is liable if they "omit[] material facts about [their] inquiry into or knowledge concerning a statement …, and if those facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 1329.

Here, Defendants' statement that they "were very pleased" with the study results did not fairly align with information in their possession at the time it was made. That statement omitted Defendants' knowledge of the fact that the study had failed its primary efficacy endpoint and that one of the investigative centers failed to follow protocol. *E.g.*, ¶¶46, 53, 56, 77-84; Mot. at 5-6. 20. The only reasonable inference an investor can draw from Defendants' statement is that the study actually met its primary efficacy endpoint. Any other conclusion is illogical.[8] To avoid that misleading inference, Defendants were required to disclose the

---

[8]A reasonable investor would interpret that a study that was "launched with the *primary goal* of demonstrating safety and efficacy" for which the Company was "very pleased" with the results and was expecting "receipt of this regulatory clearance" had met its primary efficacy endpoint. Likewise, a reasonable investor would interpret Goodwin's response that the WDR report, which said the study failed to meet its endpoint, "blatantly mischaracteriz[ed]" the IDE study and made "unsubstantiated claims against the … efficacy of our J-Plasma technology" as meaning that the study met its primary efficacy endpoint. *See* ¶49.

9

failure along with their "opinion" that the they "were very pleased." Indeed, a court recently found under *Omnicare* that that the statement "I am very pleased with the milestone" was actionable due to an omission of material facts. *Chicago Bridge*, 2018 WL 2382600 at \*8.[9] The omitted facts here would have been material to a reasonable investor in evaluating the basis for Defendants' opinions because they "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 135 S. Ct. at 1329. Accordingly, Defendants' statements claiming to be very pleased are actionable because they failed to disclose the study's failures that were in fact not "pleasing" to the market. *Id.* at 1321.

In a weak attempt to rebut materiality, Defendants claim that "investors in the medical device industry would be aware that 'some of the underlying facts may be in tension with the ultimate projection regarding FDA approval set forth by the issuer.'" Mot. at 15 (citing *Tongue*, 816 F. 3d 199). But that addresses only Defendants' optimism about approval and ignores the first part of the misleading statement: "We were very pleased with the clinical results of this study." What reasonable investor would be pleased by primary efficacy endpoint failure and protocol deviation at the most successful study site? And, that omission infects investor's understanding about Defendants' optimism about approval.

Of course, "a statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 135 S. Ct. at 1329). However, this does not save Defendants. *Omnicare* explained what "some fact cutting the other way" means: for example, "in stating an opinion about legal compliance, the issuer did not disclose that a single junior attorney expressed doubts about a practice's legality, when six of his more senior colleagues gave a stamp of approval." *Id.* at 1329. Here, "some fact cutting the other way" would be if the study had hit

---

[9] There, the court held the statements, "'[CBI] made some good progress. I am very pleased with the milestone, as I mentioned, on the main module' and that 'Lake Charles has gone through and I think passed those pretty well'" misleading due to the omission of a stop work order. *Chicago Bridge*, 2018 WL 2382600, at \*8.

its primary efficacy endpoint and the next five endpoints, and then failed the seventh. That is the opposite of here, where Defendants withheld profoundly adverse facts.[10]

### C.    Defendants Had A Duty To Disclose The Omitted Information

Defendants say they had no duty to disclose. Mot. at 15, 17. Wrong. "By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not 'so incomplete as to mislead.'" *FindWhat*, 658 F.3d at 1305. "[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." *Id*. "[A] defendant may not deal in half-truths." *Id.*

Here, Defendants repeatedly touted the IDE study, the prospects for approval and their plans following approval. ¶¶45, 64. Moreover, certain of the statements were made in response to the WDR Report, and all of the statements were made in the context of Apyx's commercialization of J-Plasma.[11] ¶¶49, 64. This triggered their duty to disclose the omitted information since it was "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

---

[10] Defendants' cases are distinguishable. In *TransEnterix Inv'r Grp. v. TransEnterix, Inc.*, the plaintiffs alleged that a product's approval was unlikely because the company had not provided human-factors data after the FDA had told them they needed to. The court held that since the company had "attempted to satisfy the FDA's requests concerning human-factors issues" and the FDA denied the application on other grounds, plaintiff's allegations "did not support an inference that SurgiBot's 510(k) application lacked human-factors data and thus was unlikely to win approval." 272 F. Supp. 3d 740, 752-53 (E.D.N.C. 2017). Here, there is no dispute about whether the allegations are accurate since Defendants concede that they did not disclose information at issue and the Company withdrew its application due to the omitted information. Mot. at 10; ¶¶51, 53.

