**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

KYLE PRITCHARD, Individually and on
Behalf of All Others Similarly Situated,

Plaintiff,

v. Case No. 8:19-cv-00919-SCB-AEP

APYX MEDICAL CORPORATION
f/k/a BOVIE MEDICAL CORPORATION
and CHARLES D. GOODWIN,

Defendants.
_________________________________/

**O R D E R**

This cause comes before the Court on Defendants Apyx Medical Corporation and Charles Goodwin's Motion to Dismiss Plaintiff's Amended Class Action Complaint and incorporated memorandum of law with exhibits. (Doc. No. 30). Plaintiff filed a memorandum in opposition to the Motion. (Doc. No. 34). Defendants' Motion to Dismiss[1] is denied for the reasons that follow.

**I. Background**

In the two-count Amended Class Action Complaint ("the Complaint"), Kyle Pritchard ("Plaintiff") sues Defendants Apyx Medical Corporation ("Apyx" or "the Company"), formerly known as Bovie Medical Corporation ("Bovie"), and Charles D. Goodwin ("Mr. Goodwin") for violations of Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b-5 promulgated thereunder (Count I), and he sues Mr. Goodwin for violations of Section

[1] The Court declines to convert Defendant's Motion into a motion for summary judgment by considering matters submitted by Defendants that are outside of the amended complaint.

20(a) of the Exchange Act (Count II). (Doc. 29, the Complaint ("Compl.")). Plaintiff brings this securities class action on behalf of himself and all others similarly situated who purchased Apyx securities between December 21, 2018 and April 1, 2019 ("the Class Period"). Apyx is a medical technology company that develops, manufactures, and sells medical devices and equipment used in surgery. (Compl., ¶ 3). Mr. Goodwin served during the Class Period as Apyx's CEO. (Compl., ¶ 21).

## **II. Statement of Facts**

Prior to August 30, 2018, Apyx (then known as Bovie) was comprised of three operating segments: 1) Core, which manufactured medical products; 2) OEM, which produced electrosurgical equipment, and 3) Advanced Energy, which manufactured and sold products employing J-Plasma technology, a patented helium-based plasma surgical product (sold under the brand name Renuvion) that is used in various medical applications. (Compl., ¶¶ 3, 25, 28). While the Food and Drug Administration ("FDA") approved marketing of J-Plasma technology was as a subdermal coagulator for the cutting, coagulation, and ablation of soft tissue during surgeries, physicians were also using J-Plasma "off-label" for dermal resurfacing, or wrinkle reduction. (Compl., ¶¶ 3, 29–30, 32). On August 30, 2018, Bovie announced in a press release, through Mr. Goodwin, that it had sold its Core business and the Bovie brand, including the Bovie name, to Symmetry Surgical, Inc. (Compl., ¶ 41). Bovie was renamed as Apyx. Mr. Goodwin explained in the announcement that "[t]his transaction gives [Apyx] the financial flexibility to invest more aggressively in the fastest-growing, largest market opportunity for our J-Plasma/Renuvion technology." (Compl. ¶ 41).

In September 2018, Apyx submitted a proposed Investigational Device Exemption ("IDE") clinical study to the FDA to demonstrate the safety and efficacy of J-Plasma for use in

dermal resurfacing. (Compl., ¶ 32). In late January 2018, Apyx announced in a press release the enrollment of its first patients in the IDE Study, and in May 2018, Apyx announced the completion of enrollment. (Compl., ¶¶ 36, 38–40, 42–43). In December 2018, Apyx submitted its 510(k) application to the FDA for clearance to market J-Plasma for dermal resurfacing. (Compl., ¶¶ 45, 55). A 510(k) application is a pre-market submission made to the FDA to demonstrate that the device to be marketed is at least as safe and effective, *i.e.*, substantially equivalent, to the legally marketed device that is not subject to premarket approval. (Compl., ¶ 28 n.4 (citing 21 C.F.R. § 807.92(a)(3))). Apyx included the IDE Study results as part of its 510(k) Application. (Compl., ¶¶ 7, 45).

