**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

|  |  |
|---|---|
| KYLE PRITCHARD, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>  v.<br><br>APYX MEDICAL CORPORATION f/k/a BOVIE MEDICAL CORPORATION, and CHARLES D. GOODWIN,<br><br>      Defendants. | Case No. 8:19-cv-00919-SCB-AEP<br><br>CLASS ACTION |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL**
**APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     STANDARDS GOVERNING APPROVAL OF CLASS ACTION SETTLEMENTS..... 4

III.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ............................ 5

        A.      Plaintiffs and Plaintiffs' Counsel Adequately Represented the Settlement Class .. 5

        B.      The Settlement Results from Arm's Length Negotiations Between Experienced
                Counsel Under the Auspices of a Well-Respected Mediator................................. 7

        C.      The Relief Provided for the Settlement Class is Adequate................................... 8

                1.      The Costs, Risks, and Delay of Trial and Appeal...................................... 9

                        (a)     Risks to Proving Liability ................................................. 9

                        (b)     Risks of Class Certification ........................................... 11

                        (c)     Risks in Proving Damages.............................................. 11

                        (d)     Risks of Preserving a Favorable Jury Verdict After Trial ........... 12

                2.      The Settlement Amount is Within the Range of Reasonableness............. 13

                3.      Other Factors Established by Rule 23(e)(2)(C) Support Final Approval of
                        the Proposed Settlement............................................................... 14

        D.      All Settlement Class Members Are Treated Equitably......................................... 16

        E.      The Remaining Eleventh Circuit Factor—the Substance and Amount of
                Opposition to the Settlement—Favors Final Approval of the Settlement ............ 17

IV.     THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED............................ 18

V.      THE NOTICE PROGRAM SATISFIES RULE 23 AND DUE PROCESS ..................... 18

VI.     THE PLAN OF ALLOCATION IS FAIR AND REASONABLE................................. 19

VII.    CONCLUSION.................................................................................................. 21

# TABLE OF AUTHORITIES

CASES

*Access Now, Inc. v. Claire's Stores, Inc.*,
   2002 WL 1162422 (S.D. Fla. May 7, 2002) ............................................................. 17

*Atkinson v. Wal-Mart Stores, Inc.*,
   2011 WL 6846747 (M.D. Fla. Dec. 29, 2011) ........................................................... 16

*Beecher v. Able*,
   575 F.2d 1010 (2d Cir. 1978) .................................................................................... 20

*Behrens v. Wometco Enters., Inc.*,
   118 F.R.D. 534 (S.D. Fla. 1988) ........................................................................ 12, 13

*Bennett v. Behring Corp.*,
   737 F.2d 982 (11th Cir. 1984) ............................................................................ 5, 7, 9

*Bonner v. City of Prichard*,
   661 F.2d 1206 (11th Cir. 1981) ................................................................................... 4

*Carpenters Health & Welfare Fund v. The Coca-Cola Co.*,
   2008 WL 11336122 (N.D. Ga. Oct. 20, 2008) ............................................................ 9

*City of Providence v. Aeropostale, Inc.*,
   2014 WL 1883494 (S.D.N.Y. May 9, 2014) .............................................................. 11

*Fernandez v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
   2017 WL 7798110 (S.D. Fla. Dec. 18, 2017) ........................................................... 16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   131 S. Ct. 2398 (2014) .............................................................................................. 11

*Hayes v. MagnaChip Semiconductor Corp.*,
   2016 WL 6902856 (N.D. Cal. Nov. 21, 2016) .......................................................... 10

*IBEW v. Int'l Game Tech., Inc.*,
   2012 WL 5199742 (D. Nev. Oct. 19, 2012) .............................................................. 14

*In re Advanced Battery Techs., Inc. Secs. Litig.*,
   298 F.R.D. 171 (S.D.N.Y. 2014) ............................................................................... 19

*In re Am. Bank Note Holographics, Inc.*,
   127 F. Supp. 2d 418 (S.D.N.Y. 2001) ................................................................. 10, 21

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
  2011 WL 1585605 (S.D. Fla. Apr. 25, 2011)..................................................................13

*In re Carrier IQ, Inc., Consumer Privacy Litig.*,
  2016 WL 4474366 (N.D. Cal. Aug. 25, 2016)................................................................16

*In re Catalina Mktg. Corp. Sec. Litig.*,
  2007 WL 9723529 (M.D. Fla. July 9, 2007)..............................................................17, 21

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001)..........................................................................................12

*In re Checking Account Overdraft Litig.*,
  275 F.R.D. 654 (S.D. Fla. 2011) ......................................................................................8

*In re China Med. Corp. Sec. Litig.*,
  2014 WL 12581781 (C.D. Cal. Jan. 7, 2014)...................................................................8

*In re Healthsouth Corp. Sec. Litig.*,
  334 F. App'x 248 (11th Cir. 2009)..................................................................................16

*In re Heritage Bond Litig.*,
  2005 WL 1594403 (C.D. Cal. June 10, 2005).................................................................19

*In re IMAX Sec. Litig.*,
  283 F.R.D. 178 (S.D.N.Y. 2012).....................................................................................19

*In re Marsh & McLennan Companies, Inc. Sec. Litig.*,
  2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009).................................................................19

*In re Mut. Funds Inv. Litig.*,
  2010 WL 2342413 (D. Md. May 19, 2010) ....................................................................19

*In re Nissan Motor Corp. Antitrust Litig.*,
  552 F.2d 1088 (5th Cir. 1977)..........................................................................................4

*In re OCA, Inc. Sec. & Deriv. Litig.*,
  2009 WL 512081 (E.D. La. Mar. 2, 2009)........................................................................8

*In re Omnivision Techs., Inc.*,
  559 F. Supp. 2d 1036 (N.D. Cal. 2008) ..........................................................................11

