**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

KYLE PRITCHARD, Individually and on
Behalf of All Others Similarly Situated,

    Plaintiff,

    v.

APYX MEDICAL CORPORATION f/k/a
BOVIE MEDICAL CORPORATION, and
CHARLES D. GOODWIN,

    Defendants.

Case No. 8:19-cv-00919-SCB-AEP

CLASS ACTION

**DECLARATION OF CASEY E. SADLER**
**IN SUPPORT OF: (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF**
**CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND**
**(II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND**
**<u>REIMBURSEMENT OF LITIGATION EXPENSES</u>**

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 2

II.     PROSECUTION OF THE ACTION ......................................................................... 6

        A.      Background ....................................................................................................... 6

        B.      Commencement of the Instant Action and Appointment of Lead Plaintiff and
                Lead Counsel ................................................................................................... 6

        C.      The Comprehensive Pre-Filing Investigation and Preparation of the Complaint ... 7

        D.      Plaintiffs Defeat Defendants' Motion to Dismiss ........................................... 8

        E.      Mediation Efforts, Settlement Negotiations, and Preliminary Approval of the
                Settlement ........................................................................................................ 8

III.    THE RISKS OF CONTINUED LITIGATION ...................................................... 10

        A.      Risks Faced in Obtaining and Maintaining Class Action Status ................... 10

        B.      Risks to Proving Liability .............................................................................. 11

        C.      Risks to Proving Loss Causation and Damages ............................................. 13

        D.      Other Risks ..................................................................................................... 15

        E.      The Settlement is Reasonable in Light of Potential Recovery in the Action ........ 16

IV.     PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL
        ORDER REQUIRING ISSUANCE OF THE NOTICE ........................................... 17

V.      ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ................... 19

VI.     LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT
        OF LITIGATION EXPENSES ............................................................................... 22

        A.      The Outcome Achieved is the Result of the Significant Time and Labor that Lead
                Counsel Devoted to the Action ....................................................................... 23

        B.      The Risks of Litigation and the Need to Ensure the Availability of Competent
                Counsel in High-Risk Contingent Securities Cases ....................................... 25

        C.      The Experience and Expertise of Lead Counsel, and the Standing and Caliber of
                Defendants' Counsel ....................................................................................... 26

D.      The Reaction of the Settlement Class Supports Lead Counsel's Fee Request ..... 27

E.      Plaintiffs Support Lead Counsel's Fee Request...................................................... 28

F.      Reimbursement of the Requested Litigation Expenses Is Fair and Reasonable... 28

VII.    CONCLUSION............................................................................................................... 30

**TABLE OF EXHIBITS TO DECLARATION**

| EX. | TITLE |
|-----|-------|
| 1 | Declaration of Gregory P. Mouton in Support of: (I) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 2 | Declaration of Kyle Pritchard in Support of: (I) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 3 | Declaration of Josephine Bravata Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections |
| 4 | Declaration of Casey E. Sadler, Esq. in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Glancy Prongay & Murray LLP |
| 5 | Declaration of Leo W. Desmond, Esq. in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of The Desmond Law Firm, P.C. |
| 6 | Excerpts of Larrni T. Bulan and Laura E. Simmons, Cornerstone Research, "Securities Class Action Settlements: 2019 Review and Analysis" (Mar. 2020) |
| 7 | Table of Peer Law Firm Billing Rates |
| 8 | Table of Fee Awards in Comparable Eleventh Circuit Complex Cases |
| 9 | Fee Awards in Comparable Complex Cases Outside the Eleventh Circuit |

iii

I, Casey E. Sadler, declare under penalty of perjury, pursuant to 28 U.S.C. §1746, as follows:

1.      I am a partner at the law firm Glancy Prongay & Murray LLP ("GPM"). GPM serves as Lead Counsel on behalf of the Court-appointed Lead Plaintiff Gregory P. Mouton ("Lead Plaintiff" or "Mouton") and plaintiff Kyle Pritchard (collectively, "Plaintiffs") in this securities class action (the "Action").[1]  Unless otherwise indicated, I have personal knowledge of the matters set forth herein based both on my extensive participation in the prosecution and settlement of the claims asserted in the Action and my supervision of those working at my direction.  If called upon, I could and would competently testify that the following facts are true and correct.

2.      I respectfully submit this declaration, together with the attached exhibits, in support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and the concurrently filed memorandum in support thereof (the "Final Approval Memorandum").  As set forth in the Final Approval Memorandum, Plaintiffs seek final approval of the $3 million Settlement for the benefit of the Settlement Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.

3.      I also respectfully submit this declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the concurrently filed memorandum in support thereof (the "Fee Memorandum").  As set forth in the Fee Memorandum, Lead Counsel seeks an award of attorneys' fees in the amount of 33⅓% of the Settlement Fund (plus interest accrued thereon), and reimbursement of

---

[1] All capitalized terms used herein that are not otherwise defined have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated July 9, 2020 (the "Stipulation") (ECF No. 55-1).

1

Litigation Expenses in the total amount of $47,616.93, which includes Lead Counsel's total expenses in the amount of $37,616.93 and $10,000 in total to Plaintiffs ($7,500 for Lead Plaintiff Mouton and $2,500 for plaintiff Pritchard) pursuant to the Private Securities Litigation Reform Act of 1995 ("PLSRA") for their costs, including lost wages, incurred in connection with their representation of the Settlement Class.