Likewise, in *Gillis v. QRX Pharma Ltd.*, the statements were that the company believed that its study showed respiratory advantages to other products. 197 F. Supp. 3d 557, 597 (S.D.N.Y. 2016). The court found that, even though the study did not meet a particular endpoint, this was not inconsistent with the statements because "[i]t does not exclude the possibility that MoxDuo demonstrated other respiratory advantages over morphine and oxycodone." *Id.* at 598. Moreover, the court went on to note that the rejection notice the company received for the product "did not cite the primary-endpoint failing on which plaintiffs focus." *Id.* at 598 n. 28. Here, the omitted facts *were the exact reasons* noted by Apyx in withdrawing its application.

[11] While Defendants claim they did not have to affirmatively disclose the results nor do FDA regulations require them to (*see* Mot. at 2, 12, 15), this does not negate Defendants' obligations to disclose the omitted material facts in the context of their statements. *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1067 (E.D. Wash. 2016) (quoting *Basic*, 485 U.S. at 239, n.17) ("The duty to disclose is triggered *either* by a specific requirement under the relevant regulations *or* 'when necessary to make statements made, in the light of the circumstances under which they are made, not misleading.'").

### D.    Defendants' Misrepresentations Are Not Protected By The Safe Harbors

The safe harbor for forward-looking statements with meaningful cautionary language does not immunize Defendants' statements because the AC alleges they were misleading due to their omission of material ***past*** and ***present*** facts concerning the ***already-completed*** IDE study. *See FindWhat*, 658 F.3d at 1299 (statements that "purport to represent present facts" are not protected); *Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1229 (S.D. Fla. 2007) ("The safe harbor does not apply to [] omissions of historical or contemporaneous facts.").[12]

Moreover, "courts that have found statements protected by the safe harbor provision have almost uniformly dealt with statements containing projections, estimates, or forecasts of future events." *City Pension Fund for Firefighters & Police Officers in the City of Miami Beach v. Aracruz Cellulose S.A.*, 41 F. Supp. 3d 1369, 1400 (S.D. Fla. 2011). Plaintiffs allege that the three statements at issue are false, not due to their future projections or forecasts, but for their failure to disclose a current condition. *In re BankAtlantic Bancorp, Inc.*, 2011 WL 1585605, at *35 (S.D. Fla. Apr. 25, 2011) ("the concept of risk touches upon the future, but whether management *knows* of a certain risk at a given time is ascertainable at that time.").

Even if the Court were to conclude that part of the statements had forward-looking elements, these parts are severable from the non-forward-looking elements. *World Acceptance*, 2015 WL 2365701, at *6 ("Because not all of the statements in the [complaint] can be clearly classified as forward-looking or as mere immaterial puffery at this stage of the litigation, the Court cannot conclude that the Safe Harbor provision extends absolute immunity from liability."). For example, if the Court were to deem the statement "we are optimistic in receiving regulatory clearance for this differentiated technology in 2019" as forward-looking, the first part of the sentence, "We were very pleased with the clinical

---

[12] *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013) ("Defendants' failure to disclose that the unpopular designs – the source of the poor sales and inventory problems in the 'back half of last year' – had been ordered through summer of 2011 is unprotected by the safe harbor, ***regardless of whether the statements thereby rendered misleading were forward-looking.***"); *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016) ("The safe harbor [] does not protect material omissions.").

results of this study," is not forward-looking, particularly since it was made in the ***past tense***, and thus is severable. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016).