On November 1, 2018, Mr. Goodwin held a conference call with Apyx analysts following Apyx's press release of its 2018 fiscal third quarter financial results. (Compl., ¶ 43). On the call, Mr. Goodwin explained Apyx's focus on the analysis of the IDE study, stating, in pertinent part, "[O]ur CRO [Contract Research Organization] does [the analysis] and so they are evaluating the data and when they are done, they will submit to us the report. We'll use that data [f]or our submission for our 510(k)." (Compl. ¶ 44).

Then, on December 21, 2018, Apyx issued a press release announcing the submission of its 510(k) application. In relevant part, the press release stated:

> Bovie Medical Corporation (NYSE:BVX) (the "Company"), a maker of medical devices and supplies and the developer of J-Plasma, a patented surgical product marketed and sold under the Renuvion Cosmetic Technology brand in the cosmetic surgery market, today announced a Premarket Notification 510(k) submission to the U.S. Food and Drug Administration (FDA) for a new indication for J-Plasma/Renuvion for use in dermal resurfacing procedures.
>
> "We are pleased to announce this 510(k) submission requesting clearance for a new clinical indication to market and sell our Renuvion Cosmetic Technology for dermal resurfacing procedures, which represents another important step towards our strategic objective to expand Renuvion's clinical indications for use in the cosmetic surgery market," said Charlie Goodwin, Chief Executive Officer. "Our

> submission is supported by data from our multi-center, single arm, evaluator-blind prospective study evaluating the safety and efficacy of our Renuvion technology for the reduction of facial wrinkles and rhytides, which was conducted at three investigational centers and consisted of 55 patients. We were very pleased with the clinical results of this study and we are optimistic in receiving regulatory clearance for this differentiated technology in 2019."

(Compl., ¶¶ 45, 55).

On January 7, 2019, Apyx issued another press release where Mr. Goodwin stated, in relevant part:

> The outlook for 2019 is very positive for Apyx Medical; we are investing in our selling infrastructure to maximize the opportunity to gain share in the U.S. cosmetic surgery market with our disruptive technology, and we achieved another milestone near the end of the fourth quarter with the announcement of a 510(k) submission requesting clearance for a new clinical indication to market and sell our Renuvion Cosmetic Technology for dermal resurfacing procedures.

(Compl., ¶ 58).

Then, on February 21, 2019, White Diamond Research published an analyst report ("WDR Report") questioning the results of Apyx's IDE study titled, "Apyx Medical's Stock Price Is About To Have A Liposuction - $3 Price Target (65% Downside)," which stated, in pertinent part:

> Apyx did not reveal the results of its clinical study on J-Plasma use for dermal resurfacing - a red flag that it may have missed its endpoints.
>
> ***
>
> We believe investors do not have the full picture regarding the safety and efficacy of J-Plasma, given that management didn't reveal the outcomes of their completed IDE clinical study which was recently submitted to the FDA for the approval of use for dermal resurfacing. We believe there's a good chance it failed to reach its primary endpoint and could result in an FDA rejection.

(Compl., ¶ 70). Also, on February 21, 2019, Apyx's share price fell $2.10, or nearly 25%, per share on unusually heavy trading volume. (Compl. ¶ 71).

In addressing the WDR Report on a conference call with Apyx analysts on March 13, 2019, Mr. Goodwin stated, in relevant part:

> The falsehood about my prior work history was frustrating but candidly the unsubstantiated claims against the safety and efficacy of our J-Plasma technology and blatant mischaracterization of our IDE study on dermal resurfacing are among the most troublesome. As discussed earlier in my prepared remarks, we believe our technology is truly differentiated and we have invested in expanding the clinical support for Renuvion which we look forward to sharing with the investment community, and our clinician customers in 2019 and beyond. As it relates to the result of the IDE study specifically, we have consistently said that the study was launched with the primary goal of demonstrating safety and efficacy to support our FDA 510(k) submission and that following the receipt of this regulatory clearance, we would pursue options for showcasing the results.

(Compl., ¶ 64).