*In re Rayonier Inc. Sec. Litig.*,
  2017 WL 4535984 (M.D. Fla. Oct. 5, 2017)...................................................................19

iii

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
  571 F. Supp. 2d 1315 (N.D. Ga. 2007) ...................................................................... 6

*In re U.S. Oil & Gas Litig.*,
  967 F.2d 489 (11th Cir. 1992) ................................................................................. 4

*Morgan v. Public Storage*,
  301 F. Supp. 3d 1237 (S.D. Fla. 2016) ................................................................... 8

*New York State Teachers' Ret. Sys. v. Gen. Motors Co.*,
  315 F.R.D. 226 (E.D. Mich. 2016) ........................................................................ 15

*Reyes v. AT&T Mobility Servs., LLC*,
  2013 WL 12219252 (S.D. Fla. June 21, 2013) ...................................................... 16

*Robbins v. Koger Props., Inc.*,
  116 F.3d 1441 (11th Cir. 1997) ............................................................................ 13

*Saccoccio v. JP Morgan Chase Bank, N.A.*,
  297 F.R.D. 683 (S.D. Fla. 2014) ........................................................................ 8, 9

Securities.  *In re Datatec Sys., Inc. Sec. Litig.*,
  2007 WL 4225828 (D.N.J. Nov. 28, 2007) ........................................................... 20

*Snyder v. Ocwen Loan Servicing, LLC*,
  2019 WL 2103379 (N.D. Ill. May 14, 2019) ........................................................... 7

*Swinton v. SquareTrade, Inc.*,
  2019 WL 617791 (S.D. Iowa Feb. 14, 2019) ........................................................... 5

*Thorpe v. Walter Inv. Mgmt. Corp*,
  2016 WL 10518902 (S.D. Fla. Oct. 14, 2016) ...................................................... 11

*Trief v. Dun & Bradstreet Corp.*,
  840 F. Supp. 277 (S.D.N.Y. 1993) ....................................................................... 13

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
  669 F.3d 632 (5th Cir. 2012) .................................................................................. 8

*Yang v. Focus Media Holding Ltd.*,
  2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ........................................................... 8

STATUTES

15 U.S.C. § 78u-4(a)(4) ............................................................................................. 17

RULES

Fed. R. Civ. P. 23 ...................................................................................................*passim*

OTHER AUTHORITIES

*Attorneys' Fees in Class Actions: 2009-2013*,
   92 N.Y.U. L. Rev. 937 (Oct. 2017) ........................................................................ 16

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiff Gregory P. Mouton and plaintiff Kyle Pritchard (collectively, "Plaintiffs"), by and through their counsel, respectfully submit this memorandum of law in support of their motion for final approval of the proposed Settlement in this Action (the "Settlement"), and for approval of the proposed plan of allocation of the net proceeds of the Settlement (the "Plan of Allocation").[1]

## I.   INTRODUCTION

Plaintiffs, though their counsel, obtained a $3,000,000 all cash, non-reversionary settlement for the benefit of the Settlement Class. As described below and in the Sadler Declaration, the Settlement is a favorable result for the Settlement Class, providing a significant and certain recovery in a case that presented numerous hurdles and risks. In fact, the Settlement represents between 16.4% and 83.3% of the maximum recoverable class-wide damages, which is significantly higher than the median recovery in securities class action settlements. *See* Ex. 6 (2019 median recovery in securities class action settlement was approximately 4.8% of estimated damages); *see also*, § III.C.2, *infra* (discussing range of possible recovery). Moreover, the Settlement was reached only after a full-day of arm's-length negotiations conducted by experienced counsel with the assistance of a highly respected mediator, Mr. Jed D. Melnick, Esq. of JAMS.

Plaintiffs' and Lead Counsel's substantial efforts and well-developed understanding of the strengths and weaknesses of the Action also support final approval. Plaintiffs' efforts,

---

[1] All capitalized terms used herein that are not otherwise defined have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated July 9, 2020 (the "Stipulation") (ECF No. 55-1) and the Declaration of Casey E. Sadler in Support of: (I) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees, and Reimbursement of Litigation Expenses ("Sadler Declaration"). Unless otherwise noted, all citations to "¶__" and "Ex." refer, respectively, to paragraphs in, and exhibits to, the Sadler Declaration.

which are detailed in the Sadler Declaration, included, among other things:

- reviewing and analyzing SEC filings, press releases, reports, announcements, news articles, investor conference call transcripts, analyst reports, and other public information regarding Apyx Medical Corporation ("Apyx" or the "Company") and the other Defendants;

- working with a damages and loss causation expert to determine damages, and consulting an FDA expert with respect to FDA submission processes and practices;

- drafting and filing the initial complaint in the Action on behalf of named plaintiff Kyle Pritchard;

- moving for appointment of Lead Plaintiff;

- using the information obtained from their thorough and substantive investigation and work with experts to draft the Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint");

- successfully negotiating with Defendants' counsel regarding the production of additional parts of Apyx's 501(k) application, in conjunction with Defendants' motion to dismiss briefing;

- researching, drafting, and filing oppositions to Defendants' motion to dismiss and request for leave to file a reply in further support of their motion;

- reviewing and analyzing Defendants' answer to the Complaint, which asserted twenty-seven affirmative defenses;

- creating a substantial discovery plan, including areas of discovery, potential deponents and custodians, drafting requests for production and interrogatories, and communicating with Plaintiffs regarding discovery;

- preparing for and participating an adversarial mediation process and extensive settlement negotiations, which involved, (i) preparing a detailed mediation statement addressing liability, loss causation, and damages along with exhibits, (ii) reviewing and analyzing Defendants' mediation statement, and (iii) participating in a full-day mediation session with an experienced and highly respected mediator, Jed D. Melnick, Esq. of JAMS, where the Parties and counsel for the D&O insurance carrier engaged in full and frank discussions concerning the merits of the Action, including, for example, heavily disputed issues of whether there was any actionable misstatement, whether Defendants acted with the requisite scienter, Plaintiffs' ability to prove loss causation, and the appropriate length of the class period;

- drafting and then negotiating the Stipulation and related exhibits, including working with a damages expert to draft the proposed Plan of Allocation; and

2

- drafting the preliminary approval and final approval briefs. ¶¶10(a)-(j), 16-30.