4.      The Court preliminarily approved the proposed Settlement by its Order entered on July 21, 2020 (the "Preliminary Approval Order"), and thereby directed notice of the Settlement to be disseminated to the Settlement Class. *See* ECF No. 56. Pursuant to the Preliminary Approval Order, Strategic Claims Services ("SCS"), the Court-approved Claims Administrator, implemented a comprehensive notice program whereby notice was given to potential Settlement Class Members by mail and by publication. *See* ¶¶53-61, *infra* (detailing notice program); *see also* Ex. 3 (Declaration of Josephine Bravata Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections, the "Bravata Decl." ¶¶2-7).

5.      In total, approximately 4,980 copies of the Postcard Notice (referring Settlement Class Members to the Settlement Website where the longform Notice and the Claim Form are located) have been mailed or e-mailed to potential Settlement Class Members, and thus far not a single objection or request for exclusion have been received. Ex. 3 (Bravata Decl. ¶¶2, 7).

## I.      INTRODUCTION

6.      Plaintiffs in this action allege claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, arising from Defendants' alleged misrepresentations and omissions made during the Settlement Class Period from December 21, 2018 to April 1, 2019, inclusive.

7. The proposed Settlement presented to the Court for final approval provides the resolution of all claims in the Action in exchange for a cash payment of $3,000,000 (the "Settlement Amount") for the benefit of the Settlement Class. As detailed herein, Plaintiffs and Lead Counsel submit that the proposed Settlement represents an excellent result for the Settlement Class in light of the significant risks to overcome and remaining in the Action.

8. The Settlement represents a recovery of at least 16.4% and as much as 83.3% of the maximum estimated provable damages in this case depending on whether Defendants had succeeded in arguing that they did not have a duty to disclose the study results prior to March 13, 2019. Accordingly, the Settlement is a tremendous result compared to recoveries in other cases alleging losses of a similar magnitude. *See* Ex. 6 (research finding median percentage of 2019 recoveries of 12.8% of estimated damages in securities class actions alleging losses under $25 million and a median recovery of 4.8% overall in securities class actions).

9. Thus, the Settlement provides a substantial, certain, and immediate recovery, while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover less than the Settlement Amount (or nothing) after years of additional litigation and delay.

10. The Settlement was only achieved after a hard-fought litigation, during which Lead Counsel became well informed of the relative strengths and weaknesses of Plaintiffs' claims in the Action. In prosecuting the Action, Lead Counsel expended great efforts and resources on behalf of the Settlement Class, including, *inter alia*:

    a.    conducting a detailed and substantive investigation of Apyx Medical Corporation's ("Apyx" or the "Company"), the Individual Defendant, and the fraudulent misrepresentations and omissions alleged in the Action, including: (i) review and analysis of Apyx's filings with the SEC, press releases, transcripts of Apyx investor calls, and other public statements made by Defendants prior to, during, and after the Settlement Class Period, as well as research reports prepared by securities and financial analysts regarding Apyx,

3

and publicly available documents, reports, announcements, and news articles concerning Defendants; (ii) consultation with experts in market efficiency, loss causation and damages; and (iii) consultation with an FDA expert with respect to FDA submission processes and practices;

b.    drafting the initial complaint that instituted the Action (ECF No. 1) and the comprehensive and factually detailed 41-page Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint," ECF No. 29) incorporating the foregoing research and investigation efforts;

c.    successfully negotiating with Defendants' counsel regarding the production of additional parts of Apyx's 501(k) application, in conjunction with Defendants' motion to dismiss briefing (ECF No. 30);

d.    researching and drafting the opposition to Defendants' motion to dismiss (ECF No. 30), which was filed by Plaintiffs on November 4, 2019 (ECF No. 34);

e.    opposing Defendants' request for leave to file a reply in further support of their motion (ECF No. 38);

f.    analyzing Defendants' answer to the Complaint and their twenty-seven affirmative defenses (ECF No. 50);

g.    creating a substantial discovery plan, including areas of discovery, potential deponents and custodians, drafting requests for production and interrogatories, and communicating with Plaintiffs regarding discovery;

h.    preparing for and participating in an adversarial mediation process and extensive settlement negotiations, which involved, (i) preparing a detailed mediation statement addressing liability, loss causation, and damages along with exhibits, (ii) reviewing and analyzing Defendants' mediation statement, and (iii) participating in a full-day mediation session with an experienced and highly respected mediator, Jed D. Melnick, Esq. of JAMS, where the Parties and counsel for the D&O insurance carrier engaged in full and frank discussions concerning the merits of the Action, including, for example, heavily disputed issues of whether Defendants acted with the requisite scienter, Plaintiffs' ability to prove loss causation, and the appropriate length of the class period. The session culminated in an agreement in principle to settle the Action for $3 million in cash;

i.    negotiating and memorializing the key terms of the Parties' agreement to settle in the comprehensive Stipulation and related exhibits; and

j.    drafting the preliminary and final approval briefs.

11.    Based on the foregoing efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the action and believe the

4

Settlement represents a favorable outcome for the Settlement Class and is in the best interests of the Settlement Class Members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Federal Rule of Civil Procedure 23(e).

12. In addition, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of one of Plaintiffs' damages consultants. ¶¶62-68, *infra* (discussing Plan of Allocation). The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts.

13. Finally, Lead Counsel seeks approval of the request for attorneys' fees, and reimbursement of Litigation Expenses, as set forth in the Fee Memorandum. As discussed in detail in the accompanying Fee Memorandum, the requested 33⅓% fee is within the range of percentage awards granted by courts in this Circuit in comparable securities class actions. Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and is warranted in light of the extent and quality of the work performed and the substantial result achieved. Likewise, the requested litigation expenses of $37,616.93 and the requested PSLRA awards to Plaintiffs ($7,500 for Lead Plaintiff Mouton and $2,500 for plaintiff Pritchard) are fair and reasonable. Accordingly, as set forth in the Fee Memorandum and for the additional reasons set forth herein below, we respectfully submit that Lead Counsel's request for attorneys' fees and reimbursement of Litigation Expenses is fair and reasonable and should be approved.