But severability is ultimately irrelevant as the statements lacked the requisite *meaningful* cautionary language. "To qualify as 'meaningful cautionary' language, a statement's warning must advise investors of 'risks of a significance similar to that actually realized.'" *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, at 1373-74 (S.D. Fla. 2001). Here, the purported risk warnings were "boilerplate" and generic. All medical companies are in an "industry that is highly regulated by the [FDA]… which ha[s] substantial authority to establish criteria which must be complied with in order for [them] to continue in operation," and face risks such as "the regulatory environment, including [their] ability to gain requisite approved from the FDA." Mot. at 7. Likewise, the caution that "there can be no assurance that J-Plasma will be successful or that such future revenues and profitability will be realized" (Mot. at 7) is not narrowly-tailored to the existing known risk. *Sherleigh Assocs. LLC v. Windmere-Durable Holdings, Inc.*, 178 F. Supp. 2d 1255, 1271-74 (S.D. Fla. 2000).

Finally, the safe harbor does not apply when, as here, Defendants identified possible future risks while failing to disclose known facts suggesting the risks have already happened. *FindWhat*, 658 F.3d at 1299 ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already happened is deceit."); *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 769 (11th Cir. 2007) (No safe harbor where "unfavorable events had already occurred")

Defendants also cannot invoke the safe harbor when their supposed forward-looking statements were made with "actual knowledge they were false or misleading." *In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *8 (N.D. Ga. Jan. 29, 2009). Congress mandated cautionary statements to warn of "important factors that could cause actual results to differ." *Applica*, 488 F. Supp. 2d at 1224. Defendants' failure to inform investors of the risks facing FDA approval failed to put investors "sufficiently on notice of the danger of the investment

13

to make an intelligent decision about it according to her own preferences for risk and reward." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 103 (D.D.C. 2015); *FindWhat*, 658 F.3d at 1299. In fact, Defendants admit they had actual knowledge of these risks. *See* Mot. at 5-6, 9, 19-22.

### E.    Defendants' Misleading Statements And Omissions Are Not Puffery

Defendants argue that certain snippets of their overall statements are inactionable puffery. Mot. at 18. "[W]hen considering a motion to dismiss a securities-fraud action, a court shouldn't grant unless the alleged misrepresentations—puffery or otherwise—are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1320 (11th Cir. 2019). Moreover, since it is inappropriate to assess statements out of context, determining whether a given statement is material [*i.e.*, not puffery] entails a fact assessment properly left to the jury. *Id.* at 1321. Regardless, Defendants' examples were integral parts of overall actionable representations and omissions (*see* Sec. IV.A., *supra*)[13] and therefore these statements are "of a type that a reasonable investor would find relevant to investment decision-making." *Carvelli*, 934 F.3d at 1321; *Chicago Bridge*, 2018 WL 2382600 at *8 (statements that defendant was "very pleased with the milestone" not puffery).

## V.    THE AC ALLEGES A STRONG INFERENCE OF SCIENTER

To plead scienter, a complaint must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). Scienter encompasses recklessness, and in this Circuit scienter is sufficiently alleged by facts demonstrating "an extreme

---

[13] In contrast, Defendants' cited cases had already determined that the defendants had not omitted any material information. *See Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1213 (M.D. Fla. 2014) ("Plaintiff has not pled with particularity any facts showing that Defendants knew or ignored information that contradicted any of these statements when they were made"); *Gillis*, 197 F. Supp. 3d at 585 ("The omitted facts relating to the NAL were thus both immaterial and unnecessary to make the challenged statements not misleading"); *Carvelli*, 934 F.3d at 1322 (finding that statements such as "it was devoting 'substantial resources' to its problems, with 'improved results,' as well as its boasts that it was taking a 'leading role' and making 'progress' toward compliance" immaterial because in context – "the market was well aware of Ocwen's regulatory problems" – a reasonable investor would not have considered these statements in their investment decision).

departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *FindWhat*, 658 F.3d at 1300. "Plaintiff[] may prove such recklessness by providing evidence that defendants possessed knowledge of facts or access to information contradicting their public statements, so as to prove that defendants knew or should have known that they were misrepresenting material facts related to the corporation." *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1360 (N.D. Ga. 2010), *aff'd sub nom. Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x 339 (11th Cir. 2012).