However, on April 1, 2019, after the market closed, Apyx revealed it had withdrawn its application for regulatory clearance of J-Plasma for use in dermal resurfacing procedures, citing concerns raised by the FDA. (Compl., ¶ 73). Apyx revealed that the clinical study for J-Plasma had missed its primary efficacy endpoint by 13%, that one of the investigative centers had fundamentally failed to follow the protocol by providing a steroid to most of its patients, and that this deviating center had results superior to the other centers that followed the protocol. (*Id.*) On April 2, 2019, Apyx's share price fell by $2.49, or about 36%, per share on unusually heavy trading volume.

As a result, Plaintiff brought the instant securities class action against Apyx and Mr. Goodwin on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Apyx securities during the Class Period.

**<u>III. Standard of Review</u>**

Defendants Apyx and Goodwin move to dismiss the Complaint, pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, for failure to state a claim on which relief can be

granted. In considering a motion to dismiss, the Court is required to accept the allegations in the complaint as true and must view the complaint in a light most favorable to the Plaintiff. *Miljkovic v. Shafritz and Dinkin, P.A.*, 791 F.3d 1291 (11th Cir. 2015). The standard for a motion brought pursuant to Rule 12(b)(6) is not whether a plaintiff will ultimately prevail, but whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists when a plaintiff pleads facts "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bell*, 550 U.S. at 556.

When considering securities fraud claims under the Exchange Act, a plaintiff's complaint must satisfy the heightened standard of pleading set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("the PSLRA"). Rule 9(b) requires that a complaint state, "with particularity the circumstances constituting fraud," while "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *See Mizzaro*, 544 F.3d 1230, 1237 (11th Cir. 2008). A complaint must plead:

> (1) precisely what . . . omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for . . . , in the case of omissions, not making them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). The PSLRA also requires a heightened pleading standard for scienter for Rule 10b–5 actions, requiring the complaint to "specify each statement alleged to have been misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Mizzaro,* 544 F.3d at 1238; *see also,* 15 U.S.C. § 78u-4(b)(1)(B), (2)(A).

**<u>IV. Discussion</u>**

Defendants move to dismiss both counts of the Complaint. Accordingly, the Court will analyze each count.

**<u>A. Count I</u>**

In Count I, Plaintiff asserts a § 10(b) and Rule 10b-5 claim against Apyx. To state a claim under § 10(b) of the Exchange Act and Rule 10b–5, Plaintiff must allege:

> 1) a material misrepresentation or omission; 2) made with scienter; 3) a connection with the purchase or sale of a security; 4) reliance on the misstatement or omission; 5) economic loss [i.e. damages]; and 6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation."

*Mizzaro*, 544 F.3d at 1236–37 (11th Cir. 2008) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)). For the reasons that follow, the Court finds that when the allegations of the Complaint are viewed in the light most favorable to Plaintiff, they sufficiently plead claims upon which relief can be granted under § 10(b) of the Exchange Act and Rule 10b-5.

**<u>1. Plaintiff Alleges an Actionable Omission.</u>**

Defendants argue that Count I should be dismissed because it fails to allege an actionable misstatement. Rule 10b-5, however, "prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *FindWhat Investor Group*, 658 F.3d at 1305 (citing 17 C.F.R. § 240.10(b–5(b)). To determine if a statement is misleading, it is considered "in the light of the facts existing at the time of the [statement] . . . [and whether a] reasonable investor, in the exercise of due care, would have been misled by it." *Id.* Therefore, the initial inquiry is "into the meaning of the statement to the reasonable investor and its relationship to the truth." *Id.* Then, while disclosures do not have to be "complete and accurate" and the sole disclosure of one fact about a company does not necessitate the disclosure of all

market-related facts, there is a duty to not mislead the public by conveying a false impression. *Id.*

As one example of an actionable omission by Defendants, Plaintiff alleges that Mr. Goodwin's March 13, 2019, statement about the WDR report being false was misleading and omitted the facts necessary to make his statement not misleading, because White Diamond Research's report was correct about the IDE study failing to meet its primary efficacy point. (Compl., ¶ 65). Mr. Goodwin stated the WDR report was "unsubstantiated" and was a "blatant mischaracterization" of the IDE study, reminding shareholders that the primary goal of the IDE study was to demonstrate the "safety and efficacy" of J-Plasma technology for dermal resurfacing. (Compl., ¶ 65).