As such, Plaintiffs and their counsel had sufficient information to make an informed decision regarding the fairness of the Settlement before entering into, and presenting it, to the Court. ¶11.

Plaintiffs and Lead Counsel believe the Settlement is an excellent result for the Settlement Class. This belief is supported by, among other things: (1) the certainty of a $3,000,000 recovery today versus the significant risk of a smaller or no recovery following years of additional litigation; (2) an analysis of the facts adduced to date; (3) past experience in litigating complex securities class actions; (4) the serious disputes between the parties concerning the merits; and (5) the favorable reaction of the Settlement Class. ¶¶5, 7-9. Plaintiffs, therefore, respectfully submit that the Settlement is fair, reasonable, and adequate.

Plaintiffs also move for approval of the Plan of Allocation of the Net Settlement Fund. Lead Counsel developed the Plan of Allocation in conjunction with Plaintiffs' damages expert, and it is designed to fairly and equitably distribute the proceeds of the Net Settlement Fund to Settlement Class Members. ¶¶62-68. As such, Plaintiffs respectfully submit that the Court should also approve the Plan of Allocation.

For these reasons, and those set forth below and in the Sadler Declaration, Plaintiffs respectfully request that the Court grant final approval of the Settlement and Plan of Allocation and grant final certification of the Settlement Class for settlement purposes.[2]

---

[2] The Sadler Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*, the factual and procedural history of the Action (¶¶10(a)-(j), 14-30); the nature of the claims asserted (¶¶18-19); the efforts involved in the drafting and defending of the Complaints (¶¶18-22, 34-36, 38, 41-42); the risks of continued litigation (¶¶31-52); the negotiations leading to the Settlement (¶¶23-26); and the Plan of Allocation (¶¶62-68).

## II.   STANDARDS GOVERNING APPROVAL OF CLASS ACTION SETTLEMENTS

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval of the compromise of claims brought on a class-wide basis.  The standard for determining whether to grant final approval to a class action settlement is whether the settlement is "fundamentally fair, adequate, and reasonable."  Fed. R. Civ. P. 23(e)(2).  Courts within this Circuit recognize that "public policy strongly favors the pretrial settlement of class action lawsuits." *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992).[3]  "Settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977).[4]

Rule 23(e)(2) requires courts to consider the following factors in determining whether a proposed settlement is fair, reasonable, and adequate:

(A)   whether the class representatives and class counsel have adequately represented the class;

(B)   whether the proposal was negotiated at arm's length;

(C)   whether the relief provided for the class is adequate, taking into account:

    i.   the costs, risks, and delay of trial and appeal;

    ii.   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

    iii.   the terms of any proposed award of attorneys' fees, including timing of payment;

    iv.   any agreement required to be identified under Rule 23(e)(3); and

(D)   whether the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Factors (A) and (B) "identify matters . . . described as procedural concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement,"

---

[3] All emphasis is added and all internal citations and quotations are omitted.

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

while factors (C) and (D) "focus on . . . a substantive review of the terms of the proposed settlement" (*i.e.*, "[t]he relief that the settlement is expected to provide to class members"). *See* Advisory Committee Notes to 2018 Amendments (324 F.R.D. 904, 919 (2018)).

The four factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the courts, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Id.* For this reason, the traditional Eleventh Circuit factors in *Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984), for evaluating whether a class action settlement is fair, reasonable, and adequate under Rule 23—certain of which overlap with Rule 23(e)(2)—are still relevant to the analysis. *See Swinton v. SquareTrade, Inc.*, 2019 WL 617791, at *5 (S.D. Iowa Feb. 14, 2019) ("The Court will therefore consider the Rule 23(e)(2) factors along with the factors developed by courts in the Eighth Circuit."). The *Bennett* factors are:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d at 986.

As discussed below, application of the factors set forth in Rule 23(e)(2), and the relevant, non-duplicative Eleventh Circuit factors, confirm that the Settlement merits final approval.

## III.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

### A.   Plaintiffs and Plaintiffs' Counsel Adequately Represented the Settlement Class

Rule 23(e)(2)(A) requires the Court to consider whether the "class representatives and class counsel have adequately represented the class." Here, Plaintiffs adequately represented the Settlement Class by actively pursuing their shared claims against Defendants, including

5

engaging counsel and filing the initial complaint in this matter (Plaintiff Kyle Pritchard), moving to be appointed Lead Plaintiff (Plaintiff Gregory Mouton), filing the Complaint, regularly communicating with Lead Counsel on case developments, discussing significant filings in the Action, and conferring with Lead Counsel throughout the settlement negotiations.   Ex. 1 and Ex. 2.   Moreover, Plaintiffs—investors who purchased Apyx securities during the Settlement Class Period and suffered damages as a result—suffered the same injury as other Settlement Class Members, thereby aligning Plaintiffs' interest in obtaining the largest possible recovery in the Action with the interests of other Settlement Class Members. *In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1332 (N.D. Ga. 2007) (finding adequacy where plaintiffs' and class members' interests were aligned in maximizing the amount of recovery).