## II.    PROSECUTION OF THE ACTION

### A.    Background

14.    Apyx is a medical technology company that historically had three operating segments: (i) the Core segment, which manufactured medical products under the Bovie brand name; (ii) the Original Equipment Manufacturer segment, which produced electrosurgical equipment for large medical device manufacturers; and (iii) the Advanced Energy segment, which manufactured and sold products employing J-Plasma, a patented helium-based plasma surgical product.  Prior to the Class Period, J-Plasma had been approved by the U.S. Food and Drug Administration ("FDA") for the use of skin tightening, but some medical professionals have used it off-label for dermal resurfacing.

15.    In late 2017, the Company pivoted its business to focus on commercializing J-Plasma for the cosmetic surgery market.  To do so, the Company ultimately sold its Core business segment, along with the lucrative Bovie brand name, to focus the organization on its strategic objective of commercializing its J-Plasma/Renuvion technology in the cosmetic surgery market.

### B.    Commencement of the Instant Action and Appointment of Lead Plaintiff and Lead Counsel

16.    On April 17, 2019, Plaintiff Kyle Pritchard filed the initial complaint in this Action, which alleged that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and that the Goodwin violated Section 20(a) of the Exchange Act.  ECF No. 1.

17.    On July 16, 2019, the Court appointed Mr. Mouton to serve as Lead Plaintiff and approved his selection of GPM to serve as Lead Counsel and the Desmond Law Firm, P.C. ("Desmond Law") to serve as Liaison Counsel.  ECF No. 12.

C.    **The Comprehensive Pre-Filing Investigation and Preparation of the Complaint**

18.    Lead Counsel conducted an extensive and detailed pre-filing investigation of Defendants, which included, among other things: (i) reviewing and analyzing the Company's public SEC filings, press releases, earnings calls, various industry conference presentations, and other public statements made by Defendants prior to, during, and after the Settlement Class Period; (ii) working with an expert to analyze price movements of Apyx securities, issues related to market efficiency, losses attributable to the false and misleading statements alleged in the Action and other issues related to loss causation and damages; (iii) retaining and working with a FDA expert regarding FDA submission processes and practices; and (iv) reviewing and analyzing court filings and other publicly available material related to lawsuits filed against Apyx to the use of the J-Plasma laser on patients.

19.    On September 3, 2019, Plaintiffs filed and served the detailed 41-page Complaint, asserting claims under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  ECF No. 29.  Among other things, the Complaint alleges that Defendants made materially false and misleading statements about Apyx's investigational new device exemption study and the results thereof, which formed the basis of an important application submitted to the FDA, known as a 501(k) application. Specifically, the Complaint alleged that certain of Defendants statements were materially false and misleading because they failed to disclose the adverse facts that the IDE study had failed to meet its primary efficacy endpoint, that one of the three investigative centers had fundamentally failed to follow the protocol by providing a steroid to most of its patients, and that this deviating center had far superior results than the other centers that actually followed the protocol.  The Complaint further alleged that the price of Apyx securities were artificially inflated as a result of Defendants' allegedly false and misleading statements and declined when the truth was revealed.

7

### D.    Plaintiffs Defeat Defendants' Motion to Dismiss

20.    On October 3, 2019, Defendants filed their motion to dismiss for failure to state a claim. ECF No. 30. Plaintiffs filed their opposition to Defendants' motion to dismiss on November 4, 2019. ECF No. 34. On November 6, 2019, Defendants moved for leave to file a reply in further support of their motion to dismiss, which Plaintiffs opposed that same day. ECF Nos. 37 & 38. Then, on November 8, 2019, the Court denied Defendants' motion for leave to file a reply. ECF No. 39.

21.    On March 11, 2020, the Court denied Defendants' motion to dismiss in its entirety. ECF No. 40.

22.    On May 1, 2020, Defendants filed and served their answer to the Complaint. ECF No. 50.

### E.    Mediation Efforts, Settlement Negotiations, and Preliminary Approval of the Settlement

23.    Following the denial of Defendants' motion to dismiss, the Parties began to discuss mediating a potential resolution of this Action. After substantial negotiation regarding potential mediators, the Parties ultimately agreed to mediate on June 4, 2020 before Mr. Melnick of JAMS and agreed to update the Court on June 12, 2020 regarding the result of the mediation and whether fact discovery would commence.

24.    To better prepare for the mediation and in case the mediation was unsuccessful, Plaintiffs began preparing for the start of discovery in case.[2] Plaintiffs created a substantial discovery plan, which included, among other things, researching potential deponents and areas of discovery, drafting discovery requests, including requests for documents and interrogatories, and beginning to prepare initial disclosures.

---

[2] All discovery had been stayed automatically pursuant to the PSLRA.

8

25.    Additionally, in advance of the mediation session, Lead Counsel dedicated substantial efforts to preparing a comprehensive and persuasive evidentiary-based mediation statement setting forth the facts relevant to the underlying alleged fraud, analyzing applicable law, and working with relevant experts on damages and loss causation.  The Parties exchanged mediation statements.  Lead Counsel also spent considerable time and effort preparing a confidential mediation communication to Mr. Melnick that responded to Defendants' mediation statement.

26.    On June 4, 2020, Lead Counsel, counsel for Defendants, and Defendants' D&O Insurer met with Mr. Melnick, who presided over a full-day, virtual mediation session. During the mediation session, the Parties engaged in full and frank discussions concerning the merits of this Action, including, for example, on the appropriate length of the class period, and potential damages.  This negotiation process enabled the Parties to meaningfully assess the relative strengths and weaknesses of their respective claims and defenses.  At the end of the session, the Parties agreed in principle to settle the Action for $3 million in cash.