An inference of scienter is "strong" if it is "cogent and compelling" and "*at least as likely as* any plausible opposing inference." *Tellabs*, 551 U.S. at 324, 328 (emphasis in original). The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. When competing inferences are shown, the tie goes to the plaintiff. *Id.* The relevant inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 310, 322 (emphasis in original).

Defendants misstate Plaintiffs' allegations and then argue against these strawmen. Defendants claim that, to allege scienter, the AC must demonstrate "that the 510(k) Application could not have been given clearance." Mot. at 19, 20. But the AC does not allege that that the statements were misleading because they failed to disclose that the Application would necessarily fail. Rather, the AC alleges that they were misleading because they failed to disclose material risks to approval. ¶¶56, 59, 62, 65.

Plaintiffs have adequately pled that Defendants were aware of these material risks.[14] *See* ¶¶77-84. Goodwin admitted prior to the Class Period that he and his team reviewed all study data prior to submission. *See, e.g.*, ¶¶82-83. Defendants also admit that they were

---

[14] Plaintiffs primarily rely on Defendants' admissions, and there is no need for any CW or internal documents to corroborate them.

15

aware the study did not meet its primary efficacy endpoint and that they had reviewed all of the data, including that one of the investigative centers failed to follow protocol and consequently had superior results. *See* Mot. at 20. Moreover, the dermal resurfacing indication and Application were vital to the future of Apyx, and Goodwin was actively involved in overseeing the J-Plasma commercialization. *Applica*, 488 F. Supp. 2d at 1226 (where improper policies "are sufficiently critical to the core operations of the company, knowledge of the [] improprieties may be imputed to the company's officers and directors who are involved in day-to-day operation of the company").[15]

Defendants' argument that they thought the study could be approved and thus did not need to disclose the material risks facing approval is classic recklessness. Mot. at 20-21. At the time the statements were made, Defendants may have hoped that the FDA would accept their arguments for approval in spite of the fact that study missed its primary efficacy endpoint and one of the centers deviated from the protocol.[16] This, however, does not negate the fact that a material risk existed *at that time*, which Defendants *knowingly, intentionally or recklessly* failed to disclose. This demonstrates scienter.[17]

Taking the allegations as true and viewing them holistically, Plaintiffs allege a strong

---

[15] Defendants' recklessness is further supported by the fact that following the publication of WDR Report which called into question whether the study had failed to meet its primary endpoint, Defendants continued to omit these material facts. *See, e.g.*, *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 888 (D. Minn. 2011) (actionable misrepresentations found where "[m]any of the statements at issue were provided in direct response to questions from financial analysts").

[16] To deflect away from their recklessness, Defendants focus on motive, contending that the lack of stock sales rebuts scienter. Mot. at 19. But as the Supreme Court has held, motive is not required. *Matrixx*, 563 U.S. at 48 ("The absence of a motive allegation, though relevant, is not dispositive."); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers … did not sell stock"). Regardless, motive is a matter for discovery.

[17] Unlike here, Defendants' cited cases involved risks that were either immaterial or actually disclosed. *See, e.g.*, *Johnson v. Pozen, Inc.*, 2009 WL 426235, at *14–15 (M.D.N.C. Feb. 19, 2009) ("Plaintiffs' allegation that Pozen withheld this information, therefore, has no merit, as there can be no claim for securities fraud where allegedly concealed facts have already been disclosed publicly"); *Gillis*, 197 F. Supp. 3d at 601 ("As explained earlier, the SAC does not adequately plead that defendants (including Holaday) knew or had access to non-public information contradicting their public statements. Thus, no inference of recklessness fairly arises."); *TransEnterix*, 272 F. Supp. 3d at 753 ("plaintiffs here failed to []… include specific allegations in the complaint identifying a specific fact or facts whose omission made the challenged statements misleading.").

inference of scienter that is at least as compelling as any opposing inference offered by Defendants. *See Tellabs*, 551 U.S. at 326. Defendants claim that the most logical inference is that they truly believed they would be approved, based on their arguments in their 510(k) submission. Mot. at 22. But that does not negate recklessness. Defendants knew there were substantial undisclosed risks facing approval. In sum, no alternative inference proffered is "more compelling" than the allegations supporting scienter. *Tellabs*, 551 U.S. at 322, 324.