Defendants argue, citing *FindWhat*, that the challenged statement is not actionable because it is neither affirmatively false nor rendered false by non-disclosure of the three aspects of the IDE Study results and, rather, it constitutes an inactionable statement of opinion. In *FindWhat*, investors brought a securities fraud class action against an internet commerce company that provided "pay-per-click" advertising services and three of its principal officers, alleging they made false and misleading statements and material omissions regarding illegitimate click traffic in order to inflate the price of the company's stock. The Eleventh Circuit found that one particular statement—a general report about an actual increase in total revenue in the preceding month across the company as a whole—was not an actionable omission given that the allegations of the Complaint were based on fraudulent click-traffic. The statement made no mention of click traffic or click revenue, but rather, was only a "general report about an actual increase in total revenue." *FindWhat*, 658 F.3d at 1306. The court opined that a reasonable investor would not believe "a conclusory, but apparently accurate, report of company-wide

revenue growth naturally implied that all was well within every component of the company that could possibly affect" future revenue. *Id*.

Mr. Goodwin's response to the WDR report, however, was not a wide-ranging statement about Apyx's financial health or even the IDE study, but rather, a targeted comment regarding the results of the IDE study. When Mr. Goodwin stated the WDR report was "unsubstantiated" and continued to remind the investors that the purpose of the study was to determine the "safety and efficacy" of J-Plasma technology, he necessitated the disclosure of the IDE study's failure to meet its primary efficacy point. Unlike the statement in *FindWhat*, Mr. Goodwin's comments would have led a reasonable investor to believe the IDE study demonstrated the effectiveness of J-Plasma technology in reducing wrinkles, the measure of which includes the primary *efficacy* point. Thus, without the inclusion of this fact alongside, Mr. Goodwin's contentions that the WDR report's claims were unsubstantiated, he misled investors into believing the IDE study proved the effectiveness of J-Plasma technology, which makes this statement an actionable omission. One actionable omission is sufficient to defeat Defendants' Motion to Dismiss.

**2. Plaintiff Does Not Fail to Plead Particularized Facts Giving Rise to the Requisite Strong Inference of Scienter.**

Defendants argue that Count I should be dismissed because Plaintiff fails to plead particularized facts giving rise to the requisite "strong" inference of scienter. Scienter means that the defendant had the intent to defraud or acted with severe recklessness. *FindWhat*, 658 F.3d at 1299. The PSLRA's heightened standard requires that Plaintiff's factual allegations, when accepted as true and taken collectively, create a strong inference that the Defendants acted with the requisite scienter. *Id.* at 1296. The "strong inference" of scienter must be "cogent and at least as compelling as any opposing inference," requiring the reviewing court to ask whether a reasonable person would "deem the inference of scienter at least as strong as any opposing

inference." *Mizzaro*, 544 F.3d at 1239 (finding that solely alleging widespread fraud within Home Depot's RTV chargebacks was insufficient to create a strong inference of scienter because alleging widespread fraud would not allow a reasonable person to infer that it is as likely as not that the high-ranking corporate defendants perpetrated the fraud or knew about it).

The facts alleged in the Complaint are sufficient to create a strong inference of scienter. In light of *Mizzaro*, for the Complaint to meet the heightened pleading standard, Plaintiff must sufficiently allege that Mr. Goodwin perpetuated the fraud of failing to disclose that the IDE study did not meet its efficacy point or that he knew of the fraud. Here, Plaintiff alleges that Mr. Goodwin and his team were to receive the report about the IDE study prior to the 510(k) submission, presumably sometime between November 1, 2018 and the 510(k) submission on December 21, 2018. (Compl., ¶¶ 44, 45). On multiple occasions, Mr. Goodwin told shareholders that the purpose of the IDE study was to demonstrate the "safety and efficacy to support our FDA 510(k) submission." (Compl., ¶¶ 40, 42, 49). Furthermore, in the middle of the IDE study period, on July 9, 2018, Mr. Goodwin announced that Apyx had sold its core business and brand, in favor of focusing efforts and resources on the Renuvion Cosmetic Technology arm, especially the commercialization of J-Plasma technology in the cosmetic surgery market. (Compl., ¶ 41). On March 13, 2019, Mr. Goodwin stated in a conference call with Apyx analysts:

> The falsehood . . . about the unsubstantiated claims against the safety and efficacy of our J-Plasma technology and blatant mischaracterization of our IDE study . . . [is] among the most troublesome. . . . As it relates to the result of the IDE study specifically, we have consistently said that the study was launched with the primary goal of demonstrating safety and efficacy.