Plaintiffs' Counsel, who have extensive experience litigating securities class action cases, have also adequately represented the Settlement Class throughout the litigation. *See* Ex. 4-C (Glancy Prongay & Murray LLP firm résumé) and Ex. 5-C (Desmond Law Firm, P.C. firm résumé).   As set forth above (*supra* § I), and detailed in the Sadler Declaration, Lead Counsel vigorously prosecuted the Action against skilled opposing counsel and achieved a favorable result.   Indeed, the Parties achieved the Settlement only after Lead Counsel: (1) thoroughly investigated the Settlement Class's claims; (2) consulted with an economic expert regarding loss causation and damages; (3) drafted an initial complaint on behalf of Kyle Pritchard, as well as the operative Complaint; (4) researched and drafted oppositions to Defendants' motion to dismiss and request for leave to file a reply in further support of the motion to dismiss; (5) created a substantial discovery plan; (6) prepared a mediation statement addressing liability and damages; and (7) engaged in vigorous arm's-length settlement negotiations before, during, and after the in-person mediation session. ¶¶10(a)-(j), 16-27.

6

Based on the foregoing, it is clear that Plaintiffs and their counsel adequately represented the Settlement Class. *See Snyder v. Ocwen Loan Servicing, LLC*, 2019 WL 2103379, at *4 (N.D. Ill. May 14, 2019) (finding adequacy of representation of the class under 23(e)(2)(A) where named plaintiffs "participated in the case diligently" and class counsel "fought hard throughout the litigation and pursued mediation when it appeared to be an advisable and feasible alternative").

### B.    The Settlement Results from Arm's Length Negotiations Between Experienced Counsel Under the Auspices of a Well-Respected Mediator

Rule 23(e)(2)(B) evaluates whether the proposed settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). This includes the Court's consideration of other related circumstances to ensure the "procedural" fairness of a settlement, including (i) "the stage of proceedings at which settlement was achieved";[5] and (ii) the opinion of competent counsel. All of these considerations support approval of the Settlement.

Here, the Parties reached the Settlement only after an extensive investigation of the alleged wrongdoing, the drafting of the Complaint and the briefing of Defendants' motion to dismiss. As such, the two sides had ample opportunity to evaluate the legal and factual merits of the claims and they were well aware of the strengths and weaknesses of the case prior to mediation. ¶¶10(a)-(j), 16-29 (detailing the investigation and work performed by Lead Counsel).[6] In addition, the mediation process—which included a full-day mediation

---

[5] *Bennett*, 737 F.2d at 968 (sixth factor).

[6] Where, as here, the Parties are adequately informed of the strengths and weakness of the case at the time of settlement negotiations, a lack of discovery is not a bar to settlement. *See Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012) (affirming approval of securities class action settlement where there had been no "formal discovery" but "class counsel had conducted informal discovery by hiring private investigators and experts," the settlement compared favorable to similar settlements, and the parties were "well informed about the merits of their respective positions"); *In re OCA, Inc. Sec. & Deriv. Litig.*, 2009 WL 512081, at *12 (E.D. La. Mar. 2, 2009) ("The question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient

7

session followed by additional arm's-length negotiations—was led by Mr. Melnick, a well-respected mediator who has significant experience mediating securities class actions and other complex litigation.[7]   These facts support a finding that the Settlement is fair, reasonable, and adequate, and was achieved free of collusion.  *See Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014) ("Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion."); *Morgan v. Public Storage*, 301 F. Supp. 3d 1237, 1247 (S.D. Fla. 2016) ("Moreover, the assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.").   Accordingly, this factor weighs in favor of final approval of the Settlement.  *See In re Checking Account Overdraft Litig.*, 275 F.R.D. 654, 661-62 (S.D. Fla. 2011) (approving settlement that was "the product of informed, good-faith, arms-length negotiations between the parties and their capable and experienced counsel, and [which] was reached with the assistance of a well-qualified and experienced mediator").

### C.    The Relief Provided for the Settlement Class is Adequate

Under Rule 23(e)(2)(C), the Court must also consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" along with other relevant factors.  Fed. R. Civ. P. 23(e)(2)(C).  Rule 23(e)(2)(C)(i) essentially incorporates four *Bennett* factors: "the likelihood of success at trial" (first factor); "the range of possible recovery" (second factor); "the point on or below the range of possible recovery

---

information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it.").

[7] *See In re China Med. Corp. Sec. Litig.*, 2014 WL 12581781, at *5 (C.D. Cal. Jan. 7, 2014) ("Mr. Melnick's involvement in the settlement supports the argument that it is non-collusive"); *Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *5 (S.D.N.Y. Sept. 4, 2014) ("Mr. Melnick's role in the settlement negotiations overcomes any hesitation this court might have about approving a settlement reached prior to any discovery.").

at which a settlement is fair, adequate and reasonable" (third factor);[8] and "the complexity, expense and duration of litigation" (fourth factor). *Bennett*, 737 F.2d at 968.

### 1.      The Costs, Risks, and Delay of Trial and Appeal

There is no question that continued litigation in this case would have been costly, risky and protracted.  Courts have repeatedly noted that "[s]tockholder litigation is notably difficult and notoriously uncertain." *Carpenters Health & Welfare Fund v. The Coca-Cola Co.*, 2008 WL 11336122, at *9 (N.D. Ga. Oct. 20, 2008).  Indeed, even though Plaintiffs prevailed at the motion to dismiss stage, Plaintiffs would still have to obtain class certification and ***prove*** their claims.  Overcoming these hurdles would be no small task, and Plaintiffs and Lead Counsel recognized the significant risk, time, and expense involved in prosecuting Plaintiffs' claims through class certification, completion of fact and expert discovery, summary judgment, trial, and subsequent appeals.