27.    The Parties advised the Court of the agreement-in-principle to resolve the Action on June 12, 2020.  ECF No. 51.

28.    Following additional negotiations, the Parties exchanged multiple drafts of— and ultimately executed—the Stipulation and Agreement of Settlement, dated July 9, 2020. *See* ECF No. 55-1.

29.    On July 10, 2020, Plaintiffs submitted their Unopposed Motion to Reopen Case and for: (I) Preliminary Approval of Class Action Settlement; (II) Certification of the Settlement Class; and (III) Approval of Notice to the Settlement Class.  ECF Nos. 53-53.

30.    On July 21, 2020, the Court entered the Preliminary Approval Order.  ECF No. 56.  The order preliminarily approved the Settlement, conditionally certified the Settlement Class for settlement purposes only, appointed Plaintiffs as Class Representatives,

9

appointed Lead Counsel as Class Counsel, approved the proposed procedure to provide notice of the Settlement to potential Settlement Class Members, and set November 6, 2020 as the date for the final-approval hearing. *Id.* The Settlement Class is defined as:

> all persons and entities who or which, between December 21, 2018 and April 1, 2019, inclusive, purchased or otherwise acquired Apyx Common Stock or Apyx Call Options, or sold Apyx Put Options, and were damaged thereby. Excluded from the Settlement Class are Defendants; the Officers and/or directors of Apyx; Immediate Family members of the Individual Defendant; any person, firm, trust, corporation, Officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

## III.   THE RISKS OF CONTINUED LITIGATION

31.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a cash payment of $3,000,000. As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through class certification, summary judgment, trial and, if successful, the inevitable appeals. These risks, among many others, were carefully considered in evaluating whether the Settlement was in the Settlement Class's best interests. While Plaintiffs were confident in the arguments presented, and the case itself, success was never guaranteed. If Defendants had prevailed in their opposition to class certification, summary judgment, trial or appeals, the entire case could have been lost.

### A.     Risks Faced in Obtaining and Maintaining Class Action Status

32.     Defendants would have argued against class certification. The Parties reached the Settlement before Plaintiffs filed a motion for class certification. While Lead Counsel is confident that all of the Rule 23 requirements would have been met, and that the Court would have certified the proposed class, Defendants would have undoubtedly raised arguments

10

challenging the propriety of class certification.  If the Court accepted any of Defendants anticipated arguments in opposition to class certification that would have created significant hurdles for the proposed class to overcome.

## B.    Risks to Proving Liability

33.    Defendants had a number of arguments that could have prevented a favorable outcome for Plaintiffs and the putative class.  Defendants asserted and would have likely continued to assert, among other things, that Plaintiffs could not allege a material misstatement or omission.

34.    Defendants argued there was no duty to disclose the actual study results at issue because relevant regulations only mandated disclosure within one year of the study's completion.  Moreover, Defendants argued they had not partially disclosed any of the results during the Class Period, which would have triggered a duty to disclose all the results. Defendants thus argued there were no actionable misstatements prior to March 13, 2019 when Defendants responded to the analyst report published by White Diamond Research ("WDR Report") that criticized the Company.  In support of this position, Defendants would have likely pointed to the Court's March 11, 2020 Order on Defendants' motion to dismiss (ECF No. 40), which only addressed the falsity of the March 13, 2019 statements and not any earlier statements, which were dissimilar in the fact that they were not made in response to an analyst report and only stated that the results had been submitted and were positive.

35.    Additionally, Defendants argued that the positive statements regarding the study results largely constituted opinions, and that Plaintiffs could not allege their falsity under *Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund*, 135 S. Ct. 1318, 1326-32 (2015).  First, Defendants argued that Defendants actually held the opinion that the study results were positive, and approval was likely due to the fact that the study had met its secondary endpoints and this had been discussed with the FDA.  Second, Defendants argued

11

that the statements were not expressions of optimism that contained any embedded statements of fact. Third, Defendants argued that the statements did not omit the basis for their opinion because they did believe the study was positive regardless of the primary efficacy endpoint being met and the protocol deviations.

36. Defendants also argued that many of the challenged statements were inactionable puffery. These included statements that the Company was "very pleased" with the study results and "optimistic in receiving regulatory clearance." Moreover, Defendants argued that the PSLRA safe harbors applied to many of the purportedly forward-looking statements at issue and that as such, they were protected from liability because the Company meaningfully cautioned investors about the uncertainty of FDA approval and Defendants did not have "actual knowledge" of their falsity

37. While Plaintiffs disagreed with these arguments and were able to prevail under the motion to dismiss standards, it is far from certain that Plaintiffs would have prevailed at summary judgment and trial in proving falsity.

38. Defendants also argued that Plaintiffs could not demonstrate scienter under the Exchange Act. Defendants argued that Plaintiffs failed to allege (i) a motive to commit fraud, and (ii) intentional fraud or severe recklessness. Specifically, Defendants argued that there was no motive for Defendants to engage in the purported fraud because the truth would ultimately come out when the FDA rendered its verdict on the application, and no corporate insider had made a single insider stock sale during the Class Period. Defendants also pointed to the fact that Plaintiffs had failed to cite a single internal Apyx document or statement from a confidential witness in support of scienter. Moreover, Defendants claimed Plaintiffs' allegations failed to allege that Defendants believed the study would fail because the Company was engaging in a good faith dialogues with the FDA regarding the FDA's

12

concerns and Defendants believed they could obtain FDA approval based on the secondary endpoints alone.