## VI.    PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION

"To prove loss causation in a section 10(b) claim, a plaintiff must offer proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1247 (N.D. Ga. 2019); *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "The loss causation element is only subject to Rule 8's notice pleading standard . . ., not the heightened pleading standards of the PSLRA.'" *In re Equifax*, 357 F. Supp. 3d at 1248, 1249. Loss causation can be demonstrated by (1) identifying a corrective disclosure; (2) showing a stock price drop as a result of the corrective disclosure; and (3) eliminating other possible explanations for the price drop. *FindWhat*, 658 F.3d at 1311-12. Defendants only challenge loss causation as to only the February 21 disclosure, conceding loss causation for the April 1 disclosure. Mot. at 24-25.

Defendants' sole argument is that the WDR Report cannot constitute a corrective disclosure because it "is not alleged to have done anything more than put a negative spin on previously disclosed information about the 510(k) Application." *Id.* at 25. This is wrong. The AC alleges that the WDR Report discloses new information, not merely repackages information as in *Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013). *In re Flowers Foods, Inc. Sec. Litig.* is instructive. There, also relying on *Meyer*, defendants argued that analyst and news reports stating that a governmental investigation could result in $1 billion in liability could not constitute corrective disclosures because the investigation was previously disclosed. 2018 WL 1558558, at *20 (M.D. Ga. Mar. 23, 2018). However, the court rejected

17

this argument because the reports "either discussed newly-public information or provided their own new information, such as that liability for Flowers *could* reach \$1 billion if the DOL found it in violation of FLSA." *Id.* Here, like in *Flowers Foods*, the WDR Report provided new information to the market by disclosing that the study "may have missed its endpoints . . . and could result in an FDA rejection." ¶70. That is precisely what the AC alleges was withheld. Also, Apyx's shares fell by 25% in response. *Id.* Since Defendants have failed to provide another explanation for this drop, loss causation is sufficiently alleged.

## VII.   THE COURT SHOULD REJECT DEFENDANTS' IMPROPER ATTEMPT TO CONVERT THE MOTION INTO A SUMMARY JUDGMENT MOTION

Defendants have attached a portion of the non-public 510(k) application (Mot. Ex. 7) as factual support to their Motion. The Court should not consider its contents since "if it considers materials outside of the complaint, a district court must convert the motion to dismiss into a summary judgment motion." *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) (citing Fed. R. Civ. P. 12(b)). While there are two exceptions, the court may (1) incorporate the document by reference, or (2) take judicial notice of the document, neither applies.

First, under the incorporation-by-reference doctrine, "the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *SFM Holdings, Ltd.*, 600 F.3d at 1337.[18] In securities fraud cases in the Circuit, documents are central only if they are alleged to contain the alleged misrepresentations. *See, e.g.*, *In re Health Ins. Innovations Sec. Litig.*, 2019 WL 3940842, at *17 (M.D. Fla. June 28, 2019) ("the denial letter is not necessary part of Lead Plaintiff's effort to make out a claim, as the 2Q17 Report is the document alleged to contain the misrepresentations."); *Halbert v. Credit Suisse AG*, 2019 WL 3975362, at *2 (N.D. Ala. Aug. 22, 2019). Here, Plaintiffs do

---

[18] Furthermore, the authenticity of Exhibit 7 is not certain. Defendants merely attached excerpts of the exhibit and did not establish the authenticity of the document by providing a sworn affidavit, or otherwise.

not allege the Application itself contains any misrepresentations. As such, it is not central.

Second, "the court may take judicial notice of an adjudicative fact not subject to reasonable dispute because it is either generally known within the trial court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id.*; Fed. R. Evid. 201. The Application simply does not qualify for this exception since it was attached to support the contention that Defendants held the opinions expressed to the public. *See* Mot. at 13-14. This "fact" is subject to reasonable dispute as their mental state is one of the central disputes in this litigation.