(Compl., ¶ 64). Finally, on April 1, 2019, Apyx announced the withdrawal of its 510(k) application, citing the FDA's concerns about the IDE study not meeting "the primary efficacy

endpoint, as only 62% of subjects were deemed to have experienced a ≥ 1-score improvement . . . whereas the study protocol and statistical analysis plan included 75% success criteria." (Compl., ¶ 73).

When the above facts are viewed in the light most favorable to Plaintiff, the Complaint sufficiently pleads a strong inference of scienter such that a reasonable person would infer that Apyx perpetrated a fraud. More specifically, the collective factual allegations demonstrate that it is at least as likely as any opposing inference that Mr. Goodwin intentionally omitted the failure of the IDE study to meet its primary efficacy endpoint because: 1) Apyx had a lot riding on the 510(k) application; 2) the purported purpose of the 510(k) was to determine the "safety and efficacy" of J-Plasma technology for dermal resurfacing; and 3) Mr. Goodwin had access to the report detailing the study's failure prior to his March 13, 2019 statements. Thus, it is as likely as any opposing inference that a reasonable person would have inferred that Mr. Goodwin intentionally omitted the failures of the IDE study because Apyx's new direction was partly riding on the IDE study.

**3. Defendants' Misrepresentations (and Related Omissions) are not Protected by the PSLRA Safe Harbor Provision.**

Defendants argue that three statements challenged by Plaintiff—statements referring to the outlook for 2019 as positive (Compl, ¶ 58 Doc. 30, Ex. 8 at 1), expressing optimism for FDA clearance (Compl., ¶ 55, Doc. 30, Ex. 6 at 1), and noting that following clearance, Apyx would pursue options for showcasing results (Compl., ¶ 64, Doc. 30, Ex. 10 at 7)—are "forward-looking" and, thus, are shielded from liability by the PSLRA's safe harbor provision. The PSLRA defines a "forward-looking statement" as:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
>
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
>
> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
>
> (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

The PSLRA safe harbors protect defendants under three circumstances when the challenged statements are forward-looking: 1) the forward-looking statement was accompanied by "meaningful cautionary language"; 2) the plaintiff fails to sufficiently plead the statement was made with "actual knowledge" of its falsity; or 3) the statement was immaterial. *Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 795 (11th Cir. 2010). Materiality is determined by "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *S.E.C. v. Merchant Capital, LLC*, 483 F.3d 747, 767 (11th Cir. 2007) (holding that promises to investors of 3.2% quarterly or 16.5% annual return on capital was immaterial because they were not guaranteed to investors, so no reasonable person would have relied on those percentages).

Courts that have found statements protected by the safe harbor provision have almost uniformly dealt with statements containing projections, estimates, or forecasts of future events. *City Pension Fund for Firefighters & Police Officers in the City of Miami Beach v. Aracruz*

*Cellulose S.A.*, 41 F. Supp. 3d 1369, 1400 (S.D. Fla. 2011). Here, however, Plaintiff alleges that the statements at issue are false, not due to their future projections or forecasts, but for their failure to disclose known facts suggesting investment risks that have already happened. Thus, the Court is not convinced that the statements at issue are entirely "forward-looking." The concept of risk touches upon the future, but whether management knows of a certain risk at a given time is ascertainable at that time. *In re BankAtlantic Bancorp., Inc.*, 2011 WL 1585605, at *35 (S.D. Fla. Apr. 25, 2011).