### (a)      Risks to Proving Liability

As in every complex case of this kind, Plaintiffs and the Settlement Class faced formidable obstacles to recovery at trial, both with respect to liability and damages. Although Plaintiffs believe that they would be successful and that the allegations of the Complaint would ultimately be borne out by the evidence, they also recognize that they faced significant hurdles in proving liability and damages.  Defendants would likely contend in a motion for summary judgment or at trial, that there were no actionable misstatements prior to March 13, 2019, when Defendants responded to the analyst report that criticized the Company.  ¶34.  They would argue, among other things, that: (i) there was no duty to disclose the actual study results at issue because relevant regulations only mandated disclosure within one year of the study's completion; and (ii) Defendants had not partially

---

[8] The second and third Bennett factors are "easily combined." *Chase Bank*, 297 F.R.D. at 693.

disclosed any of the results during the Settlement Class Period, which would have triggered a duty to disclose all the results. *Id.* Defendants would undoubtedly cite the Court's March 11, 2020 Order (ECF No. 40), which only addressed the falsity of the March 13, 2019 statements and not any earlier statements, which were dissimilar in the fact that they were not made in response to an analyst report and only stated that the results had been submitted and were positive. *Id.*

Defendants also argued that the positive statements regarding the study results largely constituted opinions and that many of the challenged statements were inactionable puffery. ¶35. Specifically, Defendants argued, among other things, that: (i) Defendants actually held the opinion that the study results were positive, and approval was likely due to the fact that the study had met its secondary endpoints and discussions with the FDA; (ii) the opinions were not embedded in statements of fact; (iii) the statements did not omit the basis for their opinions because Defendants did believe the study was positive regardless of the primary efficacy endpoint being met and the protocol deviations. *Id.*

Finally, Defendants would have likely moved for summary judgment on the element of scienter. Proving scienter in a securities case is often the most difficult element of proof and one which is rarely supported by direct evidence or an admission. *See, e.g., Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 6902856, at *5 (N.D. Cal. Nov. 21, 2016); *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 426 (S.D.N.Y. 2001). Specifically, Defendants would have argued that Plaintiffs failed to allege a motive to commit fraud because the truth regarding the study results would ultimately be revealed when the FDA rendered decision on Apyx's 501(k) application and no corporate insider had made a single insider stock sale during the putative class period. ¶38. Moreover, Defendants would have likely claimed that Plaintiffs could not allege that Defendants believed the study would fail because the Company was engaging in a good faith dialogue with the FDA regarding the

10

FDA's concerns and Defendants believed they could obtain FDA approval based on the secondary endpoints alone. *Id.*

### (b)  Risks of Class Certification

While Plaintiffs were confident that they would successfully obtain class certification, such success was not guaranteed. ¶32. Class certification requires substantial briefing, as well as extensive and costly expert discovery, including depositions, on the issue of market efficiency and price impact. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 131 S. Ct. 2398, 2405-08 (2014) (holding that defendants may rebut the presumption of reliance at the class certification stage by showing that the alleged misrepresentations did not impact the stock price). Thus, the class certification process would have involved substantial risk to the Settlement Class and considerable expense to both parties. *Thorpe v. Walter Inv. Mgmt. Corp*, 2016 WL 10518902, at *9 (S.D. Fla. Oct. 14, 2016) (noting risk of "successfully maintain[ing] class certification through trial, and prov[ing] damages, requiring additional complicated expert testimony").

Moreover, "the law of class actions is developing at a rapid clip, and it is always possible that some new Supreme Court decision would counsel in favor of decertification." *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *9 (S.D.N.Y. May 9, 2014). In short, Plaintiffs faced very real risks in obtaining and maintaining class action status, both of which would be necessary in order to achieve a class-wide recovery. *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) (even if a class is certified, "there is no guarantee the certification would survive through trial, as Defendants might have sought decertification or modification of the class").

### (c)  Risks in Proving Damages

Additionally, even if Plaintiffs were successful in establishing liability at trial, they would still face substantial risks in establishing damages on a class-wide basis. For example,

Defendants raised credible arguments that there were no actionable misstatements prior to March 13, 2019. ¶41. If Defendants succeeded in arguing they did not have a duty to disclose the study results prior to March 13, 2019, the class period covered by the Action would have been shortened from approximately three months (December 21, 2018 through April 1, 2019, inclusive) to 20 days (March 13 through April 1, 2019, inclusive), and the maximum recoverable damages in this case would have been drastically reduced to $3.6 million. *Id.* Additionally, Defendants would have disputed damages by claiming the price declines in Apyx Securities that occurred on February 21, 2019 and April 1, 2019 were caused by other negative news, not by the revelation of the alleged fraud as Plaintiffs claimed. ¶42. These disputes would have required a jury to decide the "battle of the experts"—an intrinsically expensive and unpredictable process. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001) ("[E]stablishing damages at trial would lead to a battle of experts with each side presenting its figures to the jury and with no guarantee whom the jury would believe."); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("In the battle of experts, it is virtually impossible to predict with certainty which testimony will be credited.").

### (d)    Risks of Preserving a Favorable Jury Verdict After Trial

Finally, even if Plaintiffs prevailed on liability, the Court certified the class proposed by Plaintiffs, and the class was awarded damages, Defendants would have no doubt appealed the verdict and award. The appeals process would prolong the case for years, with the ultimate outcome uncertain. ¶48. During the pending appeal, the Settlement Class would receive no distribution of any kind. In addition, an appeal of any judgment would carry the risk of reversal, in which case the Settlement Class might not receive anything. *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing jury verdict of $81

million for plaintiffs).[9]

In sum, even if Plaintiffs were to prevail after trial and appeals, there is no guarantee that they would have obtained a judgment greater than the $3 million Settlement. There was, as in any complex securities action, a very significant risk that continued litigation might yield a smaller recovery—or indeed, no recovery at all—several years in the future. *See Trief v. Dun & Bradstreet Corp.*, 840 F. Supp. 277, 282 (S.D.N.Y. 1993) ("It is beyond cavil that continued litigation in this multi-district securities class action would be complex, lengthy, and expensive, with no guarantee of recovery by the class members."). In contrast, the Settlement provides a favorable, immediately-realizable recovery that eliminates all of the risk, delay, and expense of continued litigation.

### 2.    The Settlement Amount is Within the Range of Reasonableness

In determining whether a settlement is fair in light of the potential range of recovery, the Court is guided by the "important maxim[]" that "the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988), *aff'd sub nom. Behrens v. Wometco Enterprises*, 899 F.2d 21 (11th Cir. 1990).

Under the terms of the Settlement, the Settlement Class will receive $3 million—a substantial amount—in exchange for the release of all claims against Defendants. Plaintiffs' damages consultant estimates that if Plaintiffs had ***fully prevailed*** at both summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Plaintiffs' damages theory—*i.e.*, Plaintiffs' ***best case scenario***—the total ***maximum*** damages would be approximately $18.3 million. Thus,

---

[9] *See also In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605, at \*20-22 (S.D. Fla. Apr. 25, 2011) (granting defendants' motion for judgment as a matter of law following plaintiffs' verdict) *aff'd, Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012).

the $3,000,000 Settlement Amount represents approximately 16.4% of the total **_maximum_** damages **_potentially_** available.  ¶50.

Conversely, if Defendants' colorable loss causation arguments discussed above were accepted, the maximum recoverable damages would have been drastically reduced to $3.6 million.  Under such a scenario, the $3 million recovery equates to approximately 83.3% of damages.  ¶51.  A recovery within the range of 16.4%-83.3% is above the average recovery in similar situations.  *See* Ex. 6 (Cornerstone Report, "Securities Class Action Settlements 2019 Review and Analysis," at p. 6 Figure 5 (reporting median percentage of 2019 recoveries of 12.8% in cases alleging less than $25 million in damages, and 4.8% overall for all securities class actions)); *see also IBEW v. Int'l Game Tech., Inc.*, 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (approving securities settlement where recovery was 3.5% of maximum damages and noting "this amount is within the median recovery in securities class actions settled in the last few years").

In light of the attendant risks discussed above, there can be no doubt that the Settlement Amount is well within the range of reasonableness, and that this factor weighs in favor of final approval.

### 3.    Other Factors Established by Rule 23(e)(2)(C) Support Final Approval of the Proposed Settlement

Under Rule 23(e)(2)(C), courts also must consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims," "the terms of any proposed award of attorneys' fees, including timing of payment," and "any agreement required to be identified under Rule 23(e)(2)."  Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv).  Each of these factors supports the Settlement's approval or is neutral and does not suggest any basis for concluding the Settlement is inadequate.

First, the Net Settlement Fund will be allocated to Settlement Class Members who

14

submit valid Claim Forms in accordance with the Plan of Allocation. *See* § VI, *infra*. Strategic Claims Services ("SCS")—the Claims Administrator selected by Lead Counsel and approved by the Court—will process claims under the guidance of Lead Counsel, allow claimants an opportunity to cure any deficiencies in their claims or request the Court to review a denial of their claims, and, lastly, mail or wire Authorized Claimants their *pro rata* share of the Net Settlement Fund (per the Plan of Allocation), after Court-approval.[10]   The manner of processing Claims proposed here is standard in securities class action settlements and courts have found this process to be effective, as well as necessary, since neither Plaintiffs nor Defendants possess the individual investor trading data required for a claims-free process to distribute the Net Settlement Fund.[11]  *See New York State Teachers' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 233-34, 242 (E.D. Mich. 2016) (approving settlement with a nearly identical distribution process), *aff'd*, 2017 WL 6398014 (6th Cir. Nov. 27, 2017).

Second, the relief provided for the Settlement Class is also adequate when the terms of the proposed award of attorneys' fees are taken into account.  As discussed in detail in the accompanying memorandum in support of Lead Counsel's request for award of attorneys' fees and reimbursement of Litigation Expense, the proposed attorneys' fee of 33⅓% of the Settlement Fund, to be paid upon approval by the Court, is reasonable in light of the substantial work and efforts of Plaintiffs' Counsel, the risks that they faced in the litigation, the results achieved, and awards in similar complex cases.  *Reyes v. AT&T Mobility Servs.,*

---

[10] SCS has substantial experience serving as the claims administrator in securities class action cases and was selected by Lead Counsel following an RFP process in which it was the low bidder.

[11] This is not a claims-made settlement.  If the Settlement is approved, Defendants will not have any right to the return of a portion of the Settlement based on the number or value of the claims submitted.  *See* Stipulation ¶15.

*LLC*, 2013 WL 12219252, at *3 (S.D. Fla. June 21, 2013) ("Class Counsel's request for one-third of the settlement fund is also consistent with the trend in this Circuit."); *Atkinson v. Wal-Mart Stores, Inc.*, 2011 WL 6846747, at *7 (M.D. Fla. Dec. 29, 2011) (awarding "customary fee" of 33.3% of $2,020,000).[12]

Third, with respect to Rule 23(e)(2)(C)(iv), the Parties entered into a confidential agreement establishing conditions under which Defendants may terminate the Settlement if a certain threshold of Settlement Class Members submit valid and timely requests for exclusion. This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement. *See In re Healthsouth Corp. Sec. Litig.*, 334 F. App'x 248, 250 n.4 (11th Cir. 2009); *In re Carrier IQ, Inc., Consumer Privacy Litig.*, 2016 WL 4474366, at *5 (N.D. Cal. Aug. 25, 2016) (granting final approval of class action settlement and observing that such "opt-out deals are not uncommon as they are designed to ensure that an objector cannot try to hijack a settlement in his or her own self-interest.").

### D.     All Settlement Class Members Are Treated Equitably

Rule 23(e)(2)(D) requires that the Court assess whether the settlement "treats class members equitably relative to each other." The Settlement does that. Under the proposed Plan of Allocation,[13] each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Because the proposed Plan of Allocation does not provide preferential treatment to any Settlement Class Member, segment of the Settlement Class, or

---

[12] *See also* Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 951 (Oct. 2017) (finding that, over a four year period, the mean fee award in the Eleventh Circuit was 30% and the median award was 33%); *Fernandez v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2017 WL 7798110, at *4 (S.D. Fla. Dec. 18, 2017) (awarding 35% of $25 million and stating, "[c]ourts within this Circuit have routinely awarded attorneys' fees of 33 percent or more of the gross settlement fund") (citing cases).

[13] The proposed Plan of Allocation is set forth in the Notice. Ex. 3-D (Notice at pp. 10-16).

16

to Plaintiffs, this factor supports final approval of the proposed Settlement. *See e.g.*, *In re Catalina Mktg. Corp. Sec. Litig.*, 2007 WL 9723529, at *1 (M.D. Fla. July 9, 2007) ("Although the plan of allocation benefits some members of the class differently, it was developed to fairly account for the relative strength of individual claims and the timing of the relevant securities purchases.").[14]

### E. The Remaining Eleventh Circuit Factor—the Substance and Amount of Opposition to the Settlement—Favors Final Approval of the Settlement

To date, no objections to the Settlement have been received. ¶5. Such a favorable reaction of the Class to the Settlement also supports its approval. *Access Now, Inc. v. Claire's Stores, Inc.*, 2002 WL 1162422, at *7 (S.D. Fla. May 7, 2002) ("[t]he fact that no objections have been filed strongly favors approval of the settlement").

In accordance with the Preliminary Approval Order, SCS began mailing copies of the Postcard Notice to potential Settlement Class Members and nominees on August 4, 2020. *See* Bravata Decl., at ¶¶3-4. As of September 28, 2020, 4,980 copies of the Postcard Notice have been disseminated to potential Settlement Class Members and nominees. *See id.* ¶7. The Claims Administrator also caused the Summary Notice to be published in *Investor's Business Daily* and transmitted once over *PR Newswire* on August 24, 2020. *Id.*, ¶8. While the deadline to file objections and requests for exclusion is October 16, 2020, to date, no objections or requests for exclusion have been received. ¶61; Bravata Decl. ¶12. The Settlement Class's reaction to the Settlement—as exhibited the fact that there have been no requests for exclusion and no objections—demonstrates strong support for the Settlement.

\*       \*       \*

Accordingly, each of these factors favors approval of the Settlement.

---

[14] Pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Plaintiffs may separately seek reimbursement of costs (including lost wages) incurred as a result of their representation of the Settlement Class. *See* 15 U.S.C. § 78u-4(a)(4).

17

## IV.    THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED

The Court's July 21, 2020 Preliminary Approval Order certified the Settlement Class for settlement purposes only under Fed. R. Civ. P. 23(a) and (b)(3). *See* ECF No. 56, ¶¶2-3. There have been no changes to alter the propriety of class certification for settlement purposes. Thus, for the reasons stated in Plaintiffs' Preliminary Approval Brief (*see* ECF No. 54, at pp. 21-23), Plaintiffs respectfully request that the Court affirm its determinations in the Preliminary Approval Order certifying the Settlement Class under Rules 23(a) and (b)(3).

## V.    THE NOTICE PROGRAM SATISFIES RULE 23 AND DUE PROCESS

The Court approved the proposed notice program in the Preliminary Approval Order, and Plaintiffs executed the notice program in accordance with the provisions therein. ¶¶53-60. Notice was given to Settlement Class Members via Postcard Notice, the Settlement Website (www.ApyxSecuritiesSettlement.com), and publication. ¶¶56-59. Copies of the Court-approved Postcard Notice were timely mailed by the Court-appointed Claims Administrator, SCS, to an aggregate of 4,980 potential Settlement Class Members and the largest brokerage firms, banks, institutions, and other nominees. ¶58; Bravata Decl. ¶7.

On August 24, 2020, the Court-approved Summary Notice was published in *Investors' Business Daily* and transmitted once over the *PR Newswire*. ¶59; Bravata Decl. ¶8. The published Summary Notice clearly and concisely provided information concerning the Settlement and the means to obtain a copy of the Notice. *See* Bravata Decl. at Ex. 3-C. Finally, the Claims Administrator posted the Notice, Claim Form, and other relevant documents online at the Settlement Website, and provided a toll-free telephone number for Settlement Class Members to call with any questions concerning the Settlement. ¶60; Bravata Decl. ¶¶8-9. Courts routinely find that comparable notice programs meet the requirements of due process and Rule 23. *See Murdeshwar v. SearchMedia Holdings Lltd.,*

18

*et al.*, Partial Final Judgment and Order Approving Partial Settlement and Partially Dismissing the Action with Prejudice, Case No. 1:11-cv-20549-KMW , Dkt. No. 103 (S.D. Fla April 25, 2012) (approving combination of postcard notice, summary notice and detailed notice online); *In re Mut. Funds Inv. Litig.*, 2010 WL 2342413, at *6-7 (D. Md. May 19, 2010) (approving combination of postcard notice, summary notice, and detailed notice available online as "the best notice practical"); *In re Advanced Battery Techs., Inc. Secs. Litig.*, 298 F.R.D. 171, 182-83 n.3 (S.D.N.Y. 2014) (collecting cases and stating that "[t]he use of a combination of a mailed post card directing class members to a more detailed online notice has been approved by courts").

## VI.     THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

In the Preliminary Approval Order, the Court preliminarily approved the Plan of Allocation.  Plaintiffs now request final approval of the Plan of Allocation.  Assessment of a plan of allocation of settlement proceeds in a class action under Rule 23 is governed by the same standards of review applicable to approval of the settlement as a whole—the plan must be fair, adequate and reasonable.  *In re Rayonier Inc. Sec. Litig.*, 2017 WL 4535984, at *1 (M.D. Fla. Oct. 5, 2017).  "When formulated by competent and experienced counsel, a plan for allocation of net settlement proceeds need have only a reasonable, rational basis."  *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012); *see also  In re Heritage Bond Litig.*, 2005 WL 1594403, at *11 (C.D. Cal. June 10, 2005); *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, No. 04 CIV. 8144 (CM), 2009 WL 5178546, at *13 (S.D.N.Y. Dec. 23, 2009) ("In determining whether a plan of allocation is fair, courts look largely to the opinion of counsel.").    Moreover, district courts enjoy "broad supervisory powers over the administration of class-action settlements to allocate the proceeds among the claiming class members . . . equitably."  *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978).

Here, the proposed Plan of Allocation is set forth in the Notice posted on the

Settlement Website.  Ex. 3-D (Notice at pp. 10-16).  Lead Counsel developed the Plan of Allocation in consultation with Plaintiffs' damages consultant with the objective of equitably distributing the Net Settlement Fund.  ¶64.  The calculation of each Settlement Class Member's Recognized Loss under the Plan of Allocation will be based on several factors, including when the Apyx Securities were purchased and sold, the type of Apyx Securities purchased or sold, the purchase and sale price of the Apyx Securities, the relative strength of the claims asserted, and the estimated artificial inflation in the price of Apyx Securities at the time of the purchase or sale of the Apyx Securities.  ¶66; *In re Datatec Sys., Inc. Sec. Litig.*, No. 04-CV-525 (GEB), 2007 WL 4225828, at *5 (D.N.J. Nov. 28, 2007) ("plans that allocate money depending on the timing of purchases and sales of the securities at issue are common").  If a Claimant has an overall market gain with respect to his, her, or its overall transactions in Apyx Securities during the Settlement Class Period, or if the Claimant purchased Apyx Common Stock or Apyx Call Options or sold (written) Apyx Put Options during the Settlement Class Period, but did not hold any of those Apyx Securities through at least one of the alleged corrective disclosures, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud.  ¶66.  The Net Settlement Fund will be allocated to Authorized Claimants—including Plaintiffs—on a *pro rata* basis based on the type of security (*i.e.*, common stock or option) and the relative size of their Recognized Loss(es).[15]

---

[15] For Apyx Common Stock and Apyx Call Options acquired during period December 21, 2018 through March 13, 2019, inclusive, and Apyx Put Options sold during period December 21, 2018 through March 13, 2019, inclusive, the Recognized Loss is discounted by 25% to reflect Lead Counsel's assessment of the probability of successful recovery in view of Defendants' legal arguments that the statements prior to March 13, 2019 were not actionable because they were statements of opinion and there was no duty to disclose the information at issue.  *See* Bravata Decl. at Ex. 3-D (Notice at p. 11, n.3).  The Settlement proceeds available for Apyx Call Options purchased during the Settlement Class Period and Apyx Put Options sold (written) during the Settlement Class Period shall be limited to a total amount equal to 5% of the Net Settlement Fund.  See id. at Ex. 3-D (Notice at ¶59).

Lead Counsel believe that the proposed Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result of the conduct alleged in the Action, and their opinion as to allocation is entitled to "considerable weight" by the Court in deciding whether to approve the plan.  ¶66; *see also In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 430 (S.D.N.Y. 2001) ("As with other aspects of settlement, the opinion of experienced and informed counsel is entitled to considerable weight.").  To date, no objections to the Plan of Allocation have been filed on this Court's docket or received by Lead Counsel, suggesting that the Settlement Class also finds the Plan of Allocation to be fair and reasonable.  ¶68. Moreover, similar plan have been approved by courts in securities class actions.  *See, e.g., In re Catalina Mktg. Corp. Sec. Litig.*, 2007 WL 9723529, at *1 (M.D. Fla. July 9, 2007) ("Although  the plan of allocation benefits  some  members  of  the  class  differently,  it  was developed to fairly account for the relative strength of individual claims and the timing of the relevant securities purchases.").  Accordingly, Plaintiffs respectfully submit that the proposed Plan of Allocation is fair and reasonable, and merits final approval from the Court.

## VII.    CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate, and certify the Settlement Class for the purposes of settlement.[16]

///

///

---

[16] A revised proposed Final Judgment and Order of Dismissal with Prejudice and a revised proposed Order Approving Plan of Allocation will be submitted with Plaintiffs' reply papers on October 30, 2020, after the deadline for objecting to the motion has passed.

21

Dated: October 2, 2020                        Respectfully submitted,


                                              */s/ Casey E. Sadler*
                                              Casey E. Sadler (*pro hac vice*)
                                              Joseph D. Cohen (*pro hac vice*)
                                              **GLANCY PRONGAY & MURRAY**
                                              1925 Century Park East, Suite 2100
                                              Los Angeles, California 90067
                                              Telephone: (310) 201-9150
                                              Facsimile: (310) 201-9160
                                              Email: csadler@glancylaw.com
                                                      jcohen@glancylaw.com

                                              *Lead Counsel for the Settlement Class*

                                              *-and-*

                                              Leo W. Desmond, Esquire
                                              Florida Bar Number 0041920
                                              **DESMOND LAW FIRM, P.C.**
                                              5070 Highway A1A, Suite D
                                              Vero Beach, Florida 32963
                                              Telephone: (772) 231-9600
                                              Facsimile: (772) 231-0300
                                              Email: lwd@desmondlawfirm.com

                                              *Liaison Counsel for the Settlement Class*

22

## CERTIFICATE OF SERVICE

The undersigned counsel for Plaintiffs hereby certifies that on October 2, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses of all counsel of record in this matter.

Dated:  October 2, 2020

/s/ Casey E. Sadler
Casey E. Sadler

23