39.    While Lead Counsel believed they had strong factual and legal arguments supporting Plaintiffs' allegations of scienter, there is simply no guarantee that Plaintiffs would have prevailed at summary judgment and trial on this issue after development of the evidentiary record.  Indeed, despite believing that this Action is meritorious, Plaintiffs and Lead Counsel were well aware of the high hurdle they would have to surmount in order to successfully prove that Defendants acted with the requisite mental state to ultimately prove Defendants' liability under the Exchange Act.

40.    In sum, establishing liability was, simply put, a substantial risk, especially because Lead Counsel were unable to know how discovery would proceed and the evidentiary record that would be produced.

### C.    Risks to Proving Loss Causation and Damages

41.    Even assuming Plaintiffs overcame the above risks and successfully established Defendants' liability, Plaintiffs would have confronted considerable challenges in establishing loss causation and class-wide damages.  For example, as discussed above, Defendants raised credible arguments that there were no actionable misstatements prior to March 13, 2019.  If Defendants succeeded in arguing they did not have a duty to disclose the study results prior to March 13, 2019, the class period covered by the Action would be drastically shortened, and, as a result, would have tremendously decreased the total amount of potential damages.  In fact, if Defendants had prevailed on these arguments, the total *maximum* damages available would be $3.6 million, instead of $18.3 million in damages if the entire Class Period remained.

42.    In regards to loss causation, Defendants argued that the WDR Report calling into question the study results was not a proper corrective disclosure for loss causation

13

purposes because it did not reveal anything new about the alleged fraud or correct any prior alleged misstatement.  While Plaintiffs would have argued that the declines in the prices of Apyx's Securities were attributable to corrections of the alleged misstatements and omissions that occurred on February 21, 2019 and April 1, 2019, Defendants would have asserted that much of the decline was due to other negative news, and that even if some portion of the decline in the price of Apyx's Securities was caused by corrective disclosures, damages were minimal.  For example, while the February 21, 2019 WDR Report called into question the results of the study, it also contained other criticisms of the Company and its management that Defendants would certainly argue was the cause of the stock drop.

43.    Plaintiffs would have to proffer expert testimony to prove: (i) what the "true value" of Apyx's Securities would have been had there been no alleged material misstatements and omissions; (ii) the amount by which Apyx Securities were inflated by the alleged material misstatements and omissions; and (iii) the amount of artificial inflation removed by the disclosures on February 21 and April 1, 2019.  Defendants would almost certainly present their own damages expert(s) to present conflicting conclusions and theories regarding the reasons for Apyx Securities price decline on the alleged disclosure dates, requiring a jury to decide the "battle of the experts" – an expensive and intrinsically unpredictable process.

44.    Moreover, expert testimony can often rest on many assumptions, any of which risks being rejected by a jury.  A jury's reaction to such expert testimony is highly unpredictable, and Lead Counsel recognized that, in such a battle, there is the possibility that a jury could be swayed by Defendants' expert(s) and could find only a fraction of the amount of damages Plaintiffs contended were suffered by the Settlement Class.  Thus, the amount of damages that the Settlement Class would actually recover at trial, even if successful on liability issues, was uncertain.  Similarly, there was no assurance that any evidentiary

documents and testimony relating to liability and damages (such that it even existed) would be admitted as evidence by the Court at trial.  These issues could have seriously affected Plaintiffs' ability to successfully prosecute the allegations in this case.

45.     In sum, had any of Defendants' loss causation and damages arguments been accepted at summary judgment or trial, they could have dramatically limited—if not eliminated—any potential recovery.

**D.     Other Risks**

46.     It is also noteworthy that Plaintiffs' hard work led to a relatively early procedural settlement.  Had the case not settled, Plaintiffs would have needed to complete substantial discovery, including reviewing and analyzing documents produced by Defendants and other relevant third parties, taking fact depositions and conducting all expert discovery, the costs of which are assuredly high and the fruits of which are highly uncertain.  Plaintiffs also would have had to prevail at multiple stages in the litigation—motions for class certification and summary judgment, at trial and on the appeals that were likely to follow—if they were to collect anything.  There was substantial risk at each of these stages, and even a victory at trial does not guarantee a recovery.

47.     Lead Counsel know from experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation such as this case is never assured.  In fact, Lead Counsel recently received a negative verdict following a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs.  *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.).

48.     Even if Plaintiffs had prevailed at all of those stages, they would have had to succeed on any appeals that would have surely followed.  This process could have extended

15

for years and might have ultimately led to a smaller recovery—or no recovery at all.  Indeed, even prevailing at trial would not have guaranteed a recovery larger than the $3 million Settlement.

49.    Given these significant litigation risks, Plaintiffs and Lead Counsel believe that the Settlement represents an excellent result for the Settlement Class.

**E.    The Settlement is Reasonable in Light of Potential Recovery in the Action**

50.    In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages.  If Plaintiffs had fully prevailed in each of their claims at both summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Plaintiffs' damages theory, including proof of loss causation as to each of stock price drop dates alleged in this case—*i.e.*, Plaintiffs' ***best-case scenario***, estimated total maximum damages is approximately $18.3 million. Thus, the $3 million Settlement Amount represents approximately 16.4% of the total ***maximum*** damages ***potentially*** available in this Action.

51.    Plaintiffs, taking the above information into account, also recognize that there were significant risks in proving their claims and prevailing in recovering the maximum estimated damages.  As explained above, were Defendants successful in convincing the Court that there were no actionable misstatements prior to March 13, 2019, estimated total recoverable damages would be drastically reduced to $3.6 million.  Under this scenario, the $3 million Settlement represents a remarkable recovery of 83.3%.

52.    Having evaluated the relative strengths and weaknesses of the Action in light of Defendants' arguments, and considering the very real risks presented by the significant hurdles of class certification, summary judgment, trial, and any eventual appeals that would have arisen, it is the informed judgment of Lead Counsel, based upon all of the proceedings

16

to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

## IV. PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE

53.    The Court's Preliminary Approval Order (ECF No. 56) directed that the Postcard Notice be disseminated to the Settlement Class.  The Preliminary Approval Order also set a deadline of October 16, 2020 for the receipt of objections to the Settlement, Plan of Allocation and/or the application for attorneys' fees and expenses or to request exclusion from the Settlement Class, and set a final fairness hearing date of November 6, 2020 (the "Settlement Hearing").

54.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed SCS, the Court-approved Claims Administrator, to begin disseminating copies of the Postcard Notice and to publish the Summary Notice.  Contemporaneously with the mailing of the Postcard Notice, Lead Counsel instructed SCS to post downloadable copies of the Notice and Claim Form online at www.ApyxSecuritiesSettlement.com (the "Settlement Website").  Upon request, SCS mailed copies of the Notice and/or Claim Form to Settlement Class Members and will continue to do so until the deadline to submit a Claim Form has passed.

55.    The Postcard Notice provides a limited description of the Settlement and directs potential Settlement Class Members to downloadable versions of the Notice and Claim Form posted online on the Settlement Website.  The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of Settlement Class Members' right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the application for attorneys' fees and expenses, or to exclude themselves

17

from the Settlement Class.  The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $50,000, which may include an application for reimbursement of the reasonable costs and expenses incurred by Plaintiffs directly related to their representation of the Settlement Class.

56.    To disseminate the Postcard Notice, SCS obtained from Defendants' Counsel, the names and addresses of record holders of Apyx Securities that are potential Settlement Class Members.  SCS disseminated 605 copies of the Postcard Notice to each of these potential Settlement Class Members by first-class mail on August 17, 2020.  *See* Bravata Decl. ¶3.

57.    In addition, SCS maintains a proprietary database with the names and addresses of the largest and most common banks, brokers, and other nominees.  *See id.* at ¶4. At the time of the initial mailing, SCS's proprietary master mailing list consisted of 714 banks and brokerage companies, as well as 599 mutual funds, insurance companies, pension funds, and money managers.  *Id.*  On August 4, 2020, SCS caused the letter to be sent by First-Class Mail or e-mailed to the 1,313 nominees contained in the SCS master mailing list. *Id.*  The letter notified the nominees of the Settlement and requested that, within 7 calendar days from the date of the letter, they either send a Postcard Notice to their customers who may be beneficial purchasers/owners, or provide SCS with a list of names, mailing addresses and email addresses of such beneficial owners so that SCS could promptly mail the Postcard Notice to them.  *Id.*; Ex. 3-B (nominee letter).

58.    As of September 28, 2020, SCS caused 4,980 copies of the Postcard Notice to be sent to potential Settlement Class Members.  Out of the 4,980 Postcard Notices mailed, SCS received 3 requests for the Notice and Claim Form.  *See id.* at ¶7.

18

59. On August 24, 2020, in accordance with the Preliminary Approval Order, SCS caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted once over the *PR Newswire*. *See id.* at ¶8; Ex. 3-C.

60. Lead Counsel also caused SCS to establish the dedicated Settlement Website, which became operational on August 17, 2020, to provide potential Settlement Class Members with information concerning the Settlement, submit a claim online, download copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and the Complaint. *Id.* at ¶10.

61. The deadline for Settlement Class Members to object to the Settlement, Plan of Allocation, and/or to the application for attorneys' fees and expenses, or to request exclusion from the Settlement Class is October 16, 2020. To date, no requests for exclusion have been received. *Id.* at ¶12. SCS will file a supplemental affidavit after the deadline addressing whether any requests for exclusion have been received. To date, no objection to the Settlement, the Plan of Allocation, or the application for attorneys' fees and expenses has been entered on this Court's docket, or has otherwise been received by Lead Counsel. Lead Counsel will file reply papers by October 30, 2020 that will address any objections that may be received.

## V.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

62. Pursuant to the Preliminary Approval Order (ECF No. 56), and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $3 million Settlement Amount plus any and all interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court (which may include reimbursement o Plaintiffs for their costs and expenses incurred in representing the Settlement Class); and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information

19

submitted online or postmarked no later than December 16, 2020. *See* Ex. 3-D (Notice ¶¶ 29, 40, 46); ECF No. 56 at ¶14. The Net Settlement Fund will be distributed among Authorized Claimants according to the proposed Plan of Allocation, as subject to approval by the Court.

63.    The Plan of Allocation is detailed in the longform Notice. *See* Ex. 3-D (Notice, pp. 10-16). The Notice is posted online at www.ApyxSecuritiesSettlement.com, is downloadable, and upon request, will be mailed to any potential Settlement Class Members. The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a proximate result of the alleged violations of the Exchange Act as opposed to losses caused by market, industry, or Company-specific factors or factors unrelated to the alleged violations of law, and takes into consideration when each Authorized Claimant purchased and/or sold Apyx Securities. *See* Ex. 3-D (Notice at ¶¶51-53). As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id.* at ¶52.

64.    The proposed Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act and reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the Action. More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the price of Apyx Securities was artificially inflated during the Settlement Class Period due to Defendants' alleged materially false and

20

misleading statements and omissions. The Plan of Allocation is based on the premise that the decrease in the price or value of Apyx Securities following the alleged corrective disclosures may be used to measure the alleged artificial inflation in the price of Apyx Securities prior to these disclosures. *See id.* at ¶54.

65. Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id.* at ¶70.

66. An individual Claimant's recovery under the Plan of Allocation will depend on a number of factors, including the number of valid claims filed by other Claimants and how many shares of Apyx Securities the Claimant purchased, acquired, or sold during the Settlement Class Period and when that Claimant bought, acquired, or sold the shares. If a Claimant has an overall market gain with respect to his, her, or its overall transactions in Apyx Securities during the Settlement Class Period, or if the Claimant purchased Apyx Common Stock or Apyx Call Options or sold (written) Apyx Put Options during the Settlement Class Period, but did not hold any of those Apyx Securities through at least one of the alleged corrective disclosures, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud. *Id.* at ¶54. Lead Counsel believe that the Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members who submit valid claims.

67. In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in Apyx Securities that were attributable to the conduct alleged in the Complaint.

Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

68.     As noted above, as of September 28, 2020, approximately 4,980 copies of the Postcard Notice, which directs Settlement Class Members to the Settlement Website containing the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Settlement Class Members.  *See* Bravata Decl. at ¶¶2, 7; Ex. 3-A (Postcard Notice).  To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket.

## VI.     LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

69.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying for a fee award of 33⅓% of the Settlement Fund (*i.e.*, $1 million plus interest accrued thereon).  Lead Counsel also request reimbursement in the amount of $37,616.93 for expenses paid or incurred by Lead Counsel in connection with the prosecution and resolution of the Action and awards of $7,500 and $2,500 for Lead Plaintiff Mouton and plaintiff Pritchard, respectively, for their costs, including lost wages, incurred in connection to their roles as representative plaintiffs in the Action.  Thus, the requested Litigation Expenses of $47,616.93 is below the maximum amount of $50,000 set forth in the Postcard Notice, Summary Notice, and the Notice.

70.     As set forth in the accompanying Fee Memorandum, the requested 33⅓% award and the resulting multiplier on Lead Counsel's lodestar of approximately 1.6, are both well within the range of fee awards in other comparable class action settlements and are justified here in light of the extent and quality of Lead Counsel's work.  The legal authorities supporting the requested fees and expenses are set forth in the accompanying Fee

Memorandum.  The primary factual bases for the requested fees and expenses are set forth below.

> **A.     The Outcome Achieved Is the Result of the Significant Time and Labor that Lead Counsel Devoted to the Action**

71.     The work undertaken by Lead Counsel in investigating and prosecuting the Action and arriving at the present Settlement in the face of substantial risks has been time-consuming and challenging.  At all times throughout the pendency of the Action for a period of three years, Lead Counsel's efforts were driven and focused on advancing the Action to bring about the most successful outcome for the Settlement Class, whether through settlement or trial.  As previously summarized at ¶10 above, Lead Counsel's work on this case included, *inter alia*:

a.     conducting an extensive investigation and related review of documents, and legal analysis;

b.     preparing the initial complaint in this matter and the detailed 41-page Complaint;

c.     opposing Defendants' motion to dismiss through comprehensive briefing;

d.     analyzing Defendants' answer and creating a discovery plan, including drafting discovery requests and interrogatories, in case the mediation was unsuccessful;

e.     preparing a detailed evidentiary-based mediation statement addressing liability, loss causation, and damages along with exhibits, and thereafter participating in a full-day mediation session with the experienced and highly respected mediator, Mr. Melnick;

f.     negotiated and drafted the Stipulation, including the exhibits thereto;

g.     preparing the papers in support of, and successfully obtaining, preliminary approval; and

h.     preparing the papers in support of final approval.

72.     Moreover, Lead Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval.  No additional compensation will be sought for this work.

73.      As set forth in Exhibits 4 and 5, respectively, Plaintiffs' Counsel (comprised of Lead and Liaison Counsel) expended a combined 997.45 hours prosecuting this Action, for a collective total lodestar of $609,126.25, as reflected below:

| LAW FIRM: | LODESTAR |
|---|---|
| Glancy Prongay & Murray LLP | $604,356.25 |
| Desmond Law | $4,770.00 |
| TOTAL LODESTAR | $609,126.25 |

74.     The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation.  Additionally, the rates billed by Lead Counsel (ranging from $675-945 per hour for partners, $375-575 per hour for associates, and $395 for project attorneys) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude.  *See* Ex. 7 (table of peer firm billing rates).

75.     Based on the work performed and the quality of the results achieved, Lead Counsel respectfully submits that a 33⅓% fee is fully merited under the "percentage of the fund" methodology.  Furthermore, as set forth below, though not required in the Eleventh Circuit, we also respectfully submit that the requested fee is fully supported by a "lodestar multiplier cross-check."

76.     The requested 33⅓% attorneys' fee (which equates to $1,000,000, plus interest at the rate earned by the Settlement Fund) represents a 1.6 lodestar multiple compared to the base lodestar value of counsel's time. As shown in Lead Counsel's accompanying Fee Memorandum, such a multiplier is below the range of multipliers that courts often award in comparably complex securities class actions.  Where (as here) the

24

requested fee amounts to a 1.6 multiplier on Lead Counsel's total lodestar time, the lodestar cross-check fully supports the requested fee.

77.    These substantial efforts resulted directly in the significant Settlement obtained for the benefit of the Settlement Class and, accordingly, this factor weighs strongly in favor of the requested 33⅓% award of attorneys' fees.

### B.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases

78.    This prosecution was undertaken by Lead Counsel on a pure contingency fee basis.  From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of even being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and to cover the considerable litigation costs required by a case like this one.

79.    With an average lag time of many years for complex cases like this case to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel received no compensation during the course of the Action and incurred $37,616.93 in litigation-related expenses in prosecuting the Action.

80.    Lead Counsel also bore the risk that no recovery would be achieved.  As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever.  Despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured.  Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop

the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

81.     Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 n.4 (2007) ("private securities litigation is an indispensable tool with which defrauded investors can recover their losses – a matter crucial to the integrity of domestic capital markets.") (internal quotation marks omitted).   As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting the interests of shareholders.  If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

C.     **The Experience and Expertise of Lead Counsel, and the Standing and Caliber of Defendants' Counsel**

82.     As demonstrated by the firm resume attached hereto, Lead Counsel has extensive and significant experience in the specialized area of securities litigation.  Ex. 4-C (GPM firm résumé).   The attorneys who were principally responsible for leading the prosecution of this case have prosecuted securities claims throughout their careers and have recovered tens of millions of dollars on behalf of investors.  This experience allowed Lead Counsel to develop and implement litigation strategies to address the complex obstacles that are inherent in securities class actions and those specific to this case that were raised by Defendants.  I believe that the recovery achieved here for the Settlement Class reflects the high quality of Lead Counsel's representation.

26

83.     Additionally, the quality of the work performed by Lead Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition.   Here, Defendants were represented by Cleary Gottlieb Steen & Hamilton LLP and then Freshfields Bruckhaus Deringer LLP, internationally-renowned law firms that vigorously represented the interests of their clients throughout this Action.   In the face of this experienced and formidable opposition, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms favorable to the Settlement Class.

**D.     The Reaction of the Settlement Class Supports Lead Counsel's Fee Request**

84.     As noted above, as of September 28, 2020, approximately 4,980 Postcard Notices have been mailed advising Settlement Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund.   *See* Bravata Decl. ¶7; Ex. 3-D (Notice at ¶5).   In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted once over the *PR Newswire*.   *See* Bravata Decl. ¶8; Ex. 3-C (confirmations of Summary Notice publications).   To date, no objections to the attorneys' fees maximum set forth in the Notice have been received or entered on this Court's docket.   Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers to be filed on October 30, 2020.

85.     In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted the case without any compensation or guarantee of success.   Based on the result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submit that a fee award of 33⅓%, resulting in a multiplier of 1.6 is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

### E.    Plaintiffs Support Lead Counsel's Fee Request

86.    As set forth in the declarations submitted by Lead Plaintiff Gregory P. Mouton and plaintiff Kyle Pritchard, Plaintiffs have concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action. *See* Ex. 1 (Mouton Decl. ¶8); Ex. 2 (Pritchard Decl. ¶7). Lead Counsel have represented Mr. Pritchard since before the inception of the Action and Mr. Mouton since before filing the motion for appointment for lead plaintiff on his behalf. Since that time, both Plaintiffs have been intimately involved in this case since its earliest stages, and their endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

### F.    Reimbursement of the Requested Litigation Expenses Is Fair and Reasonable

87.    Lead Counsel seeks a total of $47,616.93 in Litigation Expenses to be paid from the Settlement Fund. This amount includes $37,616.93 in expenses reasonably and necessarily incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action; as well as a total of $10,000 for the costs, including lost wages, and expenses incurred by Plaintiffs directly related to their representation of the Settlement Class. I respectfully submit that the request for reimbursement of Litigation Expenses is appropriate, fair, and reasonable and should be approved in the amounts submitted herein.

88.    From the inception of this Action, Lead Counsel were aware that they might not recover any of the expenses they incurred in prosecuting the claims against Defendants, and, at a minimum, would not recover any expenses until the Action was successfully resolved. Lead Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate Lead Counsel for the lost use or

28

opportunity costs of funds advanced to prosecute the claims against Defendants. Thus, Lead Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

89.     In Lead Counsel's opinion, the expenses paid were necessary and appropriate for the prosecution and resolution of this Action. A list of the payments by category is set forth below:

| ITEM | AMOUNT |
|---|---|
| EXPERTS | $21,547.00 |
| MEDIATION COSTS | $12,550.00 |
| PSLRA NOTICE | $120.00 |
| COURT FILING FEES | $1,100.00 |
| LEGAL RESEARCH | $2,299.43 |
| COURIER/POSTAGE | $0.50 |
| TOTAL | $37,616.93 |

90.     As set forth in the chart above, the largest expense was for the retention of experts $21,547.00 or 57.3% of the total expenses—one in the field of FDA application processes and procedures, and two in the field of damages, loss causation and market efficiency. These experts were consulted at different points throughout the litigation, including on matters related to the preparation of the Complaint, on matters relating to the negotiation of the Settlement, and on preparation of the proposed Plan of Allocation.

91.     Finally, Lead Plaintiff Mouton and plaintiff Pritchard seek reimbursement of their reasonable costs and expenses incurred directly in connection with representing the Settlement Class in the amount of $7,500 and $2,500, respectively. The substantial effort devoted to this Action by Plaintiffs is detailed in their accompanying declarations. *See* Ex. 1 (Mouton Decl. at ¶¶3-6); Ex. 2 (Pritchard Decl. at ¶¶3-5). Based on the work done by Plaintiffs for the benefit of the Settlement Class, we believe that the Court should grant the Plaintiffs' request in full.

## VII.   CONCLUSION

92.     In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Memorandum, we respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of Allocation should be approved as fair and reasonable.   We further submit that the requested fee in the amount of 33⅓% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of total Litigation Expenses in the amount of $47,616.93 (which includes $10,000 for Plaintiffs' costs) should also be approved.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 2nd day of October, 2020, at Los Angeles, California.

_s/ Casey E. Sadler_
CASEY E. SADLER