Attaching the application is a blatant attempt to abuse these doctrines. Unfortunately, as the Ninth Circuit recently noted, this is a "concerning pattern in securities cases" in which defendants are "exploiting these procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 139 S. Ct. 2615, 204 L. Ed. 2d 264 (2019). The Ninth Circuit cautioned:

> If defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently "plausible" claim for relief.

*Id.* at 998-99. Here, Defendants attached the Application as evidence that they believed the truthfulness of their statements – *i.e.*, they offered it as a defense. *See* Mot. at 14 ("the 510(k) Application included even more reasons to hold the opinions expressed."); 20 (application "provided their good faith view that clearance should still be granted").[19] That is simply improper. *Khoja*, 899 F.3d at 1002 ("if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the

---

[19] Plaintiffs do not allege that Defendants did not disclose to the FDA that the study had failed to meet its primary efficacy endpoint or that Defendants did not inform the FDA that they still believed the Application should be granted even though it had failed its endpoint. As such, any claim by Defendants that they attached the document to demonstrate what information was disclosed to the FDA (including that the primary efficacy endpoint was not met) and what opinions were expressed by Defendants to the FDA is clearly pretextual.

complaint. Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims.").

If the Court considers the Application, the Court should hold the Motion in abeyance, lift the PSLRA's discovery stay and provide Plaintiffs the opportunity to conduct adequate discovery. *See Snook v. Trust Co. of Georgia Bank, NA.*, 859 F.2d 865, 870 (11th Cir. 1988) ("If the documents or other discovery sought would be relevant to the issues presented by the motion for summary judgment, the opposing party should be allowed the opportunity to utilize the discovery process to gain access to the requested materials."); *Hardy v. Ambika, LLC*, 2010 WL 4636636, at *1 (S.D. Ala. Nov. 3, 2010) (declining to convert motion to dismiss without first allowing plaintiff to conduct relevant discovery). Specifically, Plaintiffs should be permitted to receive, at a minimum, internal correspondence about the Application and Defendants' correspondence with the FDA regarding it[20] to determine if their representations to the Court that are based on the Application's content are accurate and tell the whole story.[21] Defendants should not be permitted to selectively provide information and conceal the whole picture from the Court.

## VIII.  PLAINTIFFS ADEQUATELY ALLEGE CONTROL PERSON LIABILITY

Defendants' sole argument against control person liability is that Plaintiffs purportedly have not pled a primary violation of §10(b). Mot. at 25. As Plaintiffs adequately plead a primary violation, they state a §20(a) claim against Defendant Goodwin.

## IX.  CONCLUSION

The Motion should be denied in its entirety. If the Court grants any part of the Motion, Plaintiffs request leave to replead. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

---

[20] Plaintiffs requested the production of the Application and all FDA correspondence about the study and the Application. In response, Defendants provided the table of contents and portions of the 510(k) application that they claim pertain to the study on an attorneys' eyes only basis but refused to produce any communications.

[21] Goodwin has admitted the discovery sought exists: "We have been involved in productive and positive interactions with the [FDA] and they have been very engaged throughout the process." ¶83.

Dated: November 4, 2019

**GLANCY PRONGAY & MURRAY LLP**

By: ___*s/ Casey E. Sadler*_____

Robert V. Prongay
Casey E. Sadler (*pro hac vice)*
Lesley F. Portnoy
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
　　　csadler@glancylaw.com
　　　lportnoy@glancylaw.com

*Attorneys for Plaintiffs and Lead
Counsel for the Class*

**DESMOND LAW FIRM, P.C.**
Leo W. Desmond, Esquire
Florida Bar Number 0041920
5070 Highway A1A, Suite D
Vero Beach, Florida 32963
Telephone: (772) 231-9600
Facsimile: (772) 231-0300
Email: lwd@desmondlawfirm.com

*Liaison Counsel for the Class*

21

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On November 4, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Middle District of Florida, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 4, 2019.

*s/ Casey E. Sadler*
Casey E. Sadler