Nevertheless, the subject statements lacked the requisite meaningful cautionary language. Defendants' purported risk warnings were boilerplate. For example, Defendants warned that all medical companies are in an "industry that is highly regulated by the [FDA]… which ha[s] substantial authority to establish criteria which must be complied with in order for [them] to continue in operation," and face risks such as "the regulatory environment, including [their] ability to gain requisite approved from the FDA." (Doc. 30, p. 7). Likewise, cautioning that "there can be no assurance that J-Plasma will be successful or that such future revenues and profitability will be realized" (*see id.*) is not narrowly-tailored to the existing known risk. *Sherleigh Assocs. LLC v. Windmere-Durable Holdings, Inc.*, 178 F. Supp. 2d 1255, 1271-74 (S.D. Fla. 2000). Also, Plaintiff alleges that Defendants admit they had actual knowledge of the risks facing FDA approval and the corresponding danger of the investment when the statements were made. (Doc. 30, pp. 5–6, 9, 19 –22). Finally, the statements are not immaterial given that Defendants identified possible future risks while failing to disclose known facts suggesting risks that had already happened. A reasonable man would attach importance to the facts omitted in determining his course of action. *See FindWhat*, 658 F.3d at 1299 ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the

unfavorable events to happen when they have already happened is deceit"); *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 769 (11th Cir. 2007) (finding no safe harbor where "unfavorable events had already occurred"). Based on the foregoing, the Court finds that the statements (and related omissions) at issue do not meet the criteria for safe harbor protection and Defendants' motion to dismiss is denied as to this issue.

**4. The WDR Report constitutes a corrective disclosure.**

Finally, Defendants argue that Plaintiff fails to adequately plead loss causation in seeking to recover for the stock drop after the February 21, 2019 WDR Report. In order to show loss causation for a § 10(b) claim, a plaintiff must offer "proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." *Robbins v. Koger Properties*, 116 F.3d 1441, 1448 (11th Cir. 1997). In a case like this, a fraud-on-the-market case, a plaintiff demonstrates loss causation circumstantially by: "1) identifying a 'corrective disclosure' . . . ; 2) showing that the stock price dropped soon after the corrective disclosure; and 3) eliminating other possible explanations for this price drop." *FindWhat*, 658 F.3d at 1311–12. Defendants' motion to dismiss challenges the corrective disclosure element. A corrective disclosure is "a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud." *Id.* at 1311. The information released must be new information, meaning it is not the "mere repackaging of already-public information." *Meyer v. Greene*, 710 F.3d 1189, 1198–99 (11th Cir. 2013) (finding that an analyst's report was insufficient because it was a mere summary of facts from information that had been publicly available for three months).

When the facts of the Complaint are viewed in a light most favorable to Plaintiff, they demonstrate that the WDR Report revealed new information about the IDE study that

Defendants previously concealed. Specifically, the WDR Report pointed out that Defendants had failed to publicly disclose the results of the IDE study and the inference that could be drawn from that omission is that the results showed that the drug did not meet its primary efficacy endpoint. Further, the WDR pointed out that the potential failure of the IDE study to meet its primary efficacy endpoint "could result in an FDA rejection." (Compl., ¶ 70). The WDR Report was not just summarizing the publicly known facts about the IDE study. The WDR Report presented the new, previously undisclosed fact that failure to meet a primary efficacy endpoint could result in the FDA denying a 510(k) application. Therefore, the WDR Report constitutes a corrective disclosure, and Plaintiff has pled facts sufficient to allege loss causation and to defeat the motion to dismiss.

**B. Count II**

Defendants move to dismiss Plaintiff's § 20(a) control person claim against Goodwin set forth in Count II of the Complaint. Defendants argue that since Plaintiff cannot plead a primary violation under § 10(b) in Count I, his control person claim necessarily fails. However, the Court has found that Plaintiff sufficiently stated a claim in Count I and, therefore, the Court rejects Defendants' argument that Count II should be dismissed.

**ACCORDINGLY**, it is **ORDERED AND ADJUDGED** that:

Defendants Apyx Medical Corporation and Charles D. Goodwin's Motion to Dismiss Plaintiff's Amended Class Action Complaint (Doc. 30) is **DENIED**.

**DONE AND ORDERED** at Tampa, Florida, this 11th day of March, 2020.

SUSAN C. BUCKLEW
United States District Judge

***Copies to:***
Counsel